**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

CINTHIA THEVENIN,

         Plaintiff,

   - v -            Civ. No. 1:16-CV-1115
                  (DJS)

CITY OF TROY and
SERGEANT RANDALL FRENCH,

         Defendants.

**APPEARANCES:**        **OF COUNSEL:**

HACH & ROSE, LLP       MICHAEL A. ROSE, ESQ.
Attorneys for Plaintiff
185 Madison Avenue, 14th Floor
New York, NY 10016

HARFENIST KRAUT &      STEVEN J. HARFENIST, ESQ.
PERLSTEIN LLP        NEIL S. TORCZYNER, ESQ.
Attorneys for Plaintiff
3000 Marcus Avenue, Suite 2E1
Lake Success, NY 11042

FITZGERALD MORRIS BAKER FIRTH JOHN D. ASPLAND, ESQ.
Attorneys for Defendants      ASISH NELLUVELY, ESQ.
16 Pearl Street
P.O. Box 2017
Glens Falls, NY 12801

**DANIEL J. STEWART
United States Magistrate Judge**

## **MEMORANDUM-DECISION & ORDER**

### **I. INTRODUCTION**

On September 13, 2016, Cinthia Thevenin, the wife and Administratix of the Estate

of Edson Thevenin, filed a Complaint against the City of Troy and Randall French, a Sergeant with the City of Troy Police Department. Dkt. No. 1, Complaint ("Compl."), *generally*. In her Complaint, she alleges that on April 17, 2016, Mr. Thevenin was shot and killed by Sgt. French. *Id.* Discovery and evidentiary issues have now arisen in this civil rights action: in particular, Plaintiff seeks to compel production of statements made by Sgt. French to other police personnel at a Critical Incident Stress Debriefing ("CISD"). Dkt. No. 49, Plaintiff's Letter-Brief ("Pl.'s Letter-Brief"). She also seeks production of three police reports that Sgt. French prepared, but never submitted to the Police Department ("the Reports"). *Id.* Counsel for Defendants object to the inquiry regarding Sgt. French's statements at the CISD, upon the grounds that they are covered by the psychotherapist-patient privilege or are otherwise protected by an expectation of privacy. Dkt. No. 53, Defendants' Letter-Brief ("Defs.' Letter-Brief"). Defendants also object to production of the Reports because, according to Sgt. French's criminal defense counsel, they were prepared at the direction that defense counsel, and are therefore protected from disclosure by the attorney-client privilege or the attorney work product doctrine. *Id.* The Police Reports, together with the transmittal email, have been provided to the Court, which has conducted an *in camera* review. For the reasons that follow, Defendants' claim of privilege is rejected, and Plaintiff's Motion to Compel (Dkt. No. 49) is **granted**.

## II. DISCUSSION

### A. Statements at the CISD

In the course of their duties, police officers and first responders are likely to

experience critical incidents, including the death or injury of a coworker; taking a life or causing serious injury in the line of duty; surviving a major natural or man-made disaster; witnessing or handling multiple fatalities; or participating in ahigh-speed pursuit that ends in tragedy. *See*, *The FBI's Critical Incident Stress Management Program*, V.J. McNally & R.M. Soloman, 68 FBI LAW ENFORCEMENT BULLETIN (Feb., 1999), at 20-26. In 1974, in an effort to deal with the exposure to these dramatic incidents, Jeffrey Mitchell, PhD created the Critical Incident Stress Debriefing Process, which was designed to "inform and empower" the paramedics, police, and firefighters who were exposed to such events. Jeffrey T. Mitchell, *Critical Incident Stress Debriefing (CISD)*, INFO-TRAUMA, p. 2, http://www.info-trauma.org/flash/media-f/mitchellCriticalIncidentStressDebriefing.pdf (last visited Mar. 1, 2018). The debriefing typically occurs 24 to 72 hours after the incident. *Id*. "A CISD attempts to enhance resistance to stress reactions, build resiliency or the ability to 'bounce back' from a traumatic experience and facilitate both a recovery from traumatic stress and a return to normal, healthy functions." *Id*.

It is clear that the CISD, which has been widely adopted by police and other agencies, varies in its particular form from organization to organization. For example, as originally developed by Dr. Mitchell, the CISD facilitation would include both peer support personnel as well as a mental health professional. *Id.* Other programs, such as the one utilized by the Troy Police Department, are designed to be an intermediary between the officer and mental health professionals, and the program itself does not include licensed providers. Dkt. No. 49-9, General Order No. 03.26, Peer Support Services ("General Order"). As stated in the

General Order, peer support services are provided by the Peer Support Team who, while trained, are "not counselors or therapists." *Id.* at ¶ II.A. "The program assists employees and members who initially may be reluctant to receive professional mental health assistance, or who need a third-party intermediary to assist them during stressful times." *Id.* at ¶ II.D.

In the present case, after the shooting death of Mr. Thevenin, a stress debriefing was held, which included Sgt. French, Officer Christopher Parker, and Officer Brandon Galligan. Dkt. No. 49-7, Deposition of Christopher Parker, dated Aug. 15, 2017 ("Parker Dep."), at pp. 66-67; Dkt. No. 49-8, Deposition of Brandon Galligan, dated Aug. 15, 2017 ("Galligan Dep."), at pp. 23-24.[1] When the two nonparty Police Officers were questioned concerning their recollection of statements made by Sgt. French during the CISD, both Officers raised concerns about violating the confidentiality of the meeting, and the attorneys agreed to seek a ruling from the Court. *Id.*

Plaintiff's position is easily stated: that there is no established federal privilege that would bar the disclosure of what the named Defendant said to fellow Officers about the incident which forms the basis of this federal civil rights action. Pl.'s Letter-Brief at pp. 6-8. Defendants, on the other hand, emphasize the importance of confidentiality to secure the effectiveness of the CISD, and specifically point to the provision of the Peer Support Services Program that notes that discussions that take place shall be "considered

---

[1] Only very limited information was provided to the Court regarding the nature of this debriefing session, and the only people identified were the three officers. As noted by Officer Galligan: "Quite honestly, I don't remember much from the stress debrief. There wasn't many people there. It was kind of quick, in and out. I said what I had to say and left." Galligan Dep. at p. 23.

*-4-*

confidential," a point that is reiterated at the beginning of each session. Dkt. No. 53, Defs.' Letter-Brief at pp. 4-5; General Order at ¶¶ III.E.1. & 3.

"It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987). Where, as here, challenges have been asserted against the withholding of allegedly privileged documents, the mere production of a privilege log is insufficient to defeat those challenges, and instead the proponent of the privilege must submit evidence by way of affidavit, deposition testimony or otherwise, to establish every element of the privilege. *Id.* at 146. This is an important burden, because as noted by the Supreme Court: "[T]hese exceptions to the demand for every man's evidence are not lightly created nor expansively constructed, for they are in derogation of the search for the truth." *United States v. Nixon*, 418 US 683, 710 (1974). Thus, Defendants first have the burden of showing, through admissible evidence and in accordance with federal common law, that the privilege in question is applicable.

The starting point of the Court's analysis is the Supreme Court's decision in *Jaffee v. Redmond*, 518 U.S. 1 (1996), a case that also involved a police officer shooting. During discovery in *Jaffee*, counsel for the decedent's estate learned that the officer involved attended counseling sessions with a licensed social worker provided to her by her employer. *Id.* at 5. Plaintiff's attempt to obtain the social worker's notes regarding what the officer claimed happened, however, was ultimately blocked by the Supreme Court, which held that the notes were protected from discovery under a psychotherapist-patient privilege recognized

by Federal Rule of Evidence 501. *Id.* at 10. In reviewing the essential need for such a privilege in the area of mental health treatment, the Supreme Court noted that protecting disclosure of communications between a patient and a licensed counselor or psychotherapist would improve such treatment and protect the public good, especially with regard to treatment sought by police officers: "The entire community may suffer if police officers are not able to receive effective counseling and treatment after traumatic incidents, either because trained officers leave the profession permanently, or because those in need of treatment remain on the job." *Id.* at 11-12 n.10.

Although not defining its full nature, the Supreme Court was clear that the psychotherapist-patient privilege that it was identifying was to be limited in nature, and was not meant to encompass all communications with medical care providers. Indeed, the physician-patient privilege has not traditionally been recognized under federal common law, despite the fact that such a privilege has been codified under New York State law.[2] *EEOC v. Nichols Gas & Oil, Inc.*, 256 F.R.D. 114, 119 (W.D.N.Y 2009). The Supreme Court held that the psychotherapist-patient privilege is only available to *licensed* psychotherapists or *licensed* social workers,[3] and as to them, only for statements made during the course of

---

[2] The psychotherapist-patient privilege was one of the nine specific privileges that the Advisory Committee recommended be listed in the earlier draft of Fed. R. Evid. 501 (defining non-constitutional privileges to be recognized as: required reports, lawyer-client, psychotherapist-patient, husband-wife, communications to clergymen, political vote, trade secrets, secrets of state and other official information, and identity of informer), but was ultimately rejected, though "not [to be] understood as disapproving any recognition of a psychiatrist-patient . . . privileg[e]." *Jaffee v. Redmond*, 518 U.S. at 14-15; FED. R. EVID. 501 advisory committee note.

[3] In New York, the privilege only applies to licensed (formerly "certified") social workers. N.Y. CPLR 4508 (2004); *Shane 'NM' v. Family and Children Services*, 280 A.D. 2d 699, 700 (3d Dep't 2001) (finding no privilege where social worker was not certified).

treatment. *Jaffe v. Redmond,* 518 U.S. at 15-17. This dictate has been adopted by courts within this circuit. *United States v. Parker*, 116 F. Supp.3d 159, 179 (W.D.N.Y. 2015) (finding statements made to police by defendant in a hospital, and in front of his mental health providers, not covered by the privilege); *Nichols Gas & Oil, Inc.,* 256 F.R.D. at 119-20 (W.D.N.Y. 2009) (limiting privilege to licensed mental health professionals); *Lennon v. Seaman*, 2002 WL 109525, *5 (S.D.N.Y. Jan. 28, 2002) (finding no privilege existed where defendant did not provide the court with any evidence that the individual plaintiff spoke with was a licensed mental health professional); *see also United States v. Witt,* 542 F. Supp. 696, 698-699 (S.D.N.Y. 1982) (determining that statements to a physician whose specialty was obstetrics, and who did not profess to be a psychologist or psychiatrist, would not be privileged), *aff'd without op.*, 697 F.2d 301 (2d Cir. 1982).

Defendants rely primarily upon the Ninth Circuit case of *Olesko v. State Compensation Ins. Fund*, 243 F.3d 1154 (9th Cir. 2001), which held that certain Employee Assistance Program employees who had been trained in mental health issues, and had backgrounds in psychology or social work, but who were not formally licensed, were within the scope of the psychotherapist privileged announced in *Jaffee*. Other courts have been particularly critical of that view. *E.g., United States v. Whitney*, 2006 WL 2927531 (D. Mass. 2006) ("Given the [Supreme] Court's express use of the term 'licensed,' and in light of the vigorous dissent . . . it seems clear that the privilege does not apply to social workers, counselors, clinicians, advocates, and other counseling personnel who are not licensed, even if they are performing therapeutic functions.").

This Court need not provide a definitive answer concerning what, if any, limited exceptions to the licensure requirement of the privilege exist, such as where the social worker is not licensed but the patient reasonably believes he or she is, *Speaker v. Cty. of San Bernardino*, 82 F. Supp.2d 1105, 1114 (C.D. Cal. 2000), or where the nonlicensed individual was working under the supervision or direction of a licensed mental health provider and the individual's work was critical to the mental health treatment, *United States v. Lowe*, 948 F. Supp. 97, 99-100 (D. Mass. 1996), because none of those situations are present in this case. Here, the sole information presented to the Court was that the CISD was attended by three police officers. There is no evidence that any caseworker or mental health professional, or even someone who held themselves out as such, was present or a participant in the stress debriefing. Indeed, the policy for the Troy program specifically provides that it *does not* include counselors or therapists. General Order at ¶¶ II.A.1. Thus, any reliance upon *Olesko* is misplaced.

Defendants' position appears to be that because the Peer Support Services Program made reference to confidentiality, that Sgt. French had an expectation of privacy in disclosures made during the course of that CISD, and that such an expectation must be enforced to this Court. This argument is misplaced for several reasons. First, the general rule is that a litigant is entitled to all relevant evidence, and there is no caveat in circumstances where a party may have a reasonable expectation of privacy not otherwise covered by an established privilege. *See*, *e.g.*, *U.S. v. Nixon*, 418 U.S. at 709-10 ("[E]xceptions to the demand for every man's evidence are not . . . expansively construed").

For example, a party may unburden himself to a friend or coworker with the reasoned expectation that his statements would be kept in confidence. Absent a privilege-invoking position such as attorney, licensed therapist, or priest, however, that coworker or friend could not resist providing relevant information in a federal civil rights lawsuit on the grounds that there was an expectation that what was said would remain private. In other words, there is no general federal privilege based upon an expectation of privacy.

Second, the very General Order upon which Defendants rely is not categorical in creating an expectation of privacy, and by its very terms creates significant exceptions to its general confidentiality. The General Order provides:

> E. Confidentiality:
> 1. Discussions that take place involving peer services session shall be considered confidential between the parties, unless: . . .
> c. The individual seeking peer services is known to be directly involved in an incident which is under investigation . . .

General Order, ¶ III.E.1.

While it is true that courts have split in circumstances where a police officer is *mandated* to obtain post-shooting mental health counseling (which is not the case here, *see* General Order, ¶ III.D.1.), these cases all involve situations where the psychotherapist-patient privilege would otherwise apply as a result of the involvement of a licensed psychotherapist or counselor. *Compare Caver v. City of Trenton*, 192 F.R.D. 154, 162 (D. N.J. 2000) (holding that privilege applied to records relating to mandatory post-shooting evaluation where only a finding as to whether the officer was fit for duty was disclosed by psychologist to the police chief), *with Kamper v. Gray*, 182 F.R.D. 597, 598 (E.D. Mo. 1998) (finding no

privilege where officer knew that mandatory post-shooting evaluations would be given to his employer, and therefore officer had no reasonable expectation of confidentiality). In other words, the expectation of privacy was a secondary inquiry in those cases *after* the police officer had established that treatment was provided by a licensed professional. Here, that first critical element has not been established. The fact that the General Order of a Police Department may make reference, in a limited fashion, to an expectation of privacy is insufficient to create a federal privilege.[4]

The Court is not unmindful of the importance of confidentiality in therapy sessions, and for similar reasons, in these critical incident stress debriefings. It may well be that the fact that statements made in a Peer Support Program are discoverable in Federal Court could negatively impact the willingness of participants to be fully candid. However, the Court must apply the psychotherapist-patient privilege in the limited manner mandated by the Supreme Court; it cannot extend it to a debriefing session between fellow police officers based upon the Court's recognition of the benefits of such debriefings. If it is imperative that a federal privilege apply, police departments have several options. For example, they could include licensed therapists within the program, as that has generally resulted in a finding of privilege and prevented disclosure. *Utter v. Thompson*, 2013 WL 875506, *2 (D. Kan. Mar.

---

[4] The Second Circuit case of *Cox v. Miller* presented similar privacy and public interest concerns. That matter dealt with statements made during the course of an Alcoholics Anonymous ("A.A.") therapy session, during which time Cox confided with seven different individuals that he had killed a married couple in 1988. The Second Circuit rejected Cox's claim that his disclosure was protected by New York's cleric-congregant privilege. *Cox v. Miller*, 296 F.3d 89, 111 (2d Cir. 2002). The Second Circuit also addressed the concept of privilege due to the confidentiality component of A.A., which had been referred to as a "*sin qua non* of its therapeutic efficiency as a program for recovering alcoholics." *Id.* at 112. Ultimately, the Court concluded that it would be for the New York State Legislature to create such a privilege, which it had not done, and that therefore Cox's comments to fellow A.A. members was not covered by any recognized privilege.

7, 2013) (holding that portions of a critical incident stress debriefing prepared by psychologist was covered by the privilege); *James v. Harris Cty.*, 237 F.R.D. 606, 612 (S.D. Tex. 2006) (holding that privilege would apply to mandatory post-shooting counseling sessions with a licensed social worker). In addition, police officers and first responders may engage individually with a licensed therapist or a licensed social worker, which would ensure the privilege.

The Court does note that, while not reaching a majority, numerous states (although not New York) have created a privilege for such debriefings.[5] The fact that states have created such a privilege, however, is not necessarily determinative of any federal right.

In light of the foregoing, the Court concludes that the statements made by Sgt. French to his fellow officers at the CISD are not protected from disclosure under the psychotherapist-patient privilege, and accordingly, Plaintiff's Motion to Compel is **granted** in that regard.

---

[5] *See* Ark. Code §16-40-106 (2013) ("Privileged Communications Made to a Certified Peer Support Member by an Emergency Responder"); Ariz. Rev. Stat. § 38-1111 (2015) ("Critical Incident Stress Management Team Member; Privilege; Exceptions; Definitions"); Del. Code tit. 10, § 4319 (2017) ("Confidential Communications Involving First Responders"); Haw. Rev. Stat. § 78-52 (2003) ("Peer Support Counseling; Sessions"); Iowa Code § 622.10 (2015) ("Communications and Professional Confidence"); La. Code Evid., Art. 518 (2003) ("Trained Peer Support Member Privilege"); Me. Rev. Stat. tit. 25, § 4202 (2009) ("Critical Incident Stress Management Teams"); Mich. Comp. Laws § 333.20982 (2016) ("Confidentiality of Communication or Records"); Miss. Code §13-1-22.1 (2006) ("Certified Peer Support Member or Peer Support Event; Definitions; Privileged Communications"); Mont. Code § 39-74-105 (2009) ("Critical Incident Meetings Closed–Confidentiality–Exceptions"); N.D. Cent. Code § 32-03-50 ("Confidentiality of Critical Incident Stress Management Team Proceedings and Records"); Neb. Rev. Stat. § 71-7112 ("Confidentiality of Information"); N.H. Rev. Stat. § 153-A:17-a (2013) ("Critical Incident Intervention and Management"); N.M. Stat. Ann. § 24-10B-4.1 (2003) ("Records Confidentiality"); Ohio Rev. Code § 2317.02 (2017) ("Privileged Communications and Acts"); Okla. Stat. tit. 12, § 2506.2 (2008) ("Peer Support Counseling Confidentiality"); 42 Pa. C.S.A. § 5950 (2010) ("Confidential Communications Involving Law Enforcement Officers"); S.C. Code § 23-3-85 (2016) ("Confidential Communications"); S.D. Codified Laws § 34-50-4 (2018) ("Confidentiality of Communication to or Record of Critical Incident Stress Management Team or Peer Support Team"); Tenn. Code § 10-7-504 (2017) ("Confidentiality of Certain Records"); Tex. Health & Safety Code § 784.003 (2011) ("Confidentiality"); Va. Code § 19.2- 271.4 (2017) ("Privileged Communications by Certain Public Safety Personnel").

### B. The Police Reports

*1. Attorney-Client Privilege*

The attorney-client privilege is a longstanding, common law privilege recognized by the Federal Courts under Federal Rule of Evidence 501. This privilege encourages full engagement between a party and his or her attorney so that full and frank communication exists to impart all the information an attorney may need in order to give sage and cogent advice on a matter. *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998); *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir. 1989) ("[The] communications between attorney and client endures as the oldest rule of privilege known to the common law."). Stated another way, its essential purpose is to encourage clients to be fully forthcoming with their attorney and to receive, in return, advice that will protect the clients' legal rights. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

When determining if there is in fact an attorney-client privilege present to cloak the client's communication and the corresponding legal advice, a court restricts its protection to only those communications "(1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia,* 655 F.3d 126, 132 (2d Cir 2011). The attorney-client privilege is not given broad, unfettered latitude to every communication with a lawyer, but is to be narrowly construed to meet this narrowest of missions. *Fisher v. United States*, 425 U.S. 391, 403 (1976) ("However, since the privilege has the effect of withholding relevant information from the fact-finder, it applies only where necessary to achieve its purpose.");

*see also In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) (privilege ought to be "strictly confined within the narrowest possible limits consistent with the logic of its principle").

The Reports submitted by Defendants for an *in camera* review consist of a two-page Post Pursuit Report, a five-page Response to Resistance Report, and a one-page Supplemental Report. All of these Reports contain a narrative section prepared by Sgt. French relating to the events of April 17, 2016. All of the Reports are prepared on City of Troy Police Department official forms. They contain the Officer's name but, because they were never submitted, they are unsigned. According to the deposition testimony, the regulations of the Troy Police Department require a police officer to complete such forms any time force is used, so long as the officer is able to do so.[6] Dkt. No. 49-1, Deposition of Randall French, dated July 28, 2017 ("French Dep."), at pp. 89, 92, & 96. Sgt. French prepared the Reports on his home computer, utilizing a thumb drive that he carries with him for work that contains all the Troy Police forms on it, so that he may access them anywhere. *Id*. at p. 94. While Sgt. French in his deposition could not definitively state when the Reports were prepared, the privilege log provides a date of April 25, 2016, which would have been after Sgt. French testified in the grand jury, but a mere eight days after the shooting. *Id*. at p. 96; Dkt. No. 49-5, Privilege Log. Sgt. French testified that he never discussed with an attorney whether to fill out the Response to Resistance Report prior to its creation, and in fact no attorney has advised him not to fill out the report. French Dep. at p. 91. Nevertheless,

---

[6] According to Defendants, Sgt. French had been on medical leave from the time of the shooting, at least until the time of his deposition. Defs.' Letter-Brief at pp. 1-2. However, those medical issues did not prevent him from preparing the Reports, as established by the fact that he did prepare them.

*-13-*

he provided his police Reports by email to his private counsel, Mr. Safranko, for his review and *thereafter* they discussed it. *Id.* at p. 97. Sgt. French has never been asked by his supervisors to complete and file these official forms, but as noted above he was called to testify in a Rensselaer County Grand Jury *Id.* at pp. 90 & 95.

According to the Affidavit submitted by Attorney Safranko, he directed Sgt. French to prepare the Reports. Accordingly, Attorney Safranko maintains that these draft official Reports of the Troy Police Department are subject to, and protected by, the attorney work product and attorney-client privileges. Dkt. No. 53-1, Affidavit of Andrew R. Safranko, Esq., dated Jan. 2, 2018, at ¶¶ 2-7. Ultimately, however, it is the Court's determination of the nature of the document, and not counsel's characterization, that is determinative.

Under Supreme Court Standard 503(a)(4),[7] "[a] communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." However, if "[w]hen at the time the client communicates information to the lawyer the client does not have a reasonable expectation that the information will remain confidential, the attorney client privilege does not attach to the communication." Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence Manual, § 18.03[2][d], LexisNexis, ed., 2017. As the Second Circuit has noted, the attorney-client privilege "protects communications between a client and an attorney, not

---

[7] Although not incorporated into the Federal Rules of Evidence, the United States Supreme Court promulgated Standard 503, as a proposed rule covering the attorney-client privilege. Federal Courts have considered it an accurate statement of the common-law governing the privilege. *See in re Bieter Co.*, 16 F.3d 929, 935 (8th Cir. 1994).

communications that prove important to an attorney's legal advice to a client." *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999).

As noted above, it is the proponent's responsibility to establish the grounds for the privilege. In this case, the issue turns upon whether Sgt. French has established that the documents in question were intended to be, and remain, confidential. In the Court's view, Defendants fail to meet their burden and demonstrate that the Police Reports in question were intended to be confidential. It appears, rather, that they were created as a result of Sgt. French's employment obligations. While the forms may have been sent, *after their creation by Sgt. French*, to his private attorney, that fact alone does not change the analysis. *Anderson v. Marsh,* 312 F.R.D. 584, 591 (E. D. Cal. 2015) ("While any communication from general counsel regarding the review of the reports would fall within the attorney-client privilege, the fact that general counsel reviews the documents created during the investigation is not sufficient to entitle them to attorney-client privilege.") (collecting cases). Critical to the Court's analysis is the fact that when Sgt. French filled out the forms it was his understanding that they were required as part of his job responsibilities, and thus would not be confidential. That conclusion is underscored by the fact that Sgt. French utilized official forms of the police department which he carried on an external disk drive for the very purpose of his work. While it is true that, for what ever unexplained reason, the City of Troy Police Department did not require Sgt. French to ever file the Reports, as is their policy, this failure does not change the genesis for the creation of the Reports. Defendants' attempt to characterize what are clearly police records as items that were "not prepared for any business

purpose," Defs.' Letter-Brief at p. 3, is simply insufficient to establish the privilege. *See In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F. 2d 223, 224-25 (2d Cir. 1984) (". . . burden not discharged by mere conclusory or ipse dixit assertions.").

Further, the documents also do not disclose or contain anything of a confidential nature. The email in question was merely a transmittal email attaching the Reports. The documents themselves do not disclose any attorney-client communication. There are no markups, redlining, or notes in the margin, from which anyone could devise any thought process between attorney and client. *Compare*, *Ideal Elec. Co. v. Flowserve Corp.*, 230 F.R.D. 603, 607-608 (D. Nevada, 2005) (upholding attorney-client privilege where draft affidavits contained communications between attorney and his client with respect to how the facts should be presented, including changes to the drafts). Considering the above, Attorney Safranko's affirmation that he instructed Sgt. French to prepare the Reports, particularly where Sgt. French testified that he was not instructed to prepare the Response to Resistance Report by his attorney, is insufficient to meet Defendants' burden. *See* French Dep. at pp. 91 & 97.

### 2. Work Product Privilege

The work product doctrine is not a privilege, but a qualified immunity that protects documents and tangible things from being disclosed during discovery that have been prepared by a party or his representative in anticipation of litigation. *Hickman v. Taylor*, 329 U.S. 495, 511 (1947). The federal work product doctrine established in *Hickman* is now codified in Rule 26 of the Federal Rules of Civil Procedure. As noted by the Second Circuit:

> Both "distinct from and broader than the attorney-client privilege," the work product doctrine permits discovery of "documents and tangible things" prepared by or for counsel in anticipation of civil litigation "only upon a showing that the party seeking discovery has substantial need of the materials ... and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means[.]"

*In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F. 3d 379, 383 (2d Cir. 2002) (internal citations omitted) (citing *U.S. v. Nobles*, 422 U.S. 225, 238 n. 11 (1975); FED. R. CIV. P. 26(b)(3)).

Materials prepared by a non-attorney may constitute work product, and are protected from disclosure if they are "prepared exclusively and in specific response to imminent litigation." *Willis v. Westin Hotel Co.*, 1987 WL 6155, *1 (S.D.N.Y. Jan. 30, 1987). The materials must have been created "*because of* the prospect of litigation." *United States v. Adlman*, 134 F.3d 1194, 1202-03 (2d Cir. 1998). The burden of demonstrating that the materials are not subject to disclosure is on the party resisting production. *Fustok v. Conticommodity Servs., Inc.*, 106 F.R.D. 590, 591 (S.D.N.Y. 1985). "[D]ocuments prepared in the ordinary course of business or that 'would have been created in essentially similar form irrespective of the litigation are not protected by the work product doctrine.'" *Calabro v. Stone*, 225 F.R.D. 96, 99 (E.D.N.Y. 2004) (quoting *United States v. Adlman*, 134 F.3d at 1202). Indeed, "[a] document is not privileged merely because it was sent or received between an attorney and client." *Sokol v. Wyeth, Inc.*, 2008 WL 3166662, *5 (S.D.N.Y. Aug. 4, 2008).

Initially, as noted extensively above, the Police Reports were prepared pursuant to the

normal police practices. French Dep. at p. 89 (describing that, pursuant to Troy Police Department policy, unless an officer is injured and cannot prepare the Reports, he or she is required to complete the Reports.). Second, the Court observes from its *in camera* review of the documents that the Reports were prepared on official Troy Police Department forms. Moreover, according to Defendants' Privilege Log, Sgt. French prepared the Reports only eight days after the incident, which is also consistent with the Reports having been prepared pursuant to normal practices. *See* Privilege Log. The fact that officers are required to create the Reports at issue, in this form, is highly suggestive that these are not the types of documents that are properly shielded pursuant to a privilege. *See Vessalico v. Costco Wholesale Warehouse*, 2016 WL 3892403, *2 (E.D.N.Y. July 14, 2016) (finding that "it was 'clear from the nature of the document that it was prepared as part of the regular procedure of the defendant when incidents such as the one here occur,'" in part because "the Accident Report appears to be a standard form that is completed in the ordinary course of business whenever an accident occurs on Defendant's property.").

The Eastern District of California, presented with this same work product argument relating to similar police documents in an officer involved shooting, concluded as follows:

> Here, the documents at issue are routinely created regardless of whether there would be litigation regarding the incident. The regulations demonstrate that the purpose of creating the documents is to determine if the officer was legally justified in shooting, complied with departmental policy, and if any action should be taken by the immediate supervisor. This includes a recommended course of action by the employee's supervisor. Therefore, these documents would have been created in substantially similar form regardless of the prospect of litigation. Defendants have not met their burden of establishing that the documents were prepared in anticipation of litigation and the work

product doctrine does not provide a basis for Defendants to withhold the requested discovery.

*Anderson v. Marsh*, 312 F.R.D. at 593 (internal citations omitted).

I adopt the reasoning of Magistrate Judge Boone, and conclude that the work product doctrine does not prohibit disclosure of these Reports.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**ORDERED**, that Plaintiff's Letter-Motion (Dkt. No. 49) seeking to compel Defendants to produce copies of Sgt. French's Post Pursuit Report, Response to Resistance Report, and Supplemental Report; and to compel nonparty witnesses Parker and Galligan to testify as to any statements made by Sgt. French during the CISD, is hereby **GRANTED**; and it is further

**ORDERED**, that Plaintiff's request for costs and attorneys fees is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order on the parties in this action.

**SO ORDERED**.

Date: March 2, 2018
Albany, New York

_Daniel J. Stewart_
U.S. Magistrate Judge