UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

CINTHIA THEVENIN, individually,                    DOCKET NO: 16-CV-1115 (DJS)
and as wife of EDSON THEVENIN, Decedent, and as
Administratrix of the Estate of EDSON THEVENIN,
and as mother and natural guardian of Infant N.T.
and as mother and natural guardian of Infant Z.T. ,

                                     Plaintiff,

            –against–

THE CITY OF TROY and
SERGEANT RANDALL FRENCH,

                                     Defendants.
---------------------------------------------------------------X

# PLAINTIFF'S SUPPLEMENTAL RECORD
# IN OPPOSITION TO RULE 56 MOTION

**HARFENIST KRAUT & PERLSTEIN LLP**
*Attorneys for Plaintiff*
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042
(516) 355-9600

**HACH & ROSE LLP**
*Attorneys for Plaintiff*
185 Madison Avenue
New York, New York 10016
(212) 779-0057

Held at Glens Falls, New York
on August 9, 2016

— — — — — — — — — — — — — — — — — — — — — — — —

In the Matter of the Claim of Cinthia Thevenin,
individually, and as wife of Edson Thevenin,
Decedent, and as proposed Administratrix of the
Estate of Edson Thevenin and as mother and natural guardian
of Son ▮▮▮▮▮▮▮▮▮▮ and as mother and natural guardian of
Son ▮▮▮▮▮▮▮▮▮▮,

Claimants,

-against-

The City of Troy, City of Troy Police Department
Sergeant Randall French, Captain Matthew
Montanino, Police Officer John Tedesco,
Police Officers Joe Does 1-10 and Joel Abelove,
District Attorney,

Respondents.

— — — — — — — — — — — — — — — — — — — — — — — —

TESTIMONY OF CINTHIA THEVENIN

Theresa M. Tobin, Court Reporter
Queensbury, New York 12804
518-741-6005

ORIGINAL          SR.001

```
 1              A P P E A R A N C E S

 2    HACH & ROSE LLP
      Attorneys for Claimants
 3    185 Madison Avenue, 14th Floor
      New York, New York 10016
 4    BY:  Michael A. Rose, Esq., of Counsel

 5    FITZGERALD MORRIS BAKER FIRTH P.C.
      Attorneys for Respondents
 6    16 Pearl Street, P.O. Box 2017
      Glens Falls, New York 12801
 7    BY:  John D. Aspland, Jr., of Counsel

 8

 9

10

11

12                  -   -   -   -   -   -

13

14

15

16

17

18

19

20

21

22

23
```

# S T I P U L A T I O N S

1

2

3

4     At this 50-h Examination, the presence

5  of a referee is waived.  All objections, except

6  as to the form of the question, are reserved

7  until the time of trial and need not be noted

8  on the record today.  The filing of the transcript

9  is waived.  However, the transcript will be signed.

10                    - - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

Theresa M. Tobin, Court Reporter
Queensbury, New York 12804
518-741-6005

```
 1                        DOCUMENT REQUESTS

 2    MR. ASPLAND:

 3    PRESERVE EDSON THEVENIN'S TAX RETURNS

 4

 5

 6

 7                  -    -    -    -    -    -

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

<u>EXHIBITS</u>

1—NOTICE OF CLAIM                                              52

- - - - - -

1    CINTHIA THEVENIN, having been duly sworn, was

2            examined and testified as follows:

3    EXAMINATION BY MR. ASPLAND:

4            Q.    Mrs. Thevenin, my name is John Aspland.  I

5    represent the Respondents, the City of Troy, City of

6    Troy Police Department, Sergeant Randall French, Captain

7    Matthew Montanino, Police Chief John Tedesco, and Police

8    Officers John Does 1-10, with respect to the Notice of

9    Claim that was filed against those individuals and those

10   entities.

11           I'm going to struggle through these questions

12      today, because my voice, you can tell, is shot.  So,

13      normally, it's not that difficult to understand me or

14      my questions but today please let me know if you

15      didn't understand one of my questions.  If it got

16      garbled up in my scratchy voice, I'll be happy to

17      rephrase it, repeat it, whatever you need me to do,

18      so you can understand what I'm asking you and I can

19      be sure that you're answering the question that I

20      actually intended to ask, okay?

21           A.    Okay.

22           Q.    Couple of ground rules:  This is going to

23   be a difficult subject matter and I apologize in advance

1   for the number of questions I'm going to have to ask.

2   If you need to take a break for any reason, you let me

3   know and you and your Counsel, Mr. Rose, can leave the

4   room if you have to and we can take as long a break as

5   you need, okay?

6               A.      Okay.

7               Q.      This is just for me to get information, to

8   get through some questions with you and I don't want you

9   to feel like it's an interrogation.  So if you need to

10  take a break and as long as there's no question pending,

11  you just let me know that you need to take a break, all

12  right?

13              A.      Yes.

14              Q.      Occasionally, I will ask a question that

15  no one understands.  In my mind, I thought it was a good

16  question.  You let me know that I've confused you, okay?

17              A.      Okay.

18              Q.      Theresa is taking down everything that we

19  say.  So, as we sit here and have our conversation, I

20  may see that you're nodding your head yes or no or

21  shaking your head like you don't know.  I need you to

22  verbalize all of your responses for me because she can't

23  take down that you're nodding your head yes.  It will

8

1      just say, 'Nodding,' okay?

2              A.      Okay.

3              Q.      So, when you can answer to the best of

4      your ability in words, that's all I'm asking for.  Fair

5      enough?

6              A.      Fair.

7              Q.      Let me begin by asking you some background

8      information questions, all right?

9              A.      Yes.

10             Q.      You were married to Edson Thevenin, is

11     that right?

12             A.      Yes.

13             Q.      When were you guys married?

14             A.      August 22, 2015.

15             Q.      What was your maiden name before that?

16             A.      Cyrille.

17             Q.      Where did you and Edson live?

18             A.      ███████████████████████████████

19     ████████.

20             Q.      How long did you and Edson live at that

21     ███████████████  address?

22             A.      We've had that address all together for

23     seven years but we moved back there for the last two

```
 1    years.

 2          Q.    Where were you living before the last two

 3    years?

 4          A.    In West Haverstraw.

 5          Q.    How long did you live in West Haverstraw?

 6          A.    Two years.

 7          Q.    Where did you live before that?

 8          A.    Before that, we rented at ███████████

 9    ██████

10          Q.    Is that a home or an apartment?

11          A.    My mom's house.

12          Q.    The ████████████ is your mom's

13    house?

14          A.    No.   I'm sorry.

15          Q.    That was one of my questions.   West

16    Haverstraw is your mom's house?

17          A.    West Haverstraw is my mom's house.   The

18    ███████████████ is an apartment.

19          Q.    Are you currently employed?

20          A.    Yes I am.

21          Q.    What do you do for a living?

22          A.    I work for Sephora.

23          Q.    In what capacity?   Sales person?
```

```
 1              A.    Sales person, Cash Wrap coordinator.

 2              Q.    What is a Cash Wrap Coordinator?

 3              A.    Basically, I train all the new employees

 4    on the register, make sure our technology scores are up.

 5              Q.    How long have you worked for Sephora?

 6              A.    It's going on four years.

 7              Q.    What did you do before you worked for

 8    Sephora?

 9              A.    I worked for Key Bank.

10              Q.    What did you do at Key Bank?

11              A.    A teller.

12              Q.    Was there a particular branch that you

13    worked at?

14              A.    No.   When I worked for the branch here, I

15    was a floater teller, so you go to different branches

16    who need assistance.

17              Q.    And the floater teller area was what area

18    of New York?

19              A.    It was Albany, East Greenbush, Troy, and

20    as far as Hoosick Falls.

21              Q.    How long did you work for Key Bank?

22              A.    Key Bank, I worked for them -- all

23    together, I worked for Key Bank for six years.
```

1          Q.    Have you ever held any professional
2     licenses?
3          A.    No.
4          Q.    And can you tell me your educational
5     background?
6          A.    I have a bachelor's in Business
7     Management.
8          Q.    From what school?
9          A.    From Monroe College.
10          Q.    Where is that?
11          A.    New Rochelle, New York.
12          Q.    Where did you graduate high school?
13          A.    North Rockland High School, and that was
14     in Phiells.
15          Q.    What year did you graduate?
16          A.    2001.
17          Q.    What's your date of birth?
18          A.    ███████████
19          Q.    And your Social Security number?
20          A.    █████████████.
21          Q.    Do you have any children?
22          A.    Yes.  I have two boys.
23          Q.    And what are their names?

```
 1          A.    The oldest one is ████ and the little one
 2    is ██████.
 3          Q.    How old is ████?
 4          A.    ████ is nine.
 5          Q.    How old is ████████?
 6          A.    Four.
 7          Q.    Is their last name Thevenin?
 8          A.    Thevenin.
 9          Q.    What grade is ██████ in?
10          A.    Fourth.
11          Q.    ████████ is not going to be old enough to
12    start kindergarten yet?
13          A.    No.   Daycare.
14          Q.    How about your husband Edson's date of
15    birth?
16          A.    ████████
17          Q.    Do you have any idea what his Social
18    Security number is?
19          A.    I do.
20          Q.    What is it?
21          A.    ██████████.
22                                    (Off the record)
23    EXAMINATION BY MR. ASPLAND:
```

```
 1              Q.     What was Edson's educational background?
 2              A.     He graduated high school and he has a
 3    technical degree in automotive.
 4              Q.     As a, like, mechanic technician?
 5              A.     Yes.
 6              Q.     Was it with any particular make or model
 7    vehicle?
 8              A.     No.
 9              Q.     Where did he get that degree?
10              A.     I can't remember the name of the school.
11    It was in Jersey.  I don't remember.
12              Q.     That's fine.  Do you know when he got it?
13              A.     It was 2014.
14              Q.     And at the time of his passing, was he
15    employed?
16              A.     Yes he was.
17              Q.     What was he doing?
18              A.     He worked for Enterprise.
19              Q.     Which Enterprise location?
20              A.     The one in Latham.  It was next to the
21    hotel and a correctional facility.
22              Q.     Over by the airport?
23              A.     Yes.
```

1          Q.      How long had he been working there?

2          A.      Over a year.

3          Q.      What did he do before becoming employed at

4   Enterprise?

5          A.      He worked for a warehouse.  It was, like,

6   to get the groceries packaged and they had to be shipped

7   to, like, to the different grocery stores.

8          Q.      Do you know how much he was making at

9   Enterprise?

10         A.      Enterprise, I think he was making about

11  $11.50.

12         Q.      An hour?

13         A.      An hour.

14         Q.      Do you know roughly how much he was

15  making, like a week or month or year?

16         A.      No I don't.

17         Q.      How many hours a week would he typically

18  work?

19         A.      He worked almost forty hours a week.

20         Q.      Did he have health benefits and

21  retirement, or anything like that, that you're aware of,

22  through Enterprise?

23         A.      Yes he did.

```
 1              Q.    Which of those benefits did he have?
 2              A.    He had medical, dental and a retirement.
 3              Q.    And was it family medical and dental?
 4              A.    No it wasn't.
 5              Q.    Just the individual plan?
 6              A.    Just the individual.
 7              Q.    Do you and your children have health
 8    coverage and dental coverage?
 9              A.    Yes we do.
10              Q.    Through what program?
11              A.    CDPHP.
12              Q.    Was that through your work?
13              A.    No.   It's through -- you have to go
14    through the New York Health Plan, I think it's called.
15              Q.    New York Healthy Plus?
16              A.    Yes.
17              Q.    Did you and Edson file joint tax returns?
18              A.    No we didn't.
19              Q.    Do you know who took the boys as
20    deductions, you or Edson?
21              A.    He did.  This past year, he did.
22              Q.    2015 he did?
23              A.    Yes.  2015 yes.
```

1        Q.    And in prior years would you be the one?

2        A.    Yes.

3        Q.    And both the boys are Edson's biological

4  children?

5        A.    Yes they are.

6        Q.    And has he financially supported them

7  their entire lives?

8        A.    Yes he has.

9        Q.    How did you meet Edson?

10       A.    I met him when I was working at a watch

11  station at the mall.

12       Q.    Which mall?

13       A.    Palisades, and that's in West Nyack.

14       Q.    Did Edson grow up around this area, or was

15  he from downstate originally?

16       A.    He's from downstate originally.

17       Q.    Does he have any other family in the area?

18       A.    Yes he does.

19       Q.    Who is that?

20       A.    His mother and his two younger brothers.

21       Q.    Are they from the Watervliet area or Troy?

22       A.    One of his younger brothers lives in Troy.

23       Q.    Where does his mom live?

1      A.      ███   the Watervliet address.

2      Q.      How long did he have the warehouse job?

3      A.      For -- yeah, a year and a half.

4      Q.      What did he do before that?

5      A.      Before that, he worked as a manager for a

6   health care company.  It was United Health Care.  He was

7   a manager in a call center for United Health Care.

8      Q.      Was that like a customer relations type of

9   position?

10     A.      Yes.

11     Q.      Do you know how long he worked for United

12  Health Care?

13     A.      He worked for them for two years.  Maybe a

14  little bit over.

15     Q.      How about before that?

16     A.      Before that, he worked for a company

17  called CSE.  It was in East Greenbush.

18     Q.      Do you know how long he worked for CSE?

19     A.      I think, again, it was about two years.

20     Q.      So, do you know approximately how much

21  money he was making in the warehouse position?

22     A.      He was making fifteen an hour and

23  sometimes it was a little bit over, depending on

1  overtime.

2        Q.    Do you know what that equated to a year

3  for him at the warehouse job?

4        A.    No I don't.

5        Q.    How about when he worked at United Health

6  Care?

7        A.    He was making, I think, seventeen.

8        Q.    So, do you know what that turned into on

9  an annual basis for that job?

10       A.    No I don't.

11       Q.    Do you have access to his tax returns?

12       A.    Yes I do.

13       Q.    I'm going to ask if you have copies of

14 them, that you make sure that you preserve them?

15       A.    Okay.

16       Q.    Sometimes, in spring cleaning, things get

17 moved around but I'm going to ask that you make a

18 special effort to keep those in a place where you could

19 find them if a demand is made later on for you to

20 provide them to your counsel, who will then provide them

21 to me, okay?

22       A.    Okay.  Yes.

23       Q.    Had your husband ever been involved in a

```
 1        lawsuit?

 2                A.      No.

 3                Q.      Had he ever been convicted of a crime?

 4                A.      Just the DUI.

 5                Q.      DUI?

 6                A.      Yes.

 7                Q.      Do you know when he was convicted of DUI?

 8                A.      It was in 2000 -- I think it was 2006.

 9                Q.      Was it locally?

10                A.      No.  It was downstate.

11                Q.      Rockland County?

12                A.      Rockland county.

13                Q.      Are you aware of any other convictions?

14                A.      No.

15                Q.      Have you been examined by an attorney

16        representing Joel Abelove, the district attorney?

17                A.      Yes I have.

18                Q.      When was that?

19                A.      It was June 30th.

20                Q.      Was that John Bailey, the attorney

21        representing Mr. Abelove?

22                A.      Yes.

23                Q.      Have you ever lived at 128 Oneida Avenue
```

```
 1    in Troy?

 2              A.    Yes I have.

 3              Q.    When was that?

 4              A.    We were living there in 2007.

 5              Q.    How long did you live there?

 6              A.    I lived there a little over a year.

 7              Q.    In 2008?

 8              A.    Yes.

 9              Q.    Have you ever lived at ███████████ in

10    ████████████?

11              A.    No.

12              Q.    Do you know if Edson ever lived at that

13    address?

14              A.    Yes.

15              Q.    What address is that, if you know?

16    Family member?

17              A.    It was a family member.

18              Q.    Do you know how long he lived there?

19              A.     It had to be a few years because when I

20    met him, he was living there.

21              Q.     Do you know what his approximate height

22    and weight were at the time of his death?

23              A.     Six feet.
```

1        Q.      Do you know what his weight was?

2        A.      He lost a lot of weight.  Maybe two

3    hundred.  Maybe a little bit more.

4        Q.      At the time of his passing was he

5    financially responsible for anybody?  Was he supporting

6    anyone?

7        A.      Just us.  The family.  Me and the boys.

8        Q.      Do you know if he had any sources of

9    income other than the work at Enterprise?

10       A.      Just Enterprise.

11       Q.      Other than being a licensed mechanic auto

12   technician, or certified mechanic auto technician, did

13   he hold any other certifications or licenses for

14   purposes of work?

15       A.      No.

16                   (Off the record)

17   EXAMINATION BY MR. ASPLAND:

18       Q.      Was he ever a member of the United States

19   Military?

20       A.      No.

21       Q.      As a result of his passing, have you

22   received any monies from any source arising from or

23   related to the passing of your husband?

1          A.      Yes.

2          Q.      What money have you received?

3          A.      Social Security benefits for the boys.

4          Q.      So, each boy receives a monthly benefit

5    at this time?

6          A.      Yes.

7          Q.      Do you know what they are receiving on a

8    monthly basis?

9          A.      Around eight forty-three.

10         Q.      Each?

11         A.      Each.

12         Q.      Are you receiving any kind of benefits

13   from any source?

14         A.      No.

15         Q.      Do you know when the Social Security

16   benefits began?

17         A.      It began, I got the first one the end of

18   April.

19         Q.      And this is going to continue until what

20   age?

21         A.      Eighteen.

22         Q.      If I asked you this, I apologize.  Do you

23   hold any licenses?

```
1          A.    No I don't.

2          Q.    Other than a driver's license maybe,

3    right?

4          A.    Yes.

5          Q.    Have you ever lived in New York City?

6          A.    No.  Wait.  Yes I have.

7          Q.    When was that?

8          A.    It was for when I first went to college.

9          Q.    What school were you going to?

10         A.    The first year of college, I went to FIT.

11         Q.    Who is Crystal Thevenin?

12         A.    That's his brother's ex-wife.

13         Q.    Which brother?

14         A.    David.

15         Q.    Did Edson have any tattoos?

16         A.    Yes he did.

17         Q.    What were they of?

18         A.    He had one on each arm of the boys' names.

19         Q.    So, I want to speak a little bit about

20   April 17 of 2016.  You became aware that your husband

21   was involved in an incident with the Troy Police that

22   evening, correct?  That morning, I should say.

23         A.    Correct.
```

1        Q.   Can you tell me what you were told when
2  you were first contacted by the police?
3        A.   The first contact was the two detectives
4  came to the door around five, five-thirty.  They were
5  asking me questions about the car.
6        Q.   Did you own a car at the time?
7        A.   Yes.
8        Q.   What kind of vehicle was it?
9        A.   I did own the black Honda Civic.
10       Q.   Was that registered in your name?
11       A.   Yes it was.
12       Q.   What were the detectives asking you about
13  concerning the vehicle?
14       A.   They asked me did I own the car, did I let
15  anybody use the car.  I told them, 'My husband has the
16  car.'
17       Q.   What, if anything, did they say next?
18       A.   They told me that -- they asked me to
19  describe my husband and they told me that my husband had
20  got in a car accident.
21       Q.   Did they say anything else?
22       A.   Not at that time.  They just said he had
23  got in a car accident.  I asked if his brother was in

25

```
 1   the car because I know he went out with his brother, or

 2   if anyone else was injured, and they said everything was

 3   fine.

 4           Q.    This is his brother David?

 5           A.    No, his brother Adam.

 6           Q.    Where does Adam live?

 7           A.    He lives in Troy.

 8           Q.    The same last name, Thevenin?

 9           A.    Thevenin.

10           Q.    And they said everything was all right?

11           A.    Yes.  They told me it was just a minor car

12   accident.

13           Q.    Do you know the name of either or both

14   detectives that you spoke to that night?

15           A.    I can't recall their names.

16           Q.    Can you describe them for me?

17           A.    One was a white detective with a short

18   haircut, probably like five-six or five-seven, and then

19   the other one was a black detective.

20           Q.    Did you have any conversations with them

21   after that first conversation at five or five-thirty on

22   the morning of April 17th?

23           A.    Yes I did.
```

```
 1            Q.    What were the other conversations that you

 2      had with them?

 3            A.    I made small talk with, like, the black

 4      detective when the other detective went to make a phone

 5      call just to follow up to see what was going on and then

 6      when he came back, he told me my husband had died in a

 7      fatal car accident.

 8            Q.    Which detective told you that your husband

 9      died?

10            A.    The white detective.

11            Q.    What did the black detective say, if

12      anything?

13            A.    He just stood in the back, like behind

14      him.  He was standing behind him.

15            Q.    Did you have any other conversation with

16      either of them that morning at your house?

17            A.    They told me -- when I went upstairs, they

18      told me that I could go over to St. Mary's to see my

19      husband.

20            Q.    What, if anything, happened next?

21            A.    When we got to St. Mary's, we were met by

22      another detective.

23            Q.    Uh-huh.
```

1          A.     And he told me that I wouldn't be able to

2     identify my husband's body; that there was an incident

3     and he'd been shot by a police officer and it was now a

4     criminal investigation.

5          Q.     Do you know the name of that detective?

6          A.     I don't.

7          Q.     What happened next?

8          A.     We asked him if we could talk to the

9     doctor and after about five minutes he came back and

10    said that he did talk to the doctor and we can't see him

11    but we could go to Albany Med to identify him.

12         Q.     Did you then leave St. Mary's and head

13    over to Albany Med?

14         A.     Yes, but before we left St. Mary's we were

15    driving by the scene, so I pulled over in front of

16    Stewart's and I asked the officer if he knew what was

17    going on and he said he didn't know anything that was

18    going on, he just got there, but I saw him make a phone

19    call and then he told us to head down to the police

20    station.

21         Q.     Did you do that?

22         A.     Yes we did.  We headed down to the Troy

23    Police Department and that's where we met Chief Tedesco.

1      Q.    What, if anything, did you discuss with

2  Chief Tedesco?

3      A.    He brought us in a small room in the back

4  and told us that my husband was in an incident with the

5  police officer and he had been shot.

6      Q.    What else did he say?

7      A.    And that he didn't have all the

8  information but it's now a criminal investigation.

9      Q.    Did he discuss anything else with you?

10     A.    No.

11     Q.    Do you know how long that conversation

12  took?

13     A.    It was less than five minutes because we

14  said thank you and we left and we headed to Albany Med.

15     Q.    What did you do when you got to Albany

16  Med?  Were you able to go in and identify the body, or

17  did you have to wait?

18     A.    No.  We searched around.  We found one of

19  the Albany workers that told us where the morgue was.

20  We went there, we rang the bell and no one ever came and

21  then we must have been there for an hour and then a

22  security guard came over and asked us what we were doing

23  and we told him that we were here to identify my

1    husband's body and he said, 'You're not allowed to do

2    that.'  Hospital policy, that we were not allowed to do

3    that, and we left.

4            Q.    What's the next contact that you had with

5    any member of the Troy Police Department?

6            A.    None.

7            Q.    Have you had any contact with members of

8    the Troy Police Department since your initial contact on

9    April 17th?

10           A.    No.

11           Q.    Have you had any contact with any law

12   enforcement agency investigating the incident that

13   occurred on April 17th of 2016?

14           A.    Can you repeat?

15           Q.    Sure.  Has anyone come to you to take a

16   statement or gather any information relating to your

17   husband's death on April 17, 2016?

18           A.    No.

19           Q.    Has anyone communicated in writing with

20   you from the City of Troy concerning your husband's

21   passing?

22           A.    No.

23           Q.    Are you aware of any witnesses to the

1    events that occurred on April 17, 2016?

2           A.    Yes.

3           Q.    Who were you aware of as a witness?

4           A.    Just the ones I have read in a media.  I

5    can't recall their names.

6           Q.    So, only those people that you have read

7    about in the paper or heard about on TV?

8           A.    Yes.

9               MR. ROSE:  Just so the record is

10     clear.  Cinthia, you have had a meeting with the

11     Attorney General's Office, correct?

12          A.    Yes I have.

13             MR. ASPLAND:  I was going to ask her.

14             MR. ROSE:  Okay.

15  EXAMINATION BY MR. ASPLAND:

16          Q.    Have you seen any statements that have

17    been given by a witness concerning the events that led

18    to your husband's death?

19          A.    No.

20          Q.    Now, Mr. Rose mentioned that you have had

21    interactions with the New York State Attorney General's

22    Office?

23          A.    I have.

1          Q.     Can you tell me what those interactions

2    have been?

3          A.     I just had a meeting with them the one

4    time to introduce themselves and just to let me know

5    that they were starting an investigation.

6          Q.     Do you know who from the Attorney

7    General's Office you met with?

8          A.     I met with two investigators and I don't

9    remember their names.  I met with Jen Summers.

10         Q.     Do you know what Miss Summers' role or

11   position is with the Attorney General's Office?

12         A.     I don't remember.

13         Q.     And do you have the name of those two

14   investigators at home?

15         A.     I don't.

16         Q.     Did they give you a card?

17         A.     I know one of them gave me a card but I

18   can't remember what I did with the card.

19         Q.     What was kind of a sum total of the

20   meeting that you had?

21         A.     Just to, like I said, just to introduce

22   themselves.  There was a couple of them there.  Just to

23   let me know that they were looking into it.

1          Q.     Do you know when that took place?

2          A.     At the end of May.  Sometime in there.

3          Q.     And did they ask you to come down to their

4     office in Albany?

5          A.     Yes.

6          Q.     And have you heard from them since that

7     one meeting?

8          A.     No.

9          Q.     Have you learned about the events that

10    gave rise to your husband's car being stopped --

11    withdrawn.

12         Have you learned about the events that gave rise

13       to the vehicle your husband was operating being

14       stopped on the Collar City Bridge?

15         A.     Just from what I saw on the media and the

16    newspaper.

17         Q.     What have you come to learn?

18         A.     That it was a traffic stop that ended up

19    in a chase and my husband being shot.

20         Q.     Have you talked to anybody at all who has

21    described for you any portion of that evening events?

22         A.     No.

23         Q.     Did you have a funeral for your husband?

```
 1          A.     Yes I did.
 2          Q.     And was there a wake as well?  Was it all
 3   one?
 4          A.     It was just one.
 5          Q.     Where did the funeral take place?
 6          A.     Newcomer.
 7          Q.     Is that in Troy?
 8          A.     That is in Colonie.
 9          Q.     When was the funeral?
10          A.     The funeral was April and I don't remember
11   the exact date.
12          Q.     And where was he buried?
13          A.     He was buried in Albany.  The name is,
14   like, right here but I can't remember.
15          Q.     That's okay.  Do you remember what the
16   cost of the funeral was?
17          A.     The funeral was a little over seven
18   thousand and the burial part was a little over two
19   thousand.
20          Q.     Have you paid those bills?
21          A.     Yes.
22          Q.     Did you pay from monies that you had, or
23   did you have to raise monies in order to pay them?
```

1          A.     His mom took it out of her savings to pay

2   for the funeral and I charged the burial.

3          Q.     Is his mom expecting you to pay her back

4   or was that just her contribution?

5          A.     No, just her contribution.

6          Q.     Did he have any life insurance at the time

7   of his death?

8          A.     Yes, he did have life insurance.

9          Q.     Do you remember, off the top of your head,

10   what the company who was holding the policy was?

11          A.     Enterprise.

12          Q.     What was the death benefit under the

13   policy?

14          A.     Who would receive it, you mean?

15          Q.     How much was it?

16          A.     It was sixty.

17          Q.     Sixty thousand?

18          A.     Yes.

19          Q.     Who were the beneficiaries?

20          A.     I was.

21          Q.     Has that been paid off?

22          A.     Yes it has.

23          Q.     Were there any other monies that you have

1    received following your husband's death?

2           A.    Just life insurance and what is that --

3    not retirement.  It's, like, shares he had.

4           Q.    A 401k?

5           A.    Yes, a 401k.

6           Q.    Do you remember how much he got from the

7    payout of the 401k?

8           A.    I don't recall that one, no.

9           Q.    Do you have that information at home?

10          A.    Yes I do.

11          Q.    I'm going to ask Theresa to put a line in

12   this transcript and when you get it to review it, you

13   can consult with Mr. Rose and if you could fill in that

14   number, I'd appreciate it.

15          A.    Okay.

16   AMOUNT RECEIVED FROM 401k: $315.55

17          Q.    So, other than the life insurance, the

18   401k payout, the Social Security money going to the

19   boys, is there any other money that's come to you or

20   your sons following your husband's death?

21          A.    No there hasn't.

22          Q.    Other than this Notice of Claim, which I

23   had marked today as Exhibit 1, are you aware of any

```
 1        other Notices of Claim or suits having been filed or
 2        claims having been made, arising from the death of your
 3        husband on April 17, 2016?
 4                A.     No.
 5                Q.     Do you have any idea where your husband
 6        was that evening before he had the encounter with the
 7        police?
 8                A.     Yes I do.
 9                Q.     Where was he?
10                A.     I know that he headed over to Adam's
11        house, his younger brother who lives in Troy, and then
12        from there, they went out and I don't know what the last
13        place was, where they left from.
14                Q.     Have you ever discussed that with Adam?
15                A.     Yes.
16                Q.     Did Adam tell you where they went and you
17        just don't recall, or did Adam not tell you where they
18        went?
19                A.     He doesn't recall.
20                Q.     He doesn't recall either?
21                A.     No.
22                Q.     Did you ever have a conversation with Adam
23        about what time he and Edson separated that evening?
```

1          A.      No.

2          Q.      Do you know what time Adam got home that

3     evening?

4          A.      I don't know.

5          Q.      Prior to April 17, 2016, are you aware of

6     any contact that your husband had had with the Troy

7     Police Department?

8          A.      No.

9          Q.      Do you know if he had had any prior

10    contact with the Troy Police Department?

11         A.      No he didn't.

12         Q.      You're only aware of one DWI conviction

13    that he had?

14         A.      Yes.

15         Q.      Do you know if he went through the alcohol

16    treatment programs?

17         A.      He did.

18         Q.      Have you learned whether or not he had

19    consumed alcohol the night of his incident with the

20    police?

21         A.      Yes.  I know Adam said that he did have a

22    drink.

23         Q.      Did you ask Adam if Edson was intoxicated

Theresa M. Tobin, Court Reporter
Queensbury, New York 12804
518-741-6005

SR.037

1     that evening?

2              A.     He doesn't recall.

3              Q.     Have you ever known Edson to be a violent

4     person?

5              A.     No.

6              Q.     Never in your experience?

7              A.     No.

8              Q.     Earlier, you said that you went past the

9     scene and when we're describing the scene, are we

10    generally describing the area between Hoosick Street and

11    6th Avenue at the beginning of the Collar City Bridge?

12             A.     Yes.

13             Q.     Can you tell me what you saw at the scene

14    that early morning when you were there?

15             A.     I saw the car.  It was completely blocked

16    off.  I saw the windshield was cracked.  There was glass

17    on the floor.

18             Q.     On the roadway?

19             A.     On the roadway.

20             Q.     Did you note anything else?

21             A.     No.

22             Q.     Have you seen any of the police documents

23    that were related to the incident involving your

1      husband?

2                A.      No.

3                Q.      Did you take any photographs that morning?

4                A.      I did not.

5                Q.      Do you know if anyone went down and took

6      any photographs?

7                A.      I don't know.

8                Q.      When is the last time that you spoke to

9      your husband prior to his death?

10               A.      That night when he was leaving.

11               Q.      Do you know about what time that was?

12               A.      We were talking and he realized the time

13     and he said, 'Oh, I have to go.'  It was around

14     nine-thirty or maybe almost ten.

15               Q.      Had he had anything to drink that night at

16     home?

17               A.      No.

18               Q.      When was the first time that you learned

19     that shots had been fired and your husband had been hit

20     by those shots?

21               A.      Monday, I googled the press conference.

22               Q.      What day of the week did the incident

23     occur on?

1          A.     It was Sunday.

2          Q.     And when you spoke to Chief Tedesco did he

3    mention that your husband had been shot?

4          A.     Yeah, he said my husband had been shot.

5          Q.     Who conducted the press conference?

6          A.     I know the D.A. Abelove was on there.

7          Q.     Was Chief Tedesco also involved in this

8    press conference?

9          A.     Yes.

10         Q.     Have you ever had a conversation with D.A.

11   Abelove about what happened?

12         A.     No.

13         Q.     Have you ever had a conversation with

14   anybody from his office about what happened?

15         A.     No.

16         Q.     Do you have any sources of information,

17   other than the press conference and the conversation you

18   had with Chief Tedesco, about the events that occurred

19   on April 17, 2016?

20         A.     No.

21         Q.     Have you been appointed by a court as a

22   representative of your husband's estate?

23         A.     Yes.

```
1              Q.    What court was that?

2              A.    I think it was Albany.

3              Q.    Albany County Surrogate's Court?

4              A.    Yes.

5              Q.    Do you have a copy of the letters that

6   were issued by the Surrogate Court?

7              A.    Oh, I'm sorry.  It's not final yet.

8              Q.    Pending?

9              A.    Yes.

10             Q.    Do you know what time you got to St.

11  Mary's Hospital that morning?

12             A.    It was six a.m.

13             Q.    And you never got to speak to a doctor at

14  St. Mary's?

15             A.    No.

16             Q.    Have you ever been involved in any kind of

17  lawsuit?

18             A.    No.

19             Q.    Can you describe for me the type of Dad

20  that Edson was to the boys?

21             A.    He was very involved.  He was the one that

22  he would leave work to pick up ███ from the bus stop.

23  He did homework with ███  The times I couldn't be
```

1   home in time, he started dinner and got the boys ready

2   for bed if I was working late.

3       Q.    Where was the Sephora location that he

4   worked for at that time?

5       A.    Colonie Center.

6       Q.    What else can you tell me about the

7   relationship that Edson had with the boys?

8       A.    He played a lot of sports with them.  He

9   was more of an outside person.  Like, he liked to be

10  outside.  So, any time the weather was nice or even if

11  it was snowing, he'll be outside with the boys.  He was

12  teaching ███ how to swim because ███ was, from an

13  incident that happened, scared of the water, so he was

14  determined to teach ███ how to swim.  If he wasn't

15  working and I was home, he was with me and the boys.

16      Q.    How was your relationship with Edson?

17      A.    My relationship was awesome with him.  It

18  was very loving.  He was always motivating me.  He was

19  always trying to get me to do new things.  And every

20  time he would get me mad he would, like, sneak and find

21  a way to cheer me up by the end of the night.  He would

22  plan, like, date night at least once a month so that way

23  we could get out of the house without the kids.  And if

1    he knew I was home at times, he would just ask to leave

2    work early so he could pick me up for lunch.

3           Q.     During the time that you and Edson were

4    together, were there any periods where he was

5    incarcerated?

6           A.     Yes.

7           Q.     When were those incarcerations?

8           A.     It was eight months and that's when I was

9    pregnant with ███████.

10          Q.     Was he released before █████ was born?

11          A.     Yes.  He was released in mid June.

12          Q.     Was that from the DWI?

13          A.     Yes.

14          Q.     What hospital was ██████ born in?

15          A.     Nyack Hospital.

16          Q.     Was Edson able to be there?

17          A.     Yes he was.

18          Q.     Are there any bills that you have received

19    relating to your husband's passing that you're

20    financially obligated to pay?

21          A.     His hospital bills from that day.

22          Q.     From St. Mary's?

23          A.     From St. Mary's.

1          Q.    Do you know how much St. Mary's is looking

2     for in the form of those bills?

3          A.    It will be over two thousand.

4          Q.    Two thousand dollars?

5          A.    Yes.

6          Q.    Do those bills still remain outstanding?

7          A.    Yes.

8          Q.    As a result of Edson not being here any

9     longer, are there out-of-pocket expenses now that you're

10    incurring that you didn't otherwise have when he was

11    with us?

12         A.    I'm just --

13         Q.    I'm trying to get at, that you have to pay

14    for a daycare provider now, whereas before maybe he

15    would be the person that would watch Nate, and things of

16    that nature.

17         A.    Nate is still going to daycare, so we

18    always, like, paid half on that.  Zamir -- he would pay,

19    like, before and after school programs for Zamir.

20         Q.    So, you and Edson would kind of split the

21    bills?

22         A.    Yes.

23         Q.    Did you maintain a joint banking account,

1    or did you have separate accounts?

2            A.      We had separate accounts.  Just one had

3    our name on it but nothing really went into that.

4            Q.      So, what were the types of things that you

5    were responsible for and what were the types of things

6    that Edson was responsible for?

7            A.      He did the phone bill.  We did daycare

8    together.  I did my car note.  When we had cable, he

9    would do, like, cable.  He would do some of the

10   groceries.

11           Q.      You guys split the groceries?

12           A.      Yes, we would.  It was pretty much

13   everything, we split.  His student loan, he did that.

14   He paid for that on his own.

15           Q.      Did he still have to pay his student loan?

16           A.      It has to be paid but I haven't paid any

17   payments with it.

18           Q.      What other bills or expenses would be

19   split?

20           A.      Electric.

21           Q.      Split?

22           A.      Split.

23           Q.      What else?

```
 1              A.    The rent.  His mom helped us with rent
 2      too, so that would be split.
 3              Q.    In 2014, did you guys file separate tax
 4      returns?
 5              A.    Yes we did.
 6              Q.    And every year up until 2015, you filed
 7      separate tax returns, right?
 8              A.    Yes.
 9              Q.    Did you consider yourselves, prior to
10      being married in 2015, to be domestic partners?
11              A.    Yes.
12              Q.    Did you claim each other on health
13      insurance forms, or anything if that nature, prior to
14      your marriage in August of 2015?
15              A.    No.
16              Q.    How many years did you date for prior to
17      getting married?
18              A.    We were together fifteen.
19              Q.    Before you got married?
20              A.    Before we got married.
21              Q.    What changed in 2015?
22              A.    We were just like, 'Let's just do this.'
23      We just came to a point where we said, 'Let's just do
```

1   this.'  We were trying to save up for a big wedding.  It

2   just didn't make any sense.

3          Q.    Are you or the boys in counseling of any

4   sort related to the death of your husband?

5          A.    No, not yet.

6          Q.    Do you have plans to seek counseling on

7   behalf of yourself or the boys related to Edson's death?

8          A.    Yes.

9          Q.    Do you have somebody in mind that you're

10  going to go see and you haven't made an appointment yet,

11  or are you still kind of vetting therapists or

12  counselors?

13         A.    I'm still looking for me but for the boys,

14  I have somebody in mind.

15         Q.    Who is that?

16         A.    It's a place a doctor's office gave me in

17  Rensselaer.

18         Q.    Do you know the name of the group of the

19  therapists, or anything like that?

20         A.    I don't remember.  I know it had the word

21  Hospice in it, but I don't remember the whole name or

22  group.

23         Q.    How have the boys reacted to the passing

1    of your husband and their dad?

2            A.      They have good and bad days.    ████    is

3    afraid of police officers.

4            Q.      And he's four?

5            A.      He's four.

6            Q.      Why is he afraid of police officers?

7            A.      He thinks that every police officer that

8    he sees is the one who shot his dad and they're going to

9    do the same to us.

10           Q.      How did he learn that his dad died?

11           A.      ████, he learned from just the news but

12   the first time they heard that Dad had passed away was

13   from the two detectives that came in.  They overheard

14   that.  But the police shooting, they heard it from the

15   news.

16           Q.      And your older son, how is he doing?

17           A.      He has some good days and other days I

18   have to, like, I feel like I'm picking him up out of it

19   because he had a lot of questions.  He doesn't

20   understand why and he doesn't feel the same without his

21   dad being here.  He feels lost.

22           Q.      How are you doing?

23           A.      Right now, or in general?

49

```
 1                Q.     How about in general?

 2                A.     I'm sorry.  (Witness is crying).  Some

 3      days are better than others.

 4                Q.     This was the part, when I told you at the

 5      beginning when I said  'I'm going to ask you some

 6      difficult questions.'  This was the part I was referring

 7      to.  So, I'm sorry that we had to put you through this.

 8                A.     I know.  Some days are better than others.

 9      Sometimes I wake up thinking that he's going to be there

10      and he's going to walk through the door.  I feel empty,

11      if you really want to know how I feel.  That was my best

12      friend and now he's not here anymore and I'm left to

13      pick up the pieces.

14                Q.     When you get the boys settled in with some

15      kind of health care provider or therapist, are you

16      planning on going to see one yourself?

17                A.     Yes.

18                Q.     Did Edson have a family doctor at the time

19      of his death?

20                A.     No.

21                Q.     Do the boys have a pediatrician that they

22      see?

23                A.     Yes.
```

1      Q.     Who is their pediatrician?

2      A.     They go to Seton Pediatrics in Troy.

3      Q.     Is there one doctor that they typically

4  see or do they see kind of a group?

5      A.     They usually see the one doctor but his

6  name is so long that I can't remember it.

7      Q.     Okay.  We'll put another line in there and

8  you can write it in and this way we won't have to worry

9  about it.

10     A.     Okay.

11 NAME OF DOCTOR: Dr. Ojukwu, Ifeoma

12     Q.     Did Edson have any medical conditions that

13 you were aware of at the time of his death?

14     A.     No.

15     Q.     How would you describe his overall general

16 health at the time he passed?

17     A.     He was very healthy.

18     Q.     You mentioned earlier that he had lost a

19 lot of weight in the period of time leading up to his

20 death.  Was he trying to get healthy or was there

21 something going on and he lost weight to deal with the

22 situation, or what?

23     A.     No, he just wanted to lose weight.  He was

```
 1     trying to get healthy.  He was going to the gym a lot

 2     and he changed the way that he was eating.

 3              Q.     In the media accounts that you reviewed or

 4     watched at the time they occurred, did you learn of any

 5     of the allegations as to the conduct that your husband

 6     has said to have been engaged in as relates to his

 7     interaction with the police department that night?

 8              A.     Yes.

 9              Q.     What did you learn from those media

10     accounts?

11              A.     Just that he was in a car chase; that he

12     tried to stop them but it ended up in a car chase and

13     then I heard the 9/11, that the 9/11 dispatch called

14     him, the officer.

15              Q.     Was that on TV?

16              A.     It was.  It was on line.  For a point,

17     you're able google it.

18              Q.     In the context of listening to those media

19     accounts, did you learn that the police radio -- that

20     your husband was trying to use the car to injure a Troy

21     City Police Officer?

22              A.     Yes.

23              Q.     Does that sound like something that he
```

1      would do?

2              A.      No.

3              Q.      Did you learn that he was stopped under

4      suspicion of DWI?

5              A.      Yes.

6              Q.      And his DWI conviction that he had

7      downstate relative to 2016, how many years prior was

8      that?

9              A.      That was in -- I believe that was in '05.

10     No, that was '06 because I had ██████ in '07.  So, it

11     was, like, 2005, 2006.

12             Q.      Are you aware of whether or not Edson had

13     any kind of general distrust or dislike for the police

14     in general?

15             A.      No he didn't.  Never.

16             Q.      Has anyone told you whether or not your

17     husband was alive at the scene on the Collar City Bridge

18     and obviously prior to getting to St. Mary's, or did you

19     learn anything about his medical condition while at the

20     scene and before he was transported to St. Mary's

21     hospital?

22             A.      No.

23             Q.      Now I'm going to show you Exhibit 1.  I

1    just have some general questions about that document, so

2    if you'd take a look at it for me.

3                A.    Okay.

4                Q.    Have you had a chance to take a look at

5    the document?

6                A.    I have.

7                Q.    Have you ever seen that before today?

8                A.    Yes I have.

9                Q.    When was the first time you saw that

10   document?

11               A.    When my attorney sent it over to me.

12               Q.    In that first paragraph there it says that

13   ███████ Thevenin --

14               A.    Let me correct that.  ██████, it should be.

15               Q.    I'm just making sure.  My son is the

16   third and we call him by his initials sometimes.  I just

17   wanted to make sure we had the right name.

18               Your signature doesn't appear on this document,

19      does it?

20               A.    No.

21               Q.    And some of these questions are going to

22   seem awkward or kind of out of place but I'm going to

23   ask them anyway --

```
 1          A.    Okay.

 2          Q.    -- because I have to, based on the nature

 3   of the claim, okay?

 4          A.    Okay.

 5          Q.    If you can turn to paragraph 3 for me.

 6          A.    Yes.

 7          Q.    You see the words, 'Conscious pain and

 8   suffering,' in the beginning of the first line in there?

 9          A.    Yes.

10          Q.    Are you aware of whether or not your

11   husband was conscious and for what period of time was

12   conscious as it related to this stop he was involved in

13   on the 17th of April 2016?

14          A.    No.

15          Q.    I'm not going to ask you -- you're not an

16   attorney, correct?

17          A.    No.

18          Q.    You have never had any legal training as a

19   paralegal or with the law, generally?

20          A.    No.

21          Q.    Are you independently familiar with any of

22   the legal terminology that's used in paragraph 3?

23          A.    No.
```

1          Q.     Do you have an understanding at to what --

2     you see down at the bottom where it says, '42 U.S.C.

3     1983?'

4          A.     Yes.

5          Q.     Do you have any idea what that statute

6     deals with, from your own perspective?

7          A.     No.

8          Q.     The claim, kind of boiled down, alleges

9     that the police used -- improperly used -- force against

10    your husband Edson.  Is that how you understand the

11    claim generally to be?

12         A.     Yes.

13         Q.     Do you know whether or not there were

14    facts or circumstances present that allowed the police

15    to use force against your husband?

16         A.     No.

17         Q.     Have you had any chance to discuss the

18    facts or circumstances that led up to the encounter your

19    husband had with the police on the Collar City Bridge?

20         A.     No.

21         Q.     Do you have a reason to believe -- do you

22    have a factual basis to believe that the police officers

23    involved were less than truthful in describing their

1    interactions with your husband that night?

2         A.    Can you repeat that?

3         Q.    Sure.  Do you have a factual basis to

4    believe that the police officers who were involved in

5    the interaction with your husband that night have been

6    less than truthful in describing the interaction that

7    they had with him that night?

8         A.    No, I don't know.

9         Q.    If you look at paragraph 4.

10        A.    Yes.

11        Q.    There's a sentence that begins,

12   'Thereafter, Sgt. French shot and killed Edson Thevenin

13   without justification for the use of deadly force.'  Do

14   you have any facts to support that allegation?

15        A.    No.

16        Q.    Did your husband own a firearm?

17        A.    No.

18        Q.    Did you ever know him to carry a gun or a

19   weapon of any sort?

20        A.    No.

21        Q.    It says, 'Upon information and belief,

22   Sgt. French fired no less than eight shots at the

23   unarmed Mr. Thevenin.'  Do you know the basis for that

1      statement?

2             A.     No.

3             Q.     The next page, if you could just turn to

4      the top.  It says, 'Hours after the Decedent was shot

5      and killed, police officers John Does 1 through 10 made

6      false statements and deliberately misled Claimants and

7      Decedent's family members into believing that the

8      Decedent had been killed in a motor vehicle accident

9      without reference to being shot by a Troy Police

10     Officer.'  Did you tell me, so far, everything that you

11     recall that supports that allegation in this Notice of

12     Claim?

13            A.     Yes.

14            Q.     And you spoke to two detectives at your

15     home that night?

16            A.     Yes.

17            Q.     One detective at St. Mary's and then Chief

18     Tedesco later on that evening or early that morning?

19            A.     That morning, yes.

20            Q.     And you haven't had any contact with

21     anybody else at this point?

22            A.     No.

23            Q.     And the false statement, is that what?  He

1    had been involved in a motor vehicle accident as opposed

2    to --

3             A.       -- being shot.

4             Q.       Being shot.  And what other family members

5    besides yourself and the two boys are being referred to

6    here in this sentence event?

7             A.       His mom and his brother Tyler.

8             Q.       Who spoke to his mom from the police

9    department?

10            A.       The two detectives that came to the door.

11            Q.       Were you all in the same place?

12            A.       Yes.

13            Q.       Does his brother Tyler live there as well?

14            A.       Yes, but he will be leaving soon.

15            Q.       Just so I understand the scene, you and

16   Edson's mom and his brother Tyler were all speaking with

17   the two detectives at the same time, or independently?

18            A.       No.  His mom was the one that opened the

19   door for them and she came and got me but Tyler's bed

20   and Zamir's bed is a single bed.  They could hear

21   everything from his doorway.

22            Q.       How old is Tyler?

23            A.       Tyler is seventeen.

| | |
|---|---|
| 1 | had been involved in a motor vehicle accident as opposed |
| 2 | to -- |
| 3 | A.    -- being shot. |
| 4 | Q.    Being shot.  And what other family members |
| 5 | besides yourself and the two boys are being referred to |
| 6 | here in this sentence event? |
| 7 | A.    His mom and his brother Tyler. |
| 8 | Q.    Who spoke to his mom from the police |
| 9 | department? |
| 10 | A.    The two detectives that came to the door. |
| 11 | Q.    Were you all in the same place? |
| 12 | A.    Yes. |
| 13 | Q.    Does his brother Tyler live there as well? |
| 14 | A.    Yes, but he will be leaving soon. |
| 15 | Q.    Just so I understand the scene, you and |
| 16 | Edson's mom and his brother Tyler were all speaking with |
| 17 | the two detectives at the same time, or independently? |
| 18 | A.    No.  His mom was the one that opened the |
| 19 | door for them and she came and got me but Tyler's bed |
| 20 | and Zamir's bed is a bunk bed.  They could hear |
| 21 | everything from his doorway. |
| 22 | Q.    How old is Tyler? |
| 23 | A.    Tyler is seventeen. |

1          Q.     When you say he's leaving soon, is he

2     going off to college?

3          A.     He is going to go to college.

4          Q.     Where is he going to go to school?

5          A.     Morrisville.

6                       (Off the record)

7     EXAMINATION BY MR. ASPLAND:

8          Q.     What's Edson's mom's name?

9          A.     Gertha.

10         Q.     Are you going to continue to live at the

11    same apartment or do you have plans of moving?

12         A.     I have plans of moving.

13         Q.     Where do you plan to move to?

14         A.     Colonie, Latham, area.

15         Q.     Closer to work?

16         A.     Yes.

17         Q.     Is there anyone that you have relied upon

18    for emotional support during this time?

19         A.     My pastors, my mom, my sister and his mom.

20         Q.     What church are the pastors associated

21    with?

22         A.     Empire Christian Center.

23         Q.     Is that in Troy?

1          A.      That's in Albany.

2          Q.      In that same paragraph on page 2, a little

3    bit further down, it says, 'In denying access to the

4    body of the Decedent to his spouse and family after his

5    death, and in deliberately withholding accurate

6    information and misleading Claimants as to the facts

7    leading to his death.'  We discussed your understanding

8    of the facts that support that allegation?

9          A.      Yes.

10         Q.      Is there anything else that you now

11   remember that you feel supports the allegation that I

12   just read?

13         A.      No.

14         Q.      The next sentence, 'Respondents

15   intentionally and negligently inflicted severe emotional

16   distress upon Claimants.'  What was the intentional and

17   negligent infliction -- what was it that the Respondents

18   said or didn't say that you feel was intended to cause

19   you pain?

20         A.      Saying that he died in a fatal car

21   accident.  Not letting us identify his body.

22         Q.      That was Albany Medical Center's policy,

23   is that right?

```
 1              A.    Yes, but before that the detective had

 2     sent us there to identify the body.

 3              Q.    And then when you got to the hospital they

 4     said --

 5              A.    They said no.

 6              Q.    What facts do you have to support the

 7     belief that the Troy Police Department and the

 8     Rensselaer County District Attorney's office have

 9     conspired to conceal the truth of the events of April

10     17, 2016?

11              A.    I don't know.

12              Q.    Are you aware of whether or not a

13     Rensselaer County Grand Jury has been convened to hear

14     this case?

15              A.    Has been convened?

16              Q.    Yes.

17              A.    Yes.

18              Q.    Do you know what the grand jury

19     determined?

20              A.    They determined that he wasn't guilty.

21              Q.    What?

22              A.    He wasn't guilty.

23              Q.    The police officer?
```

1          A.     Yes.

2          Q.     Sergeant French?

3          A.     Sergeant French.

4          Q.     Is there any statement that you'd like to

5   make at this time?

6          A.     No.

7          Q.     Is there any information that you feel is

8   important for my clients to know as it relates to this

9   claim but we haven't discussed yet today?

10         A.     No.

11         Q.     Is there any answer that you have given

12  today that over the last hour and forty-five minutes

13  you've had a chance to reflect on that you'd like to

14  amend or add to or change?

15         A.     No.

16              MR. ASPLAND:  I don't have any

17      further questions.  I appreciate the difficulty of

18      the situation and I appreciate you coming in.

19         A.     Okay.

20

21

22                         -   -   -   -   -   -

23

1

2

3

4

5      STATE OF NEW YORK

6      COUNTY OF ESSEX

7

8      I, THERESA M. TOBIN, do hereby certify that the

9      foregoing is a true and correct transcript, to the

10     best of my ability, of the proceedings which took

11     place at the aforementioned time and place.

12

13

14

15                              *Theresa M. Tobin*

16                              Stenographer

17

18

19

20

21

22

23

1

2

3

4

5    STATE OF NEW YORK )

6    COUNTY OF          )

7

8    CINTHIA THEVENIN,   having been duly sworn, deposes

9    and says that he/she has read the foregoing

10   transcript of his/her testimony and knows the

11   same to be true.

12

13

14   _____

15                        Cinthia Thevenin

16

17   Subscribed and sworn to before me

18   this  8th day of  September , 2016

19

20

21   Notary Public _____

22                                          Brendan McCoy
                                            Notary Public, State of New York
                                            No. 01MC6306142
                                            Qualified in Albany County
                                            Commission Expires June 16, 20 18

23

Theresa M. Tobin, Court Reporter
Queensbury, New York 12804
518-741-6005

| DATE/ TIME | 04-17-16-0500 |
| AGENCY | TROY POLICE DEPARTMENT |
| CASE # | 38338-16 |
| PHOTOGRAPHED BY | Officer M. Furciniti EVIDENCE TECHNICIAN CAMERA # 6 |

SR.066



SR 067





SR.069

SR.070



SR.071



SR.072



SR.073