UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CINTHIA THEVENIN, individually, and as wife of EDSON THEVENIN, Decedent, and as Administratrix of the Estate of EDSON THEVENIN, and as mother and natural guardian of Infant N.T. and as mother and natural guardian of Infant Z.T,<br><br>                Plaintiff,<br><br><br>            –against–<br><br><br>THE CITY OF TROY and SERGEANT RANDALL FRENCH,<br><br>                Defendants. | DOCKET NO:<br>16-CV-1115(DJS)<br><br>**PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 7.1(a)(3)** |

Plaintiff Cinthia Thevenin, individually, and as wife of Edson Thevenin, decedent, and as Administratrix of the Estate of Edson Thevenin, and as mother and natural guardian of infant N.T. and mother and natural guardian of infant Z.T., by and through her attorneys hereby provides the following Counter Statement of Material Facts pursuant to Local Rule 7.1(a)(3), as to which Plaintiff asserts that there are genuine issues of material fact to be tried:

## GENERAL OBJECTIONS

A.    Plaintiff generally objects to the Defendants' Statement of Material Facts as it does not comply with Local Rule 7.1(a)(3) in that many of the "material facts" submitted by Defendants are not "undisputed" and Defendants have set forth multiple versions of the same events in the Statement of Material Facts.

B.    Plaintiff generally objects to the Defendants' Statement of Material Facts pursuant to Local Rule 7.1(a)(3), to the extent that some or all of the documents supplied by Defendants in

support of the "material facts" lack foundation to be admissible for the truth of their content under Federal Rules of Civil Procedure 56(c) and Local Rule 7.1(a)(3).

     C.     Plaintiff generally objects to the Defendants' Statement of Material Facts pursuant to Local Rule 7.1(a)(3), to the extent that many of the numbered paragraphs contain multiple factual assertions in derogation of Local Rule 7.1(a)(3), and do not constitute a short and concise statement of each material fact as required by the Rule.

     D.     Plaintiff's Counter Statement of Material Facts pursuant to Local Rule 7.1(a)(3), adopts the exhibit/record designations made by the Defendants and refers to those exhibits/record designations rather than burden the Court with a set of materials which duplicate the items produced by the Defendants. However, in making reference to the Defendants' exhibits/record, Plaintiff does not admit to or in any way concede the admissibility or relevance of said materials.

## PLAINTIFFS' RESPONSE TO SPECIFIC FACTS

     1.     This action was commenced on or about September 13, 2016 by the Plaintiff Cinthia Thevenin, (hereinafter "Plaintiff"), by the filing of a Summons and Complaint. R. 6.[1] By way of her Complaint, Plaintiff alleged certain causes of action sounding in excessive force as well as supplemental New York State claims for assault and battery, wrongful death and conscious pain and suffering. Plaintiff also seeks further redress against the City of Troy asserting that the City is liable under §1983 pursuant to the Supreme Court's decision in Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), commonly referred to as a Monell claim.

---

[1] All references cited as "R. __" refer to the numbered pages on the Record of Exhibits.

2.      An Answer was served on the Defendants' behalf on or about October 12, 2016. R. 18.

3.      In addition to paper discovery and the automatic disclosures mandated by the Federal Rules of Procedure, each of the parties and certain non-parties were deposed. To the extent such testimony is material to Defendants' motion, they are summarized in relevant part hereafter.

**Responses 1-3**. Plaintiff does not object to the Defendants' description of the pleadings and discovery in their Rule 7.1(a)(3) statement.

## TESTIMONY OF SERGEANT RANDALL FRENCH RELATING TO EVENTS OF APRIL 17, 2016

4.      Defendant Sergeant Randall French (hereinafter "French") has been employed by the City of Troy Police Department since July 18, 2003. R. 40.

5.      French has worked in a law enforcement capacity since the Summer of 1999.  R. 40.

6.      On April 17, 2016, French observed Edson Thevenin who, at the time, was operating a Honda Civic. R. 110.

7.      Sergeant French first observed the Honda Civic as it was turning westbound onto Congress Street from 6th Avenue in the City of Troy. R. 111.

8.      Thevenin's Honda made a wide right hand, westbound turn, from 6th Avenue onto Congress Street, traveling over the left lane of westbound Congress Street before returning to the right lane. The nature of this turn drew French's attention. R. 111.

9.      French followed the vehicle as it traveled westbound on Congress Street and turned right to travel northbound on 4th Street to where it parked on the east, right-hand side of the roadway. R. 111 – 112.

10.     French drove past the Honda and ran the vehicle's plates by entering it into his mobile data terminal, also known as a "MDT." R. 112.

11.     French continued on 4th Street and pulled over on the side of the road to review the information on the MDT which reflected that the Honda had a valid registration to a woman with an address in Watervliet, New York. R. 113.

12.     After approximately thirty seconds to a minute, Sergeant French drove back around the block and saw the Honda still parked. As such, French continued east on State Street to the County Office parking lot on the corner of 7th Avenue and Congress Street. R. 146 – 147.

13.     French remained in the County Office Parking lot for "a matter of minutes" before departing in response to a call for a large house party in north central Troy. R. 148.

**Responses 4-13**. Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

14.     At approximately 3:10 a.m., French observed the Honda Civic making an "odd" wide turn from eastbound Fulton Street onto northbound 6th Avenue. R. 149 – 150.

**Response 14** – French corrected himself that the turn was not "wide" and testified at p.121, lines 4-6 that Thevenin "went wide, and then turned back, and then straightened out again. Perhaps saying he turned wide was incorrect; just he made an odd turn." R.150.

15.     As French moved to pass in the left lane to continue to the house party call, the Honda swerved into French's lane, causing French to brake and preventing him from passing. R. 151 – 152.

16.     The Honda again swerved into French's lane before returning to his own lane. R. 152.

4

**Responses 15-16.** Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

17.     French decided to make a traffic stop of the Honda, pulled in behind the Honda and initiated his lights. R. 152 - 153.

18.     The Honda pulled over on 6th Avenue in a lane of traffic. R. 152 – 154.

19.     French radioed that he is on a traffic stop, indicating "112 central traffic stop." R. 154.

20.     French turned on his takedown lights and spot light to illuminate the area and help him see better in the dark. He exited his vehicle to approach the Honda. R. 155.

**Responses 17-20.** Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

21.     Sergeant French testified as to his interaction with Mr. Thevenin during the stop as follows:

> Q:     What was said?
>
> A:      I asked him for his license and registration; I asked him if it was his vehicle. He said originally "yes", and quickly said, "No, it's registered to my girl." I said okay. That matched up with the fact that I already run it and it came to a female, so that made sense to me. I told him I stopped him because he had swerved just down the road. He said he didn't realize he had done that. I asked him how much he had to drink, because I could smell a strong odor of an alcoholic beverage. He said, nothing or none. I said, Come on, man, I can smell it. He goes, what do you mean you can smell it. I said, I can smell it, and I know it's not me. He goes, Okay, I had beer. I said, Okay, no problem. He said he could not find the registration. He gave me his license. I said, All right, just wait right here, and I'll be right back.

R. 156 – 157.

**Response 21**. Plaintiff objects to the form of these "facts" as they are not short and plain statements of material facts, as Defendants have reproduced two pages of a deposition transcript. However, Plaintiff does not dispute that French gave this testimony in the transcript.

22.     French then returned to his vehicle and radioed to the officers responding to the house party call to check on their status. Randy indicated to them that he was involved in a stop with an impaired driver and couldn't let him drive away. R. 158.

**Response 22**. Although the facts cited at ¶22 are a general paraphrasing of multiple statements made by French, the "fact" asserted in the second sentence which reads that "Randy indicated to them that he was involved in a stop with an impaired driver and couldn't let him drive away" is disputed by Plaintiff, as French testified at p.129, lines 21-23, that at this point he did not know that he was going to make an arrest. (R.158).

23.     French ran Thevenin's license and learned that the license was valid and that Thevenin had no wants or warrants. R. 159.

24.     Intending to conduct field sobriety testing on Thevenin, Sergeant French retrieved his prescreening device and a fresh straw. R. 159.

25.     French turned off the flashing lights on his vehicle except for the arrow stick on the back of his vehicle. R. 161.

**Responses 23-25.** Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

26.     Sergeant French testified regarding his interaction with Thevenin, after approaching to conduct field sobriety testing, as follows:

Q:      And what happened when you approached the vehicle?

A:      I asked Mr. Thevenin to turn the vehicle off. He reached up, turned the keys off, left them in the ignition. I said, since you've had something to drink, I just want to make sure you're okay to drive. I'm going to ask you to step out of the car and come back here with me.

Q:      Did he in fact exit the vehicle?

A:      Yes.

6

> Q:     Was he in any way disrespectful to you?
>
> A:     No.
>
> Q:     Did he argue with you in any way?
>
> A:     No.
>
> Q:     When he exited the vehicle was he walking, in your opinion, regularly, staggering, something else?
>
> A:     He kept his hand on the car as he walked from the driver's door to the back, but other than that I did not notice anything remarkable.

R. 160 – 161.

**Response 26**. Plaintiff objects to the form of these "facts" as they are not short and plain statements of material facts, as Defendants have reproduced two pages of a deposition transcript. However, Plaintiff does not dispute that French gave this testimony in the transcript.

27.     French testified that Thevenin had impaired speech, but that Sergeant French could understand him. R. 162.

**Response 27**. Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

28.     French testified as to his continued interaction with Thevenin as follows:

> Q:     What happened next?
>
> A:     I asked him where he was coming from.
>
> Q:     And what was his answer?
>
> A:     He stated he was at a house party with his brother, but his brother became intoxicated and was causing problems so he took him home, then he went to get pizza, and then he went home.
>
> Q:     Okay. Did you know where his home was at that point?

> A:   No. I knew his address on his license was Watervliet, but I did not ask if that was a current address.
>
> Q:   So after he tells you the story about his brother and the pizza, what happens next?
>
> A:   I say, I just saw your car over by the pizza shop, he parked there at the pizza shop on 4th Street, where I saw him previously, is that when you were getting pizza? And he said, yes, and then I went home. I responded, you didn't go home because you're standing on the side of the road with me. And he responded, Yeah.

R. 162 – 163.

**Response 28**. Plaintiff objects to the form of these "facts" as they are not short and plain statements of material facts, as Defendants have reproduced two pages of a deposition transcript. However, Plaintiff does not dispute that French gave this testimony in the transcript.

29.   Sergeant French performed the horizontal gaze nystagmus test and Thevenin demonstrated all six clues, including lack of smooth pursuit, nystagmus at maximum deviation, and onset of nystagmus prior to 45 degrees. These cues indicated to Sergeant French that Thevenin had failed the test. R. 163 – 164.

30.   French next performed the vertical gaze nystagmus and Thevenin demonstrated that he had vertical gaze nystagmus. R. 164.

31.   French then directed Thevenin to perform the walk and turn test, but Mr. Thevenin also failed that test. R. 165 – 166.

**Responses 29-31**. Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement, other than ¶31 as French did not testify that Thevenin failed the walk and turn test.

32.   Sergeant French then advised Thevenin that the next test would be the one-leg stand test. R. 166.

33.     The test commenced, but French halted the test, fearing that Thevenin would fall. R. 167.

**Responses 32-33**. Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

34.     Next, French asked Mr. Thevenin to blow into the alco-sensor and testified to this sequence of events as follows:

> Q:     Did he indicate that he did not want to?
>
> A:     He said that he was very nervous about blowing into that because he had had two beers.
>
> Q:     And what was your response to that?
>
> A:     I said that's okay.  I told him that it's a prescreening device.  All I can testify to is that it tested positive for the presence of alcohol.  If he does not take a test, he would get a traffic ticket.  And whether he took it or not was not going to change what was going to happen next.
>
> Q:     And what did he say in response to that?
>
> A:     He said, then I'll take the traffic ticket. Okay.
>
> Q:     Did you in fact issue him the traffic ticket?
>
> A:     No.
>
> Q:     So after he said, I'll take the traffic ticket, what happened next?
>
> A:     I put the Alco-Sensor in my back pocket, and told him that he was under arrest for DWI

R. 168.

**Response 34**. Plaintiff objects to the form of these "facts" as they are not short and plain statements of material facts, as Defendants have reproduced multiple statements from the deposition transcript, many of which are not materials to the motion. However, Plaintiff does not dispute that French gave this testimony in the transcript.

35.     Sergeant French testified as to the sequence of events following his advising Thevenin that he was under arrest as follows:

Q:     And what was his response to that?

A:     He put his hands up, palms facing me, and said, whoa, whoa, I can't get arrested. I'm a mechanic, I'll lose my job. Then he said, you didn't tell me what I was being arrested for. I said, I did tell you. I just told you it's for DWI.

Q:     And after you said "DWI," what did he do?

A:     He just kept saying, I can't get arrested. I kept telling him to turn around and put his hands behind his back, and he kept just doing, No, no, no.

Q:     Did he put his hands on you at this point?

A:     No.

Q:     So he's saying, No, no, no. Obviously this conversation continued for some period of time. About how long did that, No, no, no –

A:     10, 15 seconds. It wasn't a long conversation.

Q:     So what happened after that?

A:     I said, let's not turn this into something it doesn't have to be. You are under arrest. I was speaking more sternly at this point, you are under arrest, turn around, and put your hands behind your back.

Q:     And what did he say?

A:     He still didn't do it, and I repeated that one more time.

Q:     And then what happened next?

A:     He turned sideways and placed his hands behind his back.

Q:     Okay. Did you begin to apply the handcuffs to his hands?

A:     I went up and I grabbed both of his hands with both of my hands, trying to push them together so I could hold both hands with one hand so I could get my handcuffs out and put on him. But he kept his hands and arms very rigged and stiff. I could not move them.

10

Q:      Were you giving verbal instructions during this time?

A:      Yes.

Q:      What were those verbal instructions?

A:      I said, let's not turn this into a resisting, you are under arrest. He just kept saying again, I can't get arrested for this. And he stayed rigid.

Q:      What happens next?

A:      I got on the radio and said, 112, I need some help here. And I continued to try to wrestle his hands together.

Q:      About how long was this wrestling going on?

A:      Five, ten seconds.

Q:      The radio that you used was on your person, or did you go back to your car to use a radio?

A:      It was on my person.

Q:      Where was the key located for the radio?

A:      My left shoulder.

Q:      So you make this radio or you key in on the radio with a call. And then what do you do next?

A:      I just continued to try to get his hands together.

Q:      And where is he standing at this point?

A:      We are standing between the two cars right behind the trunk of his car.

Q:      Is any part of his body touching the car?

A:      No, he is standing sideways from the car. And, no, we weren't right up on the trunk.

Q:      Okay. What happened after this?

A:      He said, fuck this. Those were his words, and he ripped his hands away from me.

Q:      And then what did he do next?

11

A:      He started walking towards his car.

Q:      And what did you do?

A:      I grabbed the back of, it was either a jacket or hooded sweater. I grabbed the top of it, and I tried to pull him over backwards. I was unsuccessful.

Q:      How long tall was he? (sic)

A:      About six-two.

Q:      So he was about four inches taller than you?

A:      Six inches. I'm five-eight.

Q:      You're five-eight. Okay. What was the weight difference between the two of you, best of your recollection?

A:      About 60 pounds.

Q:      That he had 60 pounds on you?

A:      Yes.

Q:      You'd say he was about 250?

A:      I would.

Q:      Okay. And after you grabbed the back of his jacket and was unsuccessful, what happened next?

A:      I kept holding onto him with my left hand. I --with my hand, I took out my OC. I reached around the side of him, to the right side, and peppered sprayed his face. It had no effect.

R. 169 – 172.

        ---                ---                ---

Q:      What happened after you applied the pepper spray the first time?

A:      I -- still holding the pepper spray in my hand, I used my right hand to also grab onto his sweatshirt. I was trying to prevent him from getting in his car long enough for help to get there.

12

Q:     Were you able to restrain him?

A:     No.

Q:     So you had your right hand on the pepper spray, and your left hand on him; is that correct?

A:     I was I still had the pepper spray in my right hand, but I was also able to grab onto the back of his outer garment with that hand as well.

Q:     Are you right hand dominant or left hand dominant.

A:     Right hand.

Q:     What happened next?

A:     He gets to his car door. He's able to open his car door, and he sits in the car. And when he sat down, he was able to shear my hands off the back of his shirt or outer garment.

Q:     What do you mean by "shear"?

A:     By the fact that he sat down hard. I 'm holding onto his hands, so now my hands hit the side of the car. I can't hold anymore because the force of him going in tears my hands away.

Q:     Understood. So he didn't actually pull your hands, but the force of his him sitting down pulled your hands off of him?

A:     Yes.

Q:     Okay. What happened next?

A:     I peppered sprayed him again.

R. 173 – 175.

---            ---            ---

Q:     So what happened next after this second pepper spraying?

A:     I put my right forearm against his upper chest to push him back in the seat because I intended on reaching over the steering column to try to get the keys out of the ignition.

Q:     Was the car turned on at this point?

13

A:     No.

Q:     Did you have a belief that he was going to start the car?

A:     Yes.

Q:     Why did you believe he was going to start the car?

A:     Based on the totality of the circumstances. He appeared that he did not want to be arrested, and he was going to leave the scene.

Q:     Okay. So what happened when you reached for the keys?

A:     He got his hand to the keys faster and turned the car on.

Q:     Okay. And what happened after he turned the car on?

A:     I then planned -- or I intended to reach for the gear shift to prevent him from putting it into gear.

Q:     Did you have to reach across his body to reach the gear shift?

A:     Between his body and the steering wheel.

Q:     Well, you were outside of the car at this point right?

A:     I 'm about halfway in the car with him.

R. 176 – 177.

        ---                 ---                 ---

Q:     What happened as you reached across the gear shift?

A:     He got to the gear shift first and put it in drive.

Q:     And what did you do after he put it in drive?

A:     He immediately started driving north on 6th Avenue with me still in the car. So I pushed out of the car because I didn't want to get dragged by him.

Q:     Okay. Did you successfully pull yourself out of the car?

A:     Yes.

14

Q:      Any part of the car strike your body?

A:      No.

Q:      As the car pulled away, where were you?

A:      I fell onto the roadway.

R. 178

**Response 35**. Plaintiff objects to the form of these "facts" as they are not short and plain statements of material fact, as Defendants have reproduced portions of nine (9) pages of the deposition transcript in their ¶35. Plaintiff additionally objects as the Defendants have used ellipses to exclude some statements from the nine (9) pages of transcript which comprise ¶35, and included some "facts" which are not material to the motion. Among the facts elipsed by Defendants are French's testimony that he did not know if the pepper spray made contact with Thevenin's eyes (R.173), that when French pepper sprayed Thevenin a second time, he was aiming for Thevenin's nose and eyes, but "does not know where it landed" and French was not impacted by the pepper spray being sprayed at close quarters (R.175). However, Plaintiff does not dispute that what is reproduced by Defendants from the nine (9) pages of the transcript is an accurate reproduction of the selected portions of the transcript.

36.      After falling onto the roadway, Sergeant French got up and ran to his patrol car, indicating into his radio "he just tried to run me over". R. 178 – 179.

37.      French acknowledges that Thevenin did not try to run him over, and he is not sure why he said that over the radio. R. 179.

38.      Sergeant French heard Officer Dean reply on the radio asking for a vehicle description because Dean was in the area. R. 179.

39.      Reaching his patrol vehicle, French turned on the lights and siren and began driving northbound. R. 180.

15

40.     French radioed that Thevenin had turned eastbound on Hoosick Street which is a right turn into the westbound lane. R. 180 – 181.

41.     French followed Thevenin and turned eastbound on Hoosick Street. R. 180 – 182.

42.     Captain Matthew Montanino came on the radio indicating that he would be calling the pursuit. R. 181 – 182.

43.     Thevenin made a U-turn and turned westbound onto the Collar City Bridge. R. 182.

44.     Thevenin's vehicle then crashed into a concrete barrier on the bridge. R. 182.

**Responses 36-44**. Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

45.     Moments after Thevenin hit the barrier, French passed the Honda and put his car at an angle next to the Honda to ensure that Thevenin could not drive away. R. 183 – 184.

**Response 45** – French did not testify as to the length of time after Thevenin hit the barrier that French took any action, as French testified at p.154, lines 4-6 (R.183) that by the time that French turned onto the bridge, Thevenin's vehicle had already crashed. Additionally, French did not testify that he put his car at angle as the actual testimony at p. 154, lines 21-23 was "I put my car -- I passed him, and I put my car in front of his to ensure that he would not be able to drive away." (R.183).

46.     Sergeant French testified that his car was a couple feet from Thevenin's vehicle where it stopped. R. 183 – 184.

**Response 46** - Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

47.     French reached to his passenger seat to retrieve his Maglite and turned to exit his vehicle but when he opened his door, it hit the front bumper of the Honda, and he had to squeeze out of his car. R. 184.

**Response 47** – Plaintiff does not object to the reference to retrieving the Maglite, but Plaintiff objects to "when he opened his door it hit the front bumper of the Honda and he had to squeeze out of his car" based on contrary testimony from Montanino, Millington and Gross which demonstrate that this is not a material fact about which there exists no genuine issue.

Montanino testified that when Montanino exited his vehicle and started to walk towards Thevenin's vehicle, he saw French "get out of the driver's door of his patrol vehicle, exit his vehicle." (R.432). Thereafter, Montanino heard French say "stop, stop." (R.432,436). While Montanino heard the "stop, stop" the engine of Thevenin's car "sounded like it was revving, like the accelerator was being pushed and the back tires were, like, spinning, indicating to me car was trying to come backwards." (R.436-437).  Montanino then observed that the tires were spinning "in reverse, because when I exited my vehicle I started to approach the Thevenin vehicle. I had started to approach on the driver's side. The engine was revving and the tires appeared to be spinning, and the vehicle came off the wall and came backwards." (R.437).

Millington testified that after Thevenin's car hit the barrier, the French and Montanino vehicles pulled in front and behind Thevenin's car to block him in. (R.649-650). Thereafter Millington saw French (who Millington identified as the officer in front of Thevenin's car) get out of his car. (R.653). Millington heard French yelling "stop" and saw that French had his gun drawn, with both hands on the gun and in a shooter's stance. (R.655-656,680). Millington observed that French was outside of his car, before he drew the weapon from his holster. (R.715). After French yelled "stop" Millington saw Thevenin back up his car and hit Montanino's car before moving

forward towards French. (R.657-658). Millington testified that it looked like Thevenin was trying to get out from in between the two cars. (R.659). Millington was unsure if Thevenin was trying to get around French or through him. (R.660). Millington was also unsure as to whether French had the ability to get out of the way of Thevenin's car. (R.721). Millington testified that the shots were fired at Thevenin at the same time that Thevenin's car collided with French. (R.660-661). Millington testified that he also saw Montanino firing his gun at Thevenin. (R.663).

Gross testified that as Thevenin and French's car were getting on the Collar City Bridge, French's car went around Thevenin's car and blocked it off. (R.763). Thereafter, Gross heard a light collision, but did not see it. (R.763). Gross then saw French get out of his car before shots were fired. (R.764-765). Gross testified that French was not in contact with the Thevenin vehicle when the shots were fired (R.765) and that were approximately four (4) feet of space between Thevenin's vehicle and French's vehicle when the shots were fired. (R. 767). Gross further testified that after the shots were fired, Thevenin's car rolled forward three or four feet and collided with French. (R.768).

48.     French believed that Thevenin had moved his vehicle after French parked in front of the Honda. When French parked, he believed that he wasn't close enough for his door to hit the Honda. R. 184.

**Response 48** – Plaintiff objects to the inclusion of this statement as material fact as French's belief is not a material fact. Plaintiff also objects to statements as to the proximity of the cars and French's testimony as to his car door striking the Honda based on contrary testimony from Montanino, Millington and Gross in Response 47 above, which demonstrate that this is not a material fact about which there exists no genuine issue.

49.     French had intended to get to the passenger side of Mr. Thevenin's car in order to stop the car and end Thevenin's flight. R. 186.

**Response 49** – Plaintiff objects to the inclusion of this statement as a "material fact" as French's intent which he never followed through with is not probative.

50.     As he exited his vehicle, Sergeant French was yelling to Thevenin to "Stop." R. 187.

**Response 50** - Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

51.     While he was able to get his entire body out of the vehicle, Sergeant French became immediately stuck between the Honda and his patrol car. R. 187.

**Response 51**- Plaintiff objects to the inclusion of this statement as a material undisputed fact as French's testimony about being stuck is contrary to testimony from Montanino, Millington and Gross in Response 47 above, which demonstrate that this is not a material fact about which there exists no genuine issue.

52.     Thevenin's front bumper was pushed up against Sergeant French's lower left leg, trapping it against French's car. French could hear Thevenin's engine revving. French R. 187 – 188.

**Response 52**- Plaintiff objects to the inclusion of this statement as a material undisputed fact as French's testimony about being trapped is contrary to testimony from Montanino, Millington and Gross in Response 47 above, which demonstrate that this is not a material fact about which there exists no genuine issue.

53.     French testified that he attempted to put his hands on the Honda's hood to pry his leg free but was unsuccessful. R. 188.

**Response 53** - Plaintiff objects to the inclusion of this statement as a material undisputed fact as French's testimony about being stuck is contrary to testimony from Montanino, Millington and Gross in Response 47 above, which demonstrate that this is not a material fact about which there exists no genuine issue.

54.     The pain for Sergeant French was unbearable and was growing worse as the engine revved. R. 189.

**Response 54** - Plaintiff objects to the inclusion of this statement as a material undisputed fact as French's testimony about being stuck is contrary to testimony from Montanino, Millington and Gross in Response 47 above, which demonstrate that this is not a material fact about which there exists no genuine issue.

55.     French testified that he had hoped his leg would break so that maybe the pain would cease. R. 189.

**Response** 55 – While Plaintiff does not disagree that French testified to this, Plaintiff objects to the inclusion of this statement as a material undisputed fact as French's testimony about being stuck is contrary to testimony from Montanino, Millington and Gross in Response 47 above which demonstrate that this is not a material fact about which there exists no genuine issue.

56.     French testified that he was still yelling at Thevenin to "stop" as the Honda continued to accelerate. R. 189.

**Response 56** - While Plaintiff does not disagree that French testified to this, Plaintiff objects to the inclusion of this statement as a material undisputed fact as French's testimony about yelling stop while being stuck is contrary to testimony from Montanino, Millington and Gross in Response 47 above, which demonstrate that this is not a material fact about which there exists no genuine issue.

57.     French, believing that he "was going to die" aimed and fired his weapon towards Thevenin. R. 189 – 190.

**Response 57** – Plaintiff objects to the inclusion of this statement as a material undisputed fact as French's testimony about thinking he was going to die while being stuck is contrary to testimony from Montanino, Millington and Gross in Response 47 above which demonstrate that this is not a material fact about which there exists no genuine issue. Additionally, French did not merely testify that he "fired his weapon towards Thevenin", as the actual question and answer provided in testimony at p.161, lines 18-19, were:

Q.     Where were you aiming when you fired the weapon?

A.     Center mass of Mr. Thevenin

(R.190).

58.     French testified that he fired on Mr. Thevenin because "I was going to die." R. 191.

**Response 58** – While Plaintiff does not disagree that French testified to this, Plaintiff objects to the inclusion of this statement as a material undisputed fact as French's testimony about thinking he was going to die while being stuck is contrary to testimony from Montanino, Millington and Gross in Response 47 above which demonstrate that this is not a material fact about which there exists no genuine issue.

59.     Sergeant French does not recall how many times he fired or whether or not he hit Thevenin after these first shots were fired. R 190 – 191.

**Response 59** – Plaintiff objects to the inclusion of this statement as a material fact about which there exists no genuine issue as French's <u>inability to recall how many times he fired or whether he hit Thevenin</u> with the initial shots are not "facts."

21

60.     After he ceased firing, Sergeant French testified that "something happened" which resulted in him twisting, with his left leg pinned sideways. His body ended up thrown up across the hood of the Honda with his head towards the passenger side of the windshield. R. 192 – 193.

61.     French observed that Thevenin appeared to be unfazed by the gunshots. R. 193.

62.     As French lay on the hood, he could still hear the engine revving constantly and his leg was still trapped between the vehicles. R. 195.

63.     French aimed and fired again at Thevenin. R. 198.

64.     French testified that he fired because he wanted to stop Thevenin. R. 198.

65.     French testified that he stopped firing because the engine stopped revving. R. 198 – 199.

**Responses 60-65** - Plaintiff objects to the inclusion of these statement as undisputed material facts, as French's testimony about being on the hood of the Thevenin vehicle, seeing Thevenin unfazed and firing his gun again until the engine stopped revving, are contrary to testimony from Millington and Gross which demonstrate that these are not material facts about which there exists no genuine issues.

Millington testified that the shots were fired at Thevenin at the same time that Thevenin's car collided with French. (R.660-661). Gross testified that French was not in contact with the Thevenin vehicle when the shots were fired (R.765) and that was approximately four (4) feet of space between Thevenin's vehicle and French's vehicle when the shots were fired. (R. 767). Gross further testified that after the shots were fired, Thevenin's car rolled forward three or four feet and collided with French. (R.768).

66.     French wanted to reload his weapon but could not get to his spare magazine. R. 199.

**Response 66** – Plaintiff objects to the inclusion of this statement as a material fact about which there exists no genuine issue as French's intent which he never followed through with is not probative.

67.     Sergeant French wanted to reload his weapon because he did not know the status of the threat, and did not know how many bullets were left in his magazine. His training taught him to reload in case he needed to fire again. R. 199.

**Response 67** – Plaintiff objects to the inclusion of this statement as a material fact about which there exists no genuine issue" as French's intent which he never followed through with is not probative.

68.     Captain Montanino removed Thevenin from the Honda and placed him on the pavement alongside the driver's side of the vehicle. R. 199 – 200.

**Response 68** – Plaintiff objects to this statement to the extent that it purports to discuss the placement of Mr. Thevenin's body, as French's actual testimony at p.170 lines 21-23 was "[a]nd at this point Captain Montanino is pulling him of out of the car." (R.199)

69.     As French observed that Thevenin was being removed from the vehicle by Montanino, he considered the threat ended and holstered his pistol. R. 199.

70.     French fell to his left towards the roadway after the people on scene were able to push the cars apart to create a gap. R. 201 – 202.

71.     Officers tried to pull French away, but his boot lace was stuck on the Honda. R. 202.

72.     After French's boot laces were cut, he was pulled up and was able to stand. R. 203.

73.     Two officers assisted French by carrying him to the back of Officer David Dean's police car. R. 204.

74.     French was put in the back seat of Officer Dean's car and driven to Albany Medical

Center on New Scotland Avenue for treatment for his injuries. R. 205.

**Responses 69-74 -** Plaintiff does not object to the Defendants' description of these facts in

their Rule 7.1(a)(3) statement.

## FRENCH DRAFT RESPONSE TO RESISTANCE REPORT

75.     Sergeant French prepared a draft Response to Resistance Report. R. 294 – 295.

**Response 75 -** Plaintiff does not object to the Defendants' description of these facts in their

Rule 7.1(a)(3) statement as French did testify that he prepared a draft response to resistance report.

76.     The report indicates that Thevenin exhibited verbal, passive physical, active

physical, and aggressive physical resistance, was under the influence of alcohol, and utilized a

vehicle as a weapon. R. 893.

77.     The report indicates that French responded to Thevenin's resistance by his physical

presence, via communication, physical control and deadly force. R. 893 – 894.

**Responses 76-77** – Plaintiff concedes that the report indicates the facts contained in ¶¶76-

77, however such report is inadmissible hearsay under Federal Rule of Evidence §803 and Plaintiff

objects to its use in a summary judgment motion. *See generally Murphy v. City of Newburgh*, 2018

WL 4625806 at n.7 (S.D.N.Y. Sept. 26, 2018).

78.     Techniques utilized by French included physical presence, verbal commands,

soft/empty hand control, handheld OC spray, and eight shots from his Kimber pistol duty firearm,

five of which hit the target. R. 893 – 894.

79.     The narrative to the response to resistance report indicated that French advised

Thevenin that he was under arrest for DWI and that Thevenin hesitated but complied. R. 895.

80.     As French attempted to apply handcuffs, Thevenin started pulling his hands away and French gave orders to stop resisting. R. 895.

81.     Thevenin said "Fuck this" and pulled both of his hands away from French. R. 895.

82.     Sergeant French grabbed the back of Thevenin's sweatshirt and tried to pull him backwards but Thevenin kept walking to his vehicle. R. 895.

83.     French deployed OC spray to the right side of Thevenin's face and continued to pull on Thevenin's clothing but Thevenin was able to get into his vehicle. R. 895.

84.     French attempted to put Thevenin into an arm bar against the door frame, but Thevenin was able to get his arm free. R. 895.

85.     French again deployed OC spray and pushed on Thevenin's torso in an attempt to prevent Thevenin from turning the vehicle on but Thevenin was able to turn the vehicle on and put the car into gear and began to drive northbound on 6th Avenue with French still in the vehicle. R. 895.

86.     As Thevenin drove away, French pushed himself out of the Honda and fell into the roadway. R. 895.

87.     French pursued the vehicle which eventually crashed west bound on the Collar City Bridge. R. 895.

**Responses 78-87** – Plaintiff concedes that the report indicates the facts contained in ¶¶78-87, however such report is inadmissible hearsay under Federal Rule of Evidence §803 and Plaintiff objects to its use in a summary judgment motion. *See generally Murphy v. City of Newburgh*, 2018 WL 4625806 at n.7 (S.D.N.Y. Sept. 26, 2018).

88.     French exited his vehicle in order to arrest Thevenin, but Thevenin drove into Sergeant French and pinned his left knee against his patrol vehicle. Thevenin kept the engine revved in an attempt to continue driving. Despite trying to do so, French was unable to free himself. R. 895.

89.     French feared that his leg would break which would cause him to fall under the suspect's vehicle and be killed. R. 895.

**Response 88-89** – Plaintiff concedes that the report indicates the facts contained in ¶¶88-89, however such report is inadmissible hearsay under Federal Rule of Evidence §803 and Plaintiff objects to its use in a summary judgment motion. *See generally Murphy v. City of Newburgh*, 2018 WL 4625806 at n.7 (S.D.N.Y. Sept. 26, 2018). Additionally, although the report makes these statements, Montanino, Millington and Gross testified to contrary facts as discussed in Response 47 above and which demonstrates that this is not a material fact about which there exists no genuine issue.

90.     French fired two rounds through the windshield at Thevenin. R. 895.

**Response 90** – Plaintiff concedes that the report indicates the facts contained in ¶90, however such report is inadmissible hearsay under Federal Rule of Evidence §803 and Plaintiff objects to its use in a summary judgment motion. *See generally Murphy v. City of Newburgh*, 2018 WL 4625806 at n.7 (S.D.N.Y. Sept. 26, 2018). Additionally, Plaintiff objects as although the document states these facts, French testified at p.245, line 19 - p.246, line 20, that he did not know how many shots were fired during the first set of shots and that his inclusion of this "fact" in the report was based on information provided to him by someone who he does not recall. (R.301-302).

91.     Thevenin turned the vehicle and continued to accelerate which caused French's leg to twist and forced Sergeant French onto the hood of Thevenin's vehicle. R. 895.

**Response 91** - Plaintiff concedes that the report indicates the facts contained in ¶91, however such report is inadmissible hearsay under Federal Rule of Evidence §803 and Plaintiff objects to its use in a summary judgment motion. *See generally Murphy v. City of Newburgh*, 2018 WL 4625806 at n.7 (S.D.N.Y. Sept. 26, 2018). Additionally, although the report makes these statements, Montanino, Millington and Gross testified to contrary facts as discussed in Response 47 above and which demonstrates that this is not a material fact about which there exists no genuine issue. Furthermore, Plaintiff objects as although the document states this, French testified during his deposition at p.252, lines 5 – p.253, line 4, that French did not recall seeing Thevenin turn the steering wheel and could not recall which way the steering wheel was turning. (R.308-309).

92.    French observed the suspect turning the wheel and that the engine was still revved and fired an additional six shots through the windshield at Thevenin. R. 895.

**Response 92** - Plaintiff concedes that the report indicates the facts contained in ¶92, however such report is inadmissible hearsay under Federal Rule of Evidence §803 and Plaintiff objects to its use in a summary judgment motion. *See generally Murphy v. City of Newburgh*, 2018 WL 4625806 at n.7 (S.D.N.Y. Sept. 26, 2018). Additionally, although the report makes these statements, Montanino, Millington and Gross testified to contrary facts as discussed in Response 47 above and which demonstrates that this is not a material fact about which there exists no genuine issue. Furthermore, Plaintiff objects as although the document states this, French testified during his deposition at p.252, lines 5 – p.253, line 4, that French did not recall seeing Thevenin turn the steering wheel and could not recall which way the steering wheel was turning. (R.308-309). Additionally, French testified during his deposition at p.252, lines 12-13 that the information as to the number of additional shots was provided to him by someone else. (R.308).

## FRENCH DRAFT POST-PURSUIT REPORT

93.     Sergeant French prepared a draft Post-Pursuit Report. R. 292 – 293.

**Response 93 -** Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement as French did testify that he prepared a draft post-pursuit report.

94.     The narrative to the report indicates that Thevenin fled from the location of the origin of the pursuit which was on 6th Avenue between Jacob Street and Hoosick Street, after Sergeant French attempted to arrest him for DWI. R. 898.

95.     French announced on the radio that the suspect was headed north on 6th Avenue and Officer Dean requested a description of the vehicle which was provided. R. 898.

96.     French indicated that Thevenin had turned east on Hoosick Street. R. 898.

97.     Captain Montanino announced that he would call the pursuit. R. 898.

98.     Thevenin then turned west bound onto the Collar City Bridge. R. 898.

99.     When French turned onto the bridge, he observed that Thevenin had crashed into the left side of the bridge. R. 898.

100.    Sergeant French then placed his vehicle in front of Thevenin's Honda in order to prevent him from driving away and continuing the chase. R. 898.

**Responses 94-100 -** Plaintiff concedes that the report indicates the facts contained in ¶¶93-100, however such report is inadmissible hearsay under Federal Rule of Evidence §803 and Plaintiff objects to its use in a summary judgment motion. *See generally Murphy v. City of Newburgh*, 2018 WL 4625806 at n.7 (S.D.N.Y. Sept. 26, 2018).

## **CELL PHONE VIDEO TAKEN BY PHILLIP GROSS**

101.    A passerby, Phillip Gross, took video of the moments following the shooting of Thevenin. R 768.

102.    From the videos commencement to about 0:11, an individual can be seen leaning over the hood of a vehicle. R. 899.

103.    At 0:02 of the Video, someone can be yelling "get it off me." R. 899.

104.    Again at 0:06 of the video, someone can be heard yelling "get it off me." R. 899.

105.    At 0:10 of the video someone can be heard yelling "someone get this car off me." R. 899.

106.    The video goes dark as it appears Mr. Gross puts his cell phone into his pocket. R. 899.

107.    Muffled screams, voices and sirens can be heard after the video goes black. R. 899.

108.    At 1:00 someone can be heard yelling about a "shoelace". R. 899.

**Responses 101-108 -** Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement as the Gross video appears to show the events described in ¶¶101-108 at or about the time indicated in these milestones.


## TESTIMONY OF CAPTAIN MATTHEW MONTANINO RELEVANT TO THE EVENTS OF APRIL 17, 2016.

109.    Captain Matthew Montanino received French's radio call while heading to north Troy on River Street in response to the call about the large party on River Street. R. 415.

110.    Montanino received French's subsequent radio call for assistance while responding to the River Street party. R. 416.

111.    After hearing Sergeant French call for assistance, Captain Montanino left the River street location and headed towards the location of French on 6th Avenue with his lights and sirens engaged. R. 418.

112.    Montanino followed French onto Hoosick Street, and came onto the radio indicating that he would be calling the pursuit. R. 421 – 422.

113.    The Thevenin vehicle then crossed into the west lane of Hoosick Street, went around a barrier and turned westbound on the Collar City Bridge in the eastbound lane. R. 423 – 424.

**Responses 109-113** - Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

114.    Captain Montanino testified as to the next movements of the Thevenin vehicle as follows:

> Q:    So what happens next after he goes in the wrong lane of the traffic?
>
> A:    He then makes -- would be a more of a left-hand turn to get onto to the entrance to the Collar City Bridge. So his vehicle makes the left and gets onto the bridge. At that point in time, as he had rounded that barrier right there at the corner of the bridge, Sergeant French's patrol vehicle then started to make the turn onto the bridge, which time I was behind him. I had to slow down in order to make the turn. As I was making the turn, I observed that the suspect vehicle had -- was in the left lane.
> There was two lanes there, a left- and right-hand lane, suspect vehicle was in the lane, and had crashed into the concrete barrier on the bridge.
>
> Q:    Okay. Which compass direction is the vehicle traveling before it crashes into the concrete barrier?
>
> A:    Westbound.
>
> Q:    And that was the correct -- the correct direction of traffic, or was he still driving against traffic at that point?
>
> A:    That was the correct direction.
>
> Q:    So he's driving westbound on a westbound lane, and he's in the left lane of two lanes going west?
>
> A:    Yes.
>
> Q:    Did you see what caused his vehicle to hit that cement barrier?

A:     No.

Q:     Did you actually see the vehicle hit the cement barrier?

A:     No.

Q:     Do you know whether his vehicle was propelled by another vehicle into the cement barrier?

A:     No, it was not.

Q:     How do know that?

A:     Because Sergeant French's vehicle had just made the turn onto the bridge, and there was distance behind him. So when I had made the turn Sergeant French's vehicle was not right at the back of his-- of the suspect vehicle at that time.

Q:     When the suspect vehicle hits that cement barrier did it stop dead, or was it still moving? You said it crashed into the barrier. Did it bounce off and then keep going, or did it stop?

A:     It was stopped.

R. 425 – 426.

**Response 114 -** Plaintiff objects to the form of these "facts" as they are not short and plain statements of material fact, as Defendants have reproduced portions of multiple pages of the deposition transcript in their ¶114. However, Plaintiff does not dispute that what is reproduced by Defendants from the transcript is an accurate reproduction of the selected portions of the transcript.

115.   Moments after the Thevenin vehicle impacted the cement barrier, Sergeant French pulled in front of the Thevenin vehicle, coming to a stop at an angle within five feet from the Honda. R. 427 – 428.

**Response 115** – Plaintiff objects to ¶115 to the extent that these facts are not contained in R.427-428, but does not otherwise object.

31

116.    Montanino testified that he pulled in behind the Honda, leaving a few feet between the vehicles.  R. 432.

117.    Captain Montanino exited his vehicle and started to approach the Honda. R. 433.

**Responses 116-117** - Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

118.    Montanino testified to the events that followed:

Q:    Did you hear any instructions from Sergeant French to Thevenin at that point when you first saw Sergeant French outside of his vehicle?

A:    Yes.

Q:    What did you hear?

A:    I could hear Sergeant French yelling, Stop. I heard that a few times. I could hear something else, but I couldn't understand what it was because my vehicle -- when I existed my vehicle I had my emergency lights and my emergency siren still activated.

R. 435.

---          ---               ---

Q:    At the point that Sergeant French was saying, Stop, stop, what was the Thevenin vehicle doing?

A:    The engine sounded like it was revving, like the accelerator was being pushed and the back tires were, like, spinning, indicating to me that the car was trying to come backwards.

Q:    Well, which way were the tires spinning?

A:    I didn't look directly at the tires.

Q:    Well, it could be spinning forward if the vehicle's trying to go forward, or they could be spinning backwards if the tires going backwards. Which way was the tires spinning, to your knowledge?

A:    I would have to say -- I would say in reverse, because when I exited my vehicle I started to approach the Thevenin vehicle. I had started to approach

on the driver's side. The engine was revving and the tires appeared to be spinning, and the vehicle came off the wall and came backwards.

R. 436 – 437.

       ---        ---        ---

Q:    Were you still outside of your vehicle at that point where you heard the tires and saw the vehicle going backwards?

A:    Yes.

Q:    And what did you do in response to that vehicle moving backwards towards your vehicle?

A:    I jumped out of the way.

Q:    Okay. Did the Thevenin vehicle make contact with any part of your vehicle?

A:    It did.

Q:    Which part of the Thevenin vehicle made contact with your vehicle?

A:    The rear of the Thevenin vehicle, when it came back in reverse, struck the front bumper area grille area of my vehicle.

Q:    Was it flush or on the side or something else?

A:    It appeared to be straight on.

R. 438.

       ---        ---        ---

Q:    Okay. After the Thevenin made contact with your vehicle, what did you do next?

A:    I had turned -- I had jumped out of the way. So I had -- my body had turned away. I believe I turned to the left, which would be facing going south. I turned back around to start to go to approach the driver's side again of the Thevenin vehicle, and the car -- the Thevenin vehicle, then started moving forward.

Q:    Okay. At this point when the Thevenin vehicle starts to move forward is your service weapon still in the holster?

A:      Yes.

Q:      Okay. Are you saying any commands?

A:      I was yelling, Stop, stop.

Q:      What was Sergeant French doing at that point?

A:      I could hear Sergeant French yelling something. I can't make out what it was.

R. 439.

---               ---               ---

Q:      The Thevenin vehicle makes contact with your vehicle. Does it stop at that point, or does it bounce off it, or what happens?

A:      It hit my vehicle, and it was a brief – seconds, and then the car proceeded forward.

R. 443.

---               ---               ---

Q:      You said it looked like he was trying to get away; correct?

A:      Yes.

Q:      When the vehicle was trying to get away, what was your response; what did you do?

A:      I, at that point, started to make the forward motion. I turned away and started to go back to my vehicle because I thought he intended to pursue the vehicle.

Q:      When this vehicle was trying to get away could you see Sergeant French at that point?

A:      No.

Q:      When's the next time you saw Sergeant French after this vehicle starts to try to get away from this police stop?

A:      The next time I saw Sergeant French was, again, when he was pinned between the vehicle and the patrol car, and he was -- upper body was laying on the hood.

34

R. 445 – 446.

   ---        ---        ---

Q:     The first time that you saw the Thevenin vehicle in contact with Sergeant French's vehicle, which part of the Thevenin vehicle was in contact with Sergeant French's vehicle?

A:     It was the front end.

Q:     Okay. Was it perpendicular to the Sergeant French vehicle?

A:     When I during the incident when I looked at it or looked quickly, everything was happening so fast that it was, again, on somewhat of an angle to the patrol vehicle.

Q:     Which part of Sergeant French's vehicle was contacted by the Thevenin vehicle?

A:     It was the driver's side, but I don't recall exactly what -- if it was the passenger door or the quarter panel. I don't recall.

Q:     Was the door, driver's side door, open to Sergeant French's vehicle at that point?

A:     I don't recall.

Q:     Okay. Which part of Sergeant French's vehicle was he pinned to at the time you saw him?

A:     It was the driver's side, somewhere between the driver's door and the back end. Again, everything was happening so fast. It was just a quick look and, you know, everything was just, kind of, evolving so fast that I didn't zero in on what exact area he was at.

Q:     Did you hear gunshots that night?

A:     I did.

Q:     Did you hear the gunshots before or after you saw Sergeant French pinned?

A:     I heard gunshots before I saw Sergeant French pinned.

Q:     Okay. Did you hear gunshots again after you saw him pinned?

A:      Yes.

Q:      Did you see Sergeant French firing his weapon?

A:      No.

R. 449 – 450.

**Response 118 -** Plaintiff objects to the form of these "facts" as they are not short and plain

statements of material fact, as Defendants have reproduced portions of sixteen (16) pages of the

deposition transcript in their ¶118. Plaintiff additionally objects as the Defendants have used

ellipses to exclude some statements from the sixteen (16) pages of transcript which comprise ¶118,

and included some "facts" which are not material to the motion. However, Plaintiff does not

dispute that what is reproduced by Defendants from the transcript is an accurate reproduction of

the selected portions of the transcript.

119.    After Captain Montanino heard the first round of gunshots, he drew his weapon and

turned towards the Thevenin vehicle and started to approach the driver. R. 45.

120.    Montanino testified as to the second round of gunshots:

Q:      What happened after the gunshots; what did you see next?

A:      I turned towards the Thevenin vehicle, and I drew my duty weapon because
        I did not know where the gunshots were coming from. I didn't know if it
        was the person who's the suspect in the vehicle. I didn't know if it was
        Sergeant French. I started to approach the vehicle with my duty weapon
        drawn straight out, pointing towards the vehicle, pointing towards the
        driver.

Q:      Were you still hunched over at that point, or were you standing?

A:      No, I was still hunched over because I didn't want to make myself a bigger
        target if the suspect in the vehicle was shooting. I approached the vehicle,
        again, with my duty weapon pointed at the vehicle, straight -- my arm was
        straight out. I was yelling to stop, get out of the vehicle. As I started to get
        up to the door, I heard a couple more gunshots.

Q:      Was the vehicle moving at that point?

36

A:     No.

Q:     Okay. So you heard these second set of gunshots after the vehicle was already stopped, the Thevenin vehicle?

A:     Yes.

R. 451 – 452.

---         ---         ---

Q:     So you're approaching the driver's side door, and you hear a couple more shots. And at that point had you seen Sergeant French yet, or you had not seen him yet?

A:     Just as I approached the door and heard, you know, a couple more shots, out of the corner of my eye, I could now see Sergeant French at the front of the vehicle, because I was still in a semi-squatting position with my gun drawn pointing at the driver of the vehicle, at the Thevenin vehicle.

Q:     Did you see any of the bullets enter the Thevenin vehicle?

A:     I did not see bullets come into the vehicle, although I did see the muzzle flash, and I did feel the blast of the gun.

Q:     Were you hit with glass?

A:     I believe I was.

Q:     Okay. Did the glass come from the windshield?

A:     As I looked at the vehicle afterwards and saw that there was bullet holes in the windshield, I would say, yes, that's where the glass came from.

Q:     When did you first feel the glass hitting you?

A:     When I was up at the driver's door of the Thevenin vehicle.

Q:     Okay. This was before or after those second shots?

A:     This was after the second shots that I heard.

Q:     That's when you first felt the glass?

A:     I felt the blast and the glass, kind of, one right after the other.

37

R. 453 – 454.

121.    Captain Montanino heard French yelling "I'm pinned, I'm pinned" and observed that his gun was in his hand and realized that French had fired the shots. R. 455.

122.    Montanino ordered Thevenin to get out of the vehicle, but he did not respond. As a result, Captain Montanino opened the driver's door of the Honda with his weapon still pointed at Thevenin, and grabbed him by the left shoulder area and pulled him from the car. R. 460.

123.    Montanino observed that Thevenin had nothing in his hands and placed one knee on Thevenin's back. R. 461.

124.    Officer David Dean then approached from the rear of the Honda, and Captain Montanino entered the driver's seat of the Honda to attempt to free French. R. 461, 466.

125.    When Montanino entered the Honda, it was in drive. R. 464.

126.    Within a minute of Captain Montanino entering the Honda, the officers were able to free French from between the vehicles. R. 465.

127.    After French was sent to Albany Medical Center, Montanino radioed for an EMT. R. 468.

128.    Montanino recalls telling someone to make sure that Thevenin was handcuffed. R. 470.

129.    Captain Montanino also recalls telling someone to remove the handcuffs when the EMS arrived on scene. R. 471.

130.    Montanino observed EMTs briefly working on Thevenin before loading him onto a stretcher and bringing him to an ambulance. R. 471.

**Responses 121-130** - Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

## TESTIMONY OF DAVID DEAN RELEVANT TO THE EVENTS OF APRIL 17, 2016.

131.     Officer Dean heard Sergeant French's radio call regarding the initial stop of Thevenin, and recalls wishing he could respond but that he was in the middle of dispersing the house party on River Street. R. 550.

**Response 131** - Plaintiff objects to the second half of the "fact" which contains Dean's recollection of wishing he could have responded, as Dean's wish is not probative.

132.     Officer Dean left the location of the party after hearing French's subsequent call for assistance. R. 555.

133.     Arriving on the scene, Officer Dean parked his vehicle and observed that Sergeant French was pinned between Thevenin's vehicle and the rear driver's side door and quarter panel of French's patrol car. R. 567.

134.     Officer Dean heard French yelling for help, and to move the vehicle off of him. R. 568 – 569.

**Responses 132-134** - Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

135.     Officer Dean walked around the Thevenin vehicle to where Captain Montanino was standing and observed Thevenin lying on the ground facedown and that Thevenin appeared to be moving his right hand and touching Montanino's right pant leg. Perceiving Thevenin's movement, Officer Dean ordered Thevenin to stop moving, and struck him with his collapsible baton. R. 570 – 571, 573 – 574.

136.     Dean got into the driver's seat of Sergeant French's vehicle, but realized that there was no way he could maneuver the car in a way to free French. R. 575 – 576.

39

137.    With no other options, Officer Dean and some other officers grabbed and moved Thevenin's vehicle in order to free French. R. 575 – 576.

138.    Upon moving the Thevenin vehicle, Dean jumped over the hood of the Thevenin vehicle and grabbed Sergeant French. With Officer Parker's assistance, they moved Sergeant French away from the vehicle. R. 581.

139.    French was put into Officer Dean's vehicle with the assistance of Officers Parker and Dean and Dean drove away with Sergeant French. R. 581.

**Responses 135-139** - Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

## PHILLIP GROSS STATEMENTS TO THE TROY POLICE AND TO THE NEW YORK STATE ATTORNEY GENERAL'S OFFICE

140.    On April 17, 2016, Phil Gross gave a sworn statement to the Troy Police Department. R. 900 – 901.

**Response 140 -** Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement as Gross did testify that he gave a statement to the Troy Police Department.

141.    Mr. Gross's statement to the Troy Police Department indicates that he was driving into Troy on Route 7 when he saw police lights and sirens and observed a police vehicle stopped sideways with a Honda behind it and a second vehicle behind the Honda. Gross heard an impact and saw an officer standing outside his car. He heard some yelling and then gunshots and at that point Gross started recording video with his phone. R. 900 – 901.

**Response 141** - Plaintiff concedes that the report indicates some of the facts contained in ¶141, however such report is inadmissible hearsay under Federal Rule of Evidence §803 and

Plaintiff objects to its use in a summary judgment motion. *See generally Murphy v. City of Newburgh*, 2018 WL 4625806 at n.7 (S.D.N.Y. Sept. 26, 2018).

142.    On May 5, 2016, Phil Gross gave a sworn statement to the New York State Office of the Attorney General. R. 902 – 907.

**Response 142 -** Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement as Gross did testify that he gave a statement to the Office of the Attorney General.

143.    Gross's statement to the New York State Office of the Attorney General indicates that he was heading east over the Collar City Bridge when he saw a marked police car following a dark colored car west onto the Collar City Bridge. The police car went around the Honda and stopped in front of the dark colored car which then stopped. A dark unmarked police vehicle was behind the Honda. The dark colored car turned its back-up lights on and backed up three to five feet and hit the unmarked car. Almost simultaneously with the impact of the dark colored car with the unmarked car, Gross could hear gunshots and began recording video. He also stated that he never heard the police yelling at the individual driving the dark colored car. R. 902 – 907.

144.    When the shots stopped, Gross indicated, the dark colored car rolled about three feet forward into the police officer and pinned him against his car. The pinned police officer then began yelling for help and that was the first that Gross heard that officer say anything. R. 903.

**Responses 142-144 -** Plaintiff concedes that the report indicates some of the facts contained in ¶¶142-144, however such report is inadmissible hearsay under Federal Rule of Evidence §803 and Plaintiff objects to its use in a summary judgment motion. *See generally Murphy v. City of Newburgh*, 2018 WL 4625806 at n.7 (S.D.N.Y. Sept. 26, 2018).

**TESTIMONY OF PHILLIP GROSS RELATING TO EVENTS OF APRIL 17, 2016**

145.    On April 17, 2016, Phil Gross was on the Collar City Bridge heading east en route to a towing job in the City of Troy. R. 754 – 755.

146.    Gross was heading east over the Collar City Bridge when he observed a marked police vehicle following a dark colored Honda heading east on Hoosick Street about a car length behind it. R. 761 – 762.

147.    The Honda took a turn onto the Collar City Bridge, followed by the marked police vehicle. R. 763.

**Responses 145-147** - Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

148.    Gross perceived a light collision sound and then observed the marked police vehicle maneuver around the Honda and block it in. R. 766.

149.    Gross observed an officer get out of the white car and fire 8-12 shots all at once. R. 764 – 765.

150.    At the same deposition, Gross testified that he heard shots fired while sitting in his truck in the eastbound lane of the Collar City Bridge at a red light approximately 50 feet from the incident location. R. 767, 772.

151.    Gross further testified that when he heard the shots fired, that the marked police vehicle and the Honda were approximately 4 feet apart. R. 767.

**Responses 148-151** - Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

152.    According to Gross's testimony, at the time the shots were fired, the unmarked police vehicle was not yet on the scene. R. 773.

153.    Gross also testified, again at the same deposition, that at the time of the shots being fired, the unmarked car was behind the Honda. R. 766.

154.    Contradicting his earlier testimony at the same deposition, Gross also testified that the Thevenin car backed up and hit the trailing unmarked vehicle and that simultaneously he heard shots being fired. R. 800 – 801.

155.    According to Gross's testimony, after the shots were fired, the Honda rolled forward approximately three or four feet to where it made contact with the left rear of the police vehicle and then "went to the right." R. 768.

156.    Gross testified that after the Honda made contact with French, that French started screaming "ow, my leg, get it off me." R. 769.

157.    At that point, Gross ran over to the scene and attempted to rock the Honda in order to free French. R. 771.

158.    Gross was questioned at his deposition about his statements to the Attorney General's Office and to the City of Troy Police Department. He ratified that everything in his statement to the Troy Police Department is true except for his indication that Thevenin was still in the vehicle at the time he arrived on the scene. R. 828.

**Responses 152-158** - Plaintiff objects to Defendants' description of these facts in their Rule 7.1(a)(3) statement as Gross also testified in his deposition at p.108, lines 17-21 that the statement to the Troy Police Department was truthful "to some point." (R.851). Gross further testified upon cross-examination by Defendants' counsel at p.109, line 14 – p.110, line 22 of his deposition that the Troy Police Officers who were taking his statement did not ask certain questions, nor did they return his call when he tried to let them know that the statement was inaccurate. this manner during his deposition. (R.852-853). Additionally, Gross testified at p.111,

line 16 – p.112, line 5 that he was not asked certain questions and did not want to "open like that" in front of "15 cops in the room." (R.854-855).

## VINCENT LAWARE STATEMENT TO THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL

159.    Vincent Laware made a statement to the Office of the Attorney General in which he states that his friend, Keith Millington, had picked him up at a party at which Laware consumed six beers.

160.    Laware testified that, while their vehicle was stalled at a stoplight, a green car drove around them and made a u-turn onto the Collar City Bridge towards Latham. R.

161.    The green car lost control and hit the bridge, impacting the barrier on the left side of the vehicle.

162.    Laware then observed two police cruisers pin the green Honda, with one in the front and one behind.

163.    The green vehicle backed up and hit the police cruiser behind him, and Laware could hear the sound of the impact.

164.    The green vehicle then went forward and to the right and at this time Laware could hear gunshots.

165.    Laware's view of the incident location was obscured by Millington in the driver seat, and that Millington is a "big guy."

**Responses 159-165** - Plaintiff concedes that the statement contains some of the facts contained in ¶¶159-165, however such report is inadmissible hearsay under Federal Rule of Evidence §803 and Plaintiff objects to its use in a summary judgment motion. *See generally Murphy v. City of Newburgh*, 2018 WL 4625806 at n.7 (S.D.N.Y. Sept. 26, 2018).

## MILLINGTON STATEMENT TO THE NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL

166.    Keith Millington made a statement to the Office of the Attorney General in which he indicates that he stalled out the vehicle he was operating while at a traffic light at the intersection of Hoosick Street and 8th Street. R. 908 – 909.

167.    Millington's statement indicates that he observed a green colored Honda approaching from behind him with no lights on. The Honda turned onto the Collar City Bridge and crashed into a cement barrier at the driver's side front of the vehicle. R. 908 – 909.

168.    Millington's statement indicates that one police vehicle pulled in front of the Honda, and one pulled behind it, and the officer in the front vehicle got out with his gun drawn. R. 908 – 909.

169.    The Honda then backed up into the second police vehicle and the Officer was yelling "Stop, stop, stop." R. 909.

170.    The Honda then accelerated forward towards the Officer who started shooting. R. 909.

171.    Millington's statement indicates that vehicle kept moving after the shots were fired, and that it appeared to impact the first police vehicle. R. 909.

**Responses 166-171** - Plaintiff concedes that the statement contains some of the facts contained in ¶¶166-171, however such report is inadmissible hearsay under Federal Rule of Evidence §803 and Plaintiff objects to its use in a summary judgment motion. *See generally Murphy v. City of Newburgh*, 2018 WL 4625806 at n.7 (S.D.N.Y. Sept. 26, 2018).

## TESTIMONY OF KEITH MILLINGTON RELEVANT TO THE EVENTS OF APRIL 16, 2016.

172.    Non-party Keith Millington was driving a friend, Vinny Laware home from party at a house on Second Avenue and 101st Street in Troy at approximately 3:00 a.m. on April 16, 2016. R. 644.

173.    Millington was the designated driver, and was operating his friend's vehicle which was a manually shifted Jeep Wrangler with plastic windows. R. 645.

174.    Millington drove down towards the Hoosick Street Bridge and took a left going towards Hoosick Street between the Collar City Bridge, but he stalled the vehicle at an intersection. R. 646.

175.    The light was green when the vehicle stalled, and turned red with the vehicle still stalled. R. 647.

176.    Millington, while stalled at the red light, observed a Honda with its lights off approach him in his rearview mirror and then pass him. R. 647.

177.    After the Honda passed Millington, he saw two marked police vehicles following behind the Honda with their lights and sirens on R. 647.

178.    The Honda made a U-turn onto the bridge and hit the side of a wall at an angle with the front left of the vehicle impacting the wall, resulting in a loud noise. R. 647 - 648, 650 – 651.

179.    At the time the Honda hit the wall, the police vehicles were still behind the Honda. R. 649.

180.    The leading police vehicle pulled in front of the Honda at an angle and the second police vehicle pulled in about three feet behind the Honda. R. 652.

**Responses 172-180** - Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

181.    The officer operating the vehicle which pulled in front of the Honda exited his patrol car and ordered the driver of the Honda to "Stop" and had his weapon drawn. R. 655 – 656.

182.    The officer operating the vehicle which pulled in behind the Honda exited his vehicle and also was yelling "stop". R. 657.

183.    The Honda backed up and impacted the police vehicle to its rear. R. 658.

184.    As the Honda impacted the police vehicle behind it, the police officer in front of the Honda was yelling at the operator of the Honda to "stop." R. 658.

185.    The officer at the rear of the Honda moved out of the way of the Honda, and also had his weapon drawn. R. 658 – 659.

186.    The Honda then went forward as if to drive around or through the police vehicle in front of him. R. 600.

**Responses 181-186** - Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

187.    Millington testified as to the following events:

Q:      Okay. And what happened next?

A:       When he was going toward the cop with his car, that's when -- that's when the shooting happened.

Q:      Did you see –

A:      I believe -- sorry to cut you off.

Q:      Sure.

A:      I believe it was simultaneously like as – like the cop started shooting as he was getting hit, like it was like simultaneously happened.

Q:      Okay. The cop starting the shooting as what was getting hit?

A:      As he was getting hit by the driver.

Q:      So the car has already finished its reverse?

A:      Yes. So he hit the car behind him and started going forward.

Q:      And as he's moving forward, what's the distance between where it was and the car in front?

A:      I'm unsure.

Q:      And how many shots did you hear fired at that point?

A:      I'm unsure.

Q:      Did you see -- withdrawn. You testified that the shots were fired -- you know what? I don't need to repeat what you said. Why don't you tell me how long after the car started moving forward from having struck the car behind it were the shots fired.

A:      I don't know how long. It happened fast. He was trying to get away.

Q:      Okay. Did you hear any of the shots fired before the Honda made contact with the officer?

A:      No. Like I said, it was like simultaneously -- happened.

Q:      So as the Honda was making contact with the officer, the shots were being fired?

A:      Correct.

Q:      Okay. Which part of the Honda hit the officer?

A:      The front.

Q:      Okay. And which part of the officer was hit by the Honda?

A:      His lower half.

Q:      Okay. Did the officer attempt to move out of the way?

A:      Yes.

Q:       Which way was he moving?

A:      I'm unsure.

48

> Q:   Did the officer say anything as the Honda was moving forward?
>
> A:   I'm unsure.
>
> Q:   After the Honda made contact with the officer, did the officer continue shooting?
>
> A:   Yes, I believe so.
>
> Q:   How many shots were fired after the Honda made contact with the officer?
>
> A:   Don't know.

R. 600 – 602.

**Response 187 -** Plaintiff objects to the form of these "facts" as they are not short and plain statements of material fact, as Defendants have reproduced portions of three (3) pages of the deposition transcript in their ¶187. However, Plaintiff does not dispute that what is reproduced by Defendants from the three (3) pages of the transcript is an accurate reproduction of the selected portions of the transcript.

188.   Millington testified that after the Honda hit the officer, it impacted the police cruiser's driver's side towards the front, with the officer between both vehicles. R. 604, 679 – 680.

**Response 188** – Plaintiff objects to these material facts as unsupported by the references to the record, as the cites portions contain no statement about "the officer between both vehicles". Furthermore, the witness was unclear as to which part of the French car was hit, testifying at p.50, lines 13- 21:

> Q. Did you see which part of the police vehicle in front of the Honda was hit by the
>
> Honda when it moved forward?
>
> A. I'm unsure. I know it's just the left driver's side.

Q. Do you know if it was the front of the car, the back of the car, the middle of the

car? And I don't want you to -- I'm going to turn the picture over because I rather

you work based on your recollection versus what's in this picture.

A. I want to say near the driver's side door, towards the front of the vehicle, maybe.

(R.679).

189.     Millington testified that it was his belief at the time the Honda was driving towards

the officer that the officer's life was in danger. R. 698.

190.     Millington testified that he observed the second officer pull the driver of the Honda

out of the vehicle. R. 724 – 725.

191.     Millington observed another police vehicle arrive on scene and that officer told him

to move along. R. 667

192.     Millington testified that the facts contained in his written statement to the Attorney

General's Office are all correct based on his observations. R. 723 – 724.

193.     Millington further testified that his written statement to the Attorney General's

Office does not contain some of the information which he conveyed to them. R. 726 – 727.

**Responses 189-193** - Plaintiff does not object to the Defendants' description of these facts

in their Rule 7.1(a)(3) statement.

### TESTIMONY OF SERGEANT RANDALL FRENCH RELEVANT TO PLAINTIFF'S MONELL CLAIM

194.     Prior to commencing his employment with the City of Troy Police Department,

Sergeant French completed the police academy at Zone 5 which comprised of 22 weeks of training.

R. 41 – 42.

195.    Following his completion of Zone 5, Sergeant French completed field training. R.

42.

196.    Sergeant French testified as to additional, specialized training as follows:

Q:      Were you given any kind of specialized training after you left Zone 5 while
        you were employed by the Troy Police Department?

A:      Yes.

Q:      And what was that specialized training?

A:      I was certified in the use of radar, lidar as well as use of the Data Master for
        what we informally call it a "breathalyzer." As well as I have been certified
        as a field training officer, a natural topics instructor, a firearms instructor, a
        mental health instructor. As well, I've taken and successfully passed both
        the basic and advanced SWAT operator courses, weapons in mass
        destruction SWAT operator course. I am a rifle instructor. I think that's it.

R. 43 – 44.

197.    Sergeant French also testified that he is an "armorer" for Sig Saur which certifies

him to diagnose and repair problems with handguns. R. 45 – 46.

198.    French also testified as to his training in dealing with intoxicated individuals as

follows:

Q:      In the event that you're dealing with a person who you suspect is intoxicated
        and unable to understand your instructions, were you given training how to
        deal with that person?

A:      During the course for standardized field sobriety tests in the academy they
        did emphasize that people who are intoxicated, you know, to try be clear in
        your instructions, repeat if necessary because they may not understand, to
        be calm. Things of that nature.

Q:      Okay. And as part of this training with Zone 5, were you given any
        instructions to how to deal with individuals who were so intoxicated that
        they're incapable of understanding your instructions even if you repeated it
        clearly?

A:      Again, just emphasizing on clear instructions, do the best that you can.

R. 47 – 48.

199.   French testified as to his training regarding the use of OC Spray as follows:

Q:   What training were you given in the use of OC spray?

A:   I was trained in the police academy. I don't remember how many hours it was. It involved instruction, practice, and exposure.

Q:   Exposure so that you would know what it felt like?

A:   Yes.

R. 102.

**Responses 194-199** - Plaintiff does not object to the Defendants' description of these facts in their Rule 7.1(a)(3) statement.

### Plaintiff's Rule 7.1(a)(3) Supplemental Statements

Plaintiff respectfully sets forth the following additional material facts which demonstrate the existence of genuine issues of fact, requiring denial of the motion.

200.   When French attempted to pass Edson on 6th and Federal in order to go to the house party, Edson was not driving above the legal speed limit. (R.151-152).

201.   When French was pursuing Edson's car after French falsely radioed that Edson had tried to run him over, French observed that Edson's car was not speeding. (R. 179-180).

202.   Montanino characterized the pursuit of Edson's car as "low to average" and "normal speed" but not a high-speed pursuit. (R.425).

203.   When Gross saw Edson's vehicle being chased by French onto the Collar City Bridge, Edson's vehicle was travelling between 15-20 miles per hour. (R.762).

204.   Gross testified that French's vehicle pulled ahead of Edson's vehicle and blocked him off as they entered the Collar City Bridge. (R.763).

205.   When Edson's car collided with the cement barrier on the Collar City Bridge and came to a stop, the driver's side front corner of Edson's car was in contact with the barrier, at an angle between 0-90 degrees to the barrier. (R.183,428-429)

206.   When French pulled in front of Edson's car on the Collar City Bridge and before French attempted to exit the vehicle, French did not make any form of instruction to Edson with the PA in French's car. (R.219,225-226)

207.   French never heard the impact of Edson's vehicle making contact with the door of French's car. (R.213)

208.   Montanino exited his vehicle and started to walk towards Edson's vehicle, when Montanino saw French "get out of the driver's door of his patrol vehicle, exit his vehicle." (R.432).

209.   Thereafter, Montanino heard French say "stop, stop." (R.432,436).

210.   While Montanino heard the "stop, stop" the engine of Edson's car "sounded like it was revving, like the accelerator was being pushed and the back tires were, like, spinning, indicating to me car was trying to come backwards." (R.436-437).

211.   Montanino observed that the tires were spinning "in reverse, because when I exited my vehicle I started to approach Edson's vehicle. I had started to approach on the driver's side. The engine was revving and the tires appeared to be spinning, and the vehicle came off the wall and came backwards." (R.437).

212.   Thereafter, Montanino jumped out of the way and the rear of Edson's vehicle made contact with the front bumper of the Montanino vehicle. (R.438).

213.   When Edson's vehicle made contact with the Montanino vehicle, there was a low to average speed collision and the Thevenin vehicle was not moving at a fast speed. (R.446).

214.   The airbags did not deploy in the Montanino vehicle as a result of the collusion with the Thevenin vehicle. (R.446).

215.   Montanino again began to approach Edson's vehicle when it started to move forward. (R.439).

216.   When Edson's vehicle started to move forward it was moving slowly. (R.457).

217.   Montanino knew that French had already exited his vehicle and had moved to the passenger side of Edson's vehicle, when Edson's vehicle began to move forward. (R.440).

218.   French did not give any form of verbal warning that he was going to fire before he fired his gun. (R.192,764-765)

219.   French did not attempt to use any option other than his service weapon in order to disengage from Edson's vehicle. (R.228-229).

220.   When French fired his second set of shots at Edson, French was again aiming for Edson's center mass. (R.198,215)

221.   French did not recall giving any form of verbal warning before he fired the second set of shots. (R.198)

222.   French does not know how many shots were in the second set of shots (R.198)

223.   French does not know how much time transpired between the two sets of shots. (R.214)

224.   Montanino first heard gunshots before he saw that French was pinned. (R.450)

225.   Montanino heard gunshots again after he saw French was pinned, but did not see French fire his weapon. (R.450).

226.   Montanino is unsure whether the first set of shots was before or after Edson's car impacted French. (R.489-490).

227.   Montanino testified that the second set of shots were "a couple of shots." (R.452-453).

228.   When French was lying on the ground next to the Honda and before his bootlace was cut free from the Honda, French was not feeling pain in his leg. (R.203)

229.   While Montanino was trying to shift Edson's car into reverse, Phil Gross and another officer attempted to free French from between the vehicles. (R.464-465)

230.   After French's bootlace was cut free from under the Honda, other officers picked French up from the ground and French was able to stand. (R.203)

231.   French was taken from the scene to Albany Medical Center on New Scotland Avenue where he was treated and released. (R.234)

232.   When Dean arrived at the scene, French was still trapped between French's car and Edson's car. (R.567).

233.   At that time, Dean observed that Edson was moving his arm and forearm, while lying face down on the ground. (R.570-571).

234.   Dean instructed Edson to stop moving, but Edson continued to move his hand. (R. 572-573).

235.   Dean thought that Edson was either grabbing for Montanino's leg, or attempting to get up. (R.572-573).

236.   Dean hit Edson with his baton, but does not know where contact was made, but thereafter Thevenin stopped moving his hand. (R.573-574).

237.   Milllington thought that one of officers was trying to kick Edson when he was on the ground. (R.722,724).

238.   Montanino first called for medical assistance for Edson after French was placed in a patrol car to take French to Albany Medical Center. (R.468)

239.   Montanino did not know when the first time was that Edson was examined to see if he was still alive. (R.468).

240.   Montanino did not know if anyone attempted to stop Edson's bleeding from the gunshots or performed CPR on Edson at the scene. (R470).

241.   Montanino did not direct any officers to attend to Edson before EMS arrived. (R.472).

242.   When EMS showed up at the scene, Montanino instructed that the handcuffs be removed from Edson. (R.471).

243.   When French was in the hospital he was not told that he had broken any bones. (R.235)

244.   Photos of French's leg taken by the Troy Police Evidence Technician at the hospital showed a small red welt the size of a quarter. (SR.67-73).

245.   French's leg was not casted after the incident as he was solely given a removable knee brace/immobilizer. (R.230,235)

246.   French did not have surgery after the incident. (R.230-231)

247.   More than a couple of weeks after the incident, French had an MRI that revealed a fracture of the tibial spine in his left leg. (R.230)

248.   The same MRI also determined that the tibial bone was bruised. (R.234)

DATED:  April 2, 2019

Respectfully submitted,
HARFENIST KRAUT & PERLSTEIN, LLP
Attorneys for Plaintiff
3000 Marcus Avenue

Lake Success, New York 11042
(516) 355-9600

By:  *Steven J. Harfenist*
      Steven J. Harfenist
      Neil Torczyner

HACH & ROSE LLP
Attorneys for Plaintiff
185 Madison Avenue
New York, New York 10016
(212) 779-0057