UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

CINTHIA THEVENIN, individually,                    DOCKET NO: 16-CV-1115 (DJS)
and as wife of EDSON THEVENIN, Decedent, and as
Administratrix of the Estate of EDSON THEVENIN,
and as mother and natural guardian of Infant N.T.
and as mother and natural guardian of Infant Z.T. ,

                                    Plaintiff,

            –against–

THE CITY OF TROY and
SERGEANT RANDALL FRENCH,

                                    Defendants.
-------------------------------------------------------------X

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
# TO RULE 56 MOTION

**HARFENIST KRAUT & PERLSTEIN LLP**
*Attorneys for Plaintiff*
3000 Marcus Avenue, Suite 2E1
Lake Success, New York 11042
(516)355-9600

**HACH & ROSE LLP**
*Attorneys for Plaintiff*
185 Madison Avenue
New York, New York 10016
(212) 779-0057

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ i

PRELIMINARY STATEMENT ..................................................................... 1

STATEMENT OF FACTS .............................................................................. 2

    A.     French's Version of the Events Leading up to the Incident on the Bridge ........... 2
    B.     The Incident on the Bridge ................................................................ 4
         1.  French's Testimony as to the Events on the Bridge ......................... 4
         2.  Millington's Testimony as to the Events on the Bridge ..................... 6
         3.  Montanino's Testimony as to the Events on the Bridge .................... 7
         4.  Gross' Testimony as to the Events on the Bridge ............................ 8

POINT I
    THE LEGAL STANDARD FOR A RULE 56 MOTION ........................................ 9

POINT II
    GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER FRENCH'S USE
    OF DEADLY FORCE WAS REASONABLE, PREVENTS SUMMARY
    JUDGMENT ....................................................................................... 11

    A.     Defendants Cannot Show that French's use of Deadly Force was Reasonable.... 11
         1.  Defendants Failed to Eliminate Questions of Fact as to Whether French
            Needed to Shoot Edson Since the Non-Party Witnesses Present
            Conflicting Evidence that French was Pinned by Edson's car or
            that it was Moving when he Began Firing ...................................... 12
         2.  Defendants' Misapply the Law as to the Reasonableness of the Use of
            Deadly Force ............................................................................ 14

    B.     Defendants Cannot Show an Entitlement to Qualified Immunity ........................ 18
         1.  It was Clearly Established at the time of the Shooting that Edson had
            a Right Not to be Shot Unless French was in Physical Danger ..................... 19
          2.  At the Very Least, Questions of Fact Exist as to Whether a Reasonable
            Officer Would Have Believed Shooting Edson was Unlawful ...................... 20

POINT III
    DEFENDANTS ARE NOT ENTITLED TO JUDGMENT ON THE
    STATE LAW CLAIMS ............................................................................ 24

POINT IV
    THE MONELL CLAIM SHOULD BE DISMISSED .......................................... 25

    CONCLUSION ...................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*Aczel v. Labonia*
   92 F. App'x 17, 19–20 (2d Cir. 2004) .......................................................... 18-19

*Ashcroft v. al–Kidd*
   563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) .......................... 22

*Black v. Petitinato,*
   __ F. .App'x__ 2019 WL 366704, at *1 (2d Cir. Jan. 30, 2019) .......................... 18

*Brosseau v. Haugen,*
   543 U.S. 194, 125 S. Ct. 596, (2004) ................................................. *passim*

*Carvajal v. Mihalek*
   453 F. App'x 69, 71 (2d Cir. 2011) .............................................................. 12

*Childs v. City of Chicago*
   2017 WL 1151049, at *9 (N.D. Ill. Mar. 28, 2017) ...................................... 17

*Costello v. Town of Warwick*
   273 Fed Appx 118 (2d Cir. 2008) .......................................................... 19,23

*County of Los Angeles, Calif. v. Mendez*
   137 S. Ct. 1539, 1546, 198 L. Ed. 2d 52 (2017) ...................................... 11

*Cowan ex rel. Estate of Cooper v. Breen*
   352 F.3d 756, 762 (2d Cir. 2003) ........................................................... 16-17

*Cox v. Vill. of Pleasantville*
   271 F. Supp. 3d 591 (S.D.N.Y. 2017) .................................................... 23-24

*Crews v. Cty. of Nassau*
   996 F. Supp. 2d 186, 211 (E.D.N.Y. 2014) ............................................. 25

*Doninger v. Niehoff*
   642 F.3d 334, 345 (2d Cir. 2011) ............................................................ 19

*Farrow v. City of Syracuse*
   2014 WL 1311903, at *7 (N.D.N.Y. Mar 31, 2014) ................................... 21

*Felder v. Graham*
   2019 WL 608983, at *2 (N.D.N.Y. Jan. 2, 2019) ......................................... 9

*Fusco v. City of Rensselaer*
   *N.Y.*, 2006 WL 752794, at *2 (N.D.N.Y. Mar. 22, 2006) ........................... 10

*Gibbs v. City of Bridgeport*
   2018 WL 4119588, at *8 (D. Conn. Aug. 29, 2018) ................................. 17

*Godawa v Byrd*
   798 F.3d 457 (6th Cir. 2015), ................................................................ 21

*Graham v. Connor*
   490 U.S. 386, 397, 109 S. Ct. 1865 (1989) ............................................. 11

*Hernandez v. Mesa*
   137 S. Ct. 2003, 2007, 198 L. Ed. 2d 625 (2017) .................................... 22

*Holcomb v. Iona Coll.*
   521 F.3d 130, 137 (2d Cir. 2008) ............................................................ 10

*Jamison v. Metz*
   541 F. App'x 15, 19 (2d Cir. 2013) ...................................................... 15-16

*Jones v. Howard*
   2018 WL 3432713, at *3 (N.D.N.Y. July 16, 2018) ................................ 17

*Kerman v. City of New York*
   261 F.3d 229, 240 (2d Cir. 2001) ............................................................ 18

*Martin v. Cty. of Onondaga*
   2019 WL 1100157, at *5 (N.D.N.Y. Mar. 8, 2019) ........................... 17, 21

*Maravilla v. United States*,
   60 F.3d 1230, 1233–34 (7th Cir.1995) ..................................................... 10

*Monell v. Dep't of Social Services*
   436 U.S. 658, 98 S.Ct. 2018 (1978) ........................................................ 25

*Mullenix v. Luna*
   136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) ................................ *passim*

*Negron v. City of New York*
   976 F. Supp. 2d 360, 373 (E.D.N.Y. 2013) ............................................ 25

*Noll v. Int'l Bus. Machines Corp*.
   787 F.3d 89, 94 (2d Cir. 2015) .................................................................. 9

*O'Bert ex rel. Estate of O'Bert v. Vargo*
   331 F.3d 29, 36 (2d Cir. 2003) .......................................................... *passim*

*Pearson v. Callahan*
   555 U.S. 223, 231, 129 S.Ct. 808 (2009) ........................................... 18, 19

*Peguero v. City of New York*
   2015 WL 1208353 (S.D.N.Y. Mar. 17, 2015) ................................... *passim*

*Plakas v. Drinski*,
   19 F.3d 1143, 1147 (7th Cir. 1994) ......................................................... 10

*Plumhoff v. Rickard*
   572 U.S. 765, 134 S. Ct. 2012 (2014) ............................................... *passim*

*Roberts v. Univ. of Rochester*
   573 F. App'x 29, 33 (2d Cir. 2014) ........................................................... 9

*Rogoz v. City of Hartford*
   796 F.3d 236, 240 (2d. Cir. 2015) ........................................................... 21

*Tennessee v. Garner*
   471 U.S. 1, 11, 105 S.Ct. 1694 (1985) .................................................... 12

*Tracy v. Freshwater*
   623 F.3d 90, 96 (2d Cir.2010) ................................................................. 11


**Statutes & Rules**
FRCP 56 ................................................................................................... 1, 9
Northern District Local Rule 7.1(a)(3) ..................................................... 10

## PRELIMINARY STATEMENT

This lawsuit by Cynthia Thevenin ("Plaintiff")[1] seeks to redress the wrongful shooting death of her husband Edson Thevenin ("Edson") on the Collar City Bridge ("the Bridge") at 3:30 A.M. on April 17, 2016 by Sergeant Randall French ("French") of the Troy police department. (French and City of Troy collectively called "Defendants"). Edson's only crime, before being shot, was leading the police on a low speed chase on empty streets after refusing to be arrested by French for suspected driving while intoxicated. Edson was shot five times and left to die on the street outside his car, as the authorities tended to French and the quarter size welt on his knee he claimed was caused by being pinned by Edson's car.

In moving for summary judgment, Defendants have presented a story which ignores significant questions of fact as to the reasonableness of the shooting as raised by the non-party witnesses. Ironically, Defendants' arguments conflict with French's own version of the events. Instead, Defendants claim the shooting was a constitutionally permissible use of force since it was "reasonable: under the circumstances. They base this argument on French's story that when he emerged from his patrol vehicle on the Bridge, he was "immediately pinned" and that he only fired on Edson because the pain in his leg was so intense that he thought "he was going to die." In the alternative, Defendants assert that French should be cloaked with qualified immunity because of the "sometimes hazy border between excessive and acceptable force." They are wrong in both regards.

Though Edson cannot tell his version of what occurred on the Bridge, other witnesses have testified contrary to French on crucial factual issue as to whether French was facing serious risk to his physical well-being when he began shooting at Edson.  These witnesses' testimony

---

[1] Although Cynthia has sued in multiple capacities as she was Edson's wife, the mother and natural guardian of his sons and has also been named Administrator, she is referred to solely as "Plaintiff" in the motion.

creates material issues of fact as to whether the shooting was constitutionally reasonable. Among the witnesses who have contradicted French's version of the facts are (1) Phillip Gross ("Gross"), a tow truck driver who helped free French from between the cars; (2) Keith Millington ("Millington"), a wannabe Troy Police Officer, at the scene before being told by Troy Police personnel to "get the F— outta here" and (3) Captain Matthew Montanino ("Montanino") the Troy Patrol Supervisor who was the trailing vehicle during the police chase**.** When viewed together, these non-party witness raise questions of fact as to central questions in this case a) whether French was pinned when he shot Edson and b) whether Edson's car was even moving towards French before he began shooting at Edson.

Simply put, the testimony of the witnesses contradicts French's story that he fired because he was "pinned" leaving it to a jury to determine the reasonableness of the deadly force used by French.

Nor does qualified immunity help French. First, the impermissible use of deadly force when stopping a DWI suspect who is not posing physical risk to the officer or the public is well established. Secondly, as no evidence exists that the public was in danger due to Edson as his care was stopped when was confronted by French, the questions of fact exist as to whether French was faced with his own physical danger precludes the imposition of qualified immunity.

 As material issues of fact exist about the reasonableness of the force used by French, the Defendants' motion must be denied.

## STATEMENT OF FACTS[2]

### A.    French's Version of the Events Leading up to the Incident on the Bridge

---

[2] All facts in Plaintiff's Memorandum of Law derive from the Defendants' Record incorporated in Defendants Statement of Material Facts and Plaintiff's Supplemental Record. References to Defendants' Record are (R._) and references to Plaintiff's Supplemental Record are reflected as (SR._).

In the early morning of April 17, 2016, French observed Edson operating a Honda Civic. (R.110). Although Edson purportedly made a wide turn which caused his car to drift into another lane, French did not try to pull Edson over when French first observed him. (R.111-112).

The Honda which Edson was driving was owned and registered to Edson's wife Cynthia. (R.113,156). Edson and Cynthia had been married slightly less than a year and resided in Watervliet. (SR.8). Edson was employed by Enterprise Rent-A-Car near Albany International Airport as an auto technician. (SR.13,21).

At about 3:10 A.M. French again observed Edson this time making an "odd" turn. (R.149-150). French decided to pull Edson over and then performed various tests on Edson to determine whether Edson was driving under the influence. (R.163-167). Edson was not disrespectful to French, nor did he argue with French about taking the DWI tests. (R.160-161).

After performing the various tests, French asked Edson to blow into an Alco-Sensor device, but Edson refused and French informed Edson that he was under arrest for DWI. (R.168). According to French, Edson stated that he would lose his job if he was arrested and he did not allow French to handcuff him. This refusal caused French to pepper spray Edson in the face and try and grab him by his clothes. (R.169-172).

French used his left hand to try to prevent Edson from reaching his car. Edson was able to sit down in his car at which point French pepper sprayed him a second time. (R.174-175). French tried to take the keys out of the ignition of Edson's car, but Edson "was faster and turned the car on." (R.177). French then sought to reach across Edson's body to stop him from putting the car in gear, but Edson "got to the gear shift first and put in drive." (R.177-178). French testified that police officers are not instructed to take away the keys from a vehicle as part of a DWI stop. French had never attempted this before. (R.180).

Edson then began driving north on Sixth Avenue and French pushed himself out of the car. (R.178). No part of Edson's car struck French during this process and French fell onto the roadway. (R.178). French radioed "he tried to run me over" but testified that Edson did not try to run him over and that he did not know why he radioed that Edson tried to run him over. (R.179).

French testified that when Edson left the scene he was not speeding. (R.179-180).[3] French then got in his car and turned on the lights and sirens and began to pursue Edson eastbound on Hoosick Street. (R.181). French did not remember any other vehicles coming towards them as he pursued Edson. (R.181).

At this point, French heard Montanino call in on the radio that he was going to "call the pursuit" which meant that he would take care of the radio transmissions while French pursued Edson. (R.181-182). Edson then made a U-turn and turned westbound on the Bridge. (R.182).

### B.    The Incident on the Bridge

Although the Defendants have moved for judgment based solely on French's testimony, there are multiple different versions of the events on the Bridge from other witnesses with significant differences from French's testimony.  These deviations, which are noted, show the questions of fact which warrant a trial.

### 1.    French's Testimony as to the Events on the Bridge

French testified that he followed Edson onto to the Bridge. Once reaching it, he saw that Edson's car had crashed into the left side of the roadway. (R.183). French testified that "I put my car -- I passed him, and I put my car in front of his to ensure that he would not be able to drive away." (R.183).

---

[3] Montanino and Gross also testified that Edson was not speeding. Montanino stated that he "would not consider it a high speed pursuit" and that it was "low to average, you know at least normal speed." (R.425). Montanino further shared that he did not know whether Edson ever exceeded the speed limit while Montanino was pursuing him. (R.425). Gross similarly testified that when he saw Edson's vehicle being chased onto the Bridge by French, it was travelling between 15-20 miles per hour. (R.762).

While French's vehicle was now a "couple of feet" from Edson's, French did not try to give any verbal commands to Edson. (R.183-184,219-220). French never saw Edson back his vehicle up at any point after French pulled in front of Edson's car. (R.181).

After reaching for a flashlight, French opened his car door, but the door struck Edson's car and French "squeezed out." (R.184-185). French testified that his car door was touching Edson's front bumper and that when exiting, French "was immediately stuck between his car and my car" (R.187) as Edson's "front bumper was pushed up against my lower left leg, pushing that against the side of my car." (R.187-188).

French testified that Edson's car's engine was revving and not moving. (R.188). French then tried to pull his leg up to climb onto the hood of Edson's car but was unable to do so. He then drew his gun and fired. (R.188-189). French did not give any kind of verbal warning before he fired. (R.192). French was looking straight at Edson who was looking directly at him when French drew his gun. Edson did not react to French drawing his gun. (R.189-190). French then aimed directly at Edson's "center mass" and does not know how many times he fired, nor does he know why he stopped firing. (R.190-192).

French testified that after he fired the first shots, "[s]omething happened that caused me now to twist. So instead of being straight on him, my left leg was now pinned sideways between his car and my car, and that caused me to be thrown up on the hood." (R.192-193). French also testified that when he fired the first set of shots, he was squared up to Edson's car. (R.196-197).

French observed that Edson appeared to be unaffected by the first set of shots and that the tires of Edson's car were not moving, but the engine still sounded like it was revving. (R.193,195). French then fired a second set of shots at Edson's center mass but does not recall how many shots he fired. (R.198). French testified that he stopped firing when he heard the

engine stop revving. (R.198-199). French does not how much time passed between the first and second set of shots. (R.214).

### 2. Millington's Testimony as to the Events on the Bridge

Millington testified that he observed the shooting on the Bridge. (R.644). At the time, Millington was driving his friend's Jeep home from a party because his friend was intoxicated. (R.644). Millington testified that he was on Hoosick Street, heading up between the ramps of the Bridge and that he was stalled out at the traffic light between the on and off ramps. (R.646-647).

While Millington was stopped at the light, he saw a Honda come up from behind him, followed by two police cars with their lights on. (R.647). Millington saw the Honda make a U-turn onto the Bridge and hit the wall on an angle. (R.647,651). Millington then saw the first police car pull in front of the Honda and the second police car pull behind it to block it in. (R.650-651). Millington testified that the police car behind the Honda was either 1-3 feet behind it, or far enough behind that another car could parallel park between them. (R.652).

In direct contrast to French's version of the events, Millington testified that French (who he called "the driver of the front car")[4] got out of his car (R.653) and was yelling "stop" and then drew his gun. (R.655-656,715). Millington observed that French had both hands on the gun and was in a shooter's stance. (R.680). At that point, the Honda backed up in reverse and either "hit the car behind him or went towards the car behind him." (R.657). Millington then observed the Honda move forward "like he was trying to get out from in between the cars." (R.659). Millington testified that when the Honda started moving forward the shooting happened and Millington believed that the shooting started as French was being struck by the Honda. (R.660,661). Millington also believed that Montanino fired his gun as well. (R.663).

---

[4] Millington did not know the names of the officers, but testified about the actions of "the driver of the front car" who he saw fire the gun at Edson. For brevity "the driver of the front police car" is called French.

### 3.     Montanino's Testimony as to the Events on the Bridge

Montanino was the patrol captain for this shift and heard French radio for assistance. (R.416). Montanino observed Edson make a left turn to drive westbound on the Bridge (R.424-425). French and Montanino then turned to follow Edson onto the bridge as well. (R.426). After making the turn, Montanino observed that Edson's vehicle had crashed into the cement barrier in the left lane of the westbound bridge. (R.426-427). Montanino did not see what caused Edson to hit the barrier, but he did not think that French's car propelled Edson into the barrier. (R.427).

Montanino testified that French parked his vehicle within five feet of Edson's vehicle at an angle to Edson's and the cement barrier. (R.431-432). Montanino then parked behind Edson's car, leaving a few feet of room between them. (R.432). Montanino exited his vehicle and started walking towards Edson's car when he saw that French had exited his car. (R.433-434). Montanino then heard French say "stop" and he saw the tires on Edson's car spinning which suggested to Montanino that Edson vehicle was trying to come backwards off the cement barrier. (R.436-437).  As Montanino continued his approach, Edson's car "came off the wall and came backwards" (R.437) which caused the rear of Edson's vehicle hit the front of Montanino's. (R.438). Montanino characterized the collision as low to average speed as the airbag in Montanino's car did not deploy. (R.456).

Unlike French's testimony, Montanino testified that French had exited his vehicle and was by the front passenger side of Edson's car. (R.440).

Montanino testified that after Edson's car collided with his car, Edson's car started to move forward. (R.439,443) and it appeared to Montanino that Edson "was trying to get away." (R.444). Montanino observed that Edson's vehicle was moving slowly as it had just started to accelerate. (R.457).

Montanino did not see Edson's car collide with French, but he heard the collision between Edson's car and French's car. (R.448-449). Montanino testified that he heard gunshots but was not sure how many he heard, nor did he see French fire his gun. (R.450). Montanino did not see French pinned right after the first set of gunshots and he started to advance towards the door of Edson's car when he heard the second set of gunshots. (R.451-452). As Montanino approached the driver's door of Edson's car he heard the second set of gunshots and saw French at the front of Edson's car. (R.453). Montanino was unsure whether the first shots were fired before Edson's car struck French. (R.489-490).

### 4. Gross' Testimony as to the Events on the Bridge

Gross testified that he was present at the Bridge at the time of the shooting because he had received a call from the New York State Police to tow a car at Congress & 15th Street in Troy and was going to get his tow truck. (R.754,756). Gross was travelling east on the bridge and he observed a Troy Police vehicle going eastbound on the other side of the barrier. (R.759-760). Gross saw the Troy Police vehicle following a small two door Honda. (R.761-762). Gross then observed the Honda turn west onto the Bridge.

The Troy Police vehicle followed the Honda and then blocked the Honda as they entered onto the bridge. (R.763,766). Gross heard the sound of a collision involving metal as the Troy Police vehicle went around the bend. (R.763). Gross then saw the Troy Police car come to a stop, the officer got out of the car and then he heard shots. (R.764). Gross observed that a trailing Troy Police car was already on the bridge when the shots were fired. (R.766). The trailing police vehicle was behind the Honda and there was some space between it and the Honda, perhaps as much as eight feet. (R.766-767).

In sharp contrast to French's testimony, Gross testified that French was not in physical contact with the Honda when the shots were fired. (R.765). Gross also testified that the Honda was not moving when the shots were fired. (R.767) and that the Honda only collided with French after the shots were fired. (R.768-769).

## POINT I
## THE LEGAL STANDARD FOR A RULE 56 MOTION

Under Rule 56 of the Federal Rules of Civil Procedure, the "court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56. A genuine issue of material fact is "one that 'might affect the outcome of the suit under the governing law' and as to which 'a reasonable jury could return a verdict for the nonmoving party.'" *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015). *See also Roberts v. Univ. of Rochester*, 573 F. App'x 29, 33 (2d Cir. 2014)("Those genuinely disputed facts are material because they "might affect the outcome of the suit under the governing law").

As noted by this Court "[t]he moving party bears the burden to demonstrate through 'pleadings, depositions, answers to interrogatories, and admissions on file, together with [] affidavits, if any,' that there is no genuine issue of material fact." *Felder v. Graham*, 2019 WL 608983, at *2 (N.D.N.Y. Jan. 2, 2019), report and recommendation adopted, 2019 WL 587301 (N.D.N.Y. Feb. 13, 2019) citing *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994).

In this District, the moving party must include a statement of material facts under Local Rule 7.1(a)(3) constituting "a short and concise statement of each material fact about which the moving party contends there exists no genuine issue." Northern District Local Rule 7.1(a)(3).

In moving for summary judgment, the movant bears the initial burden of proving "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-

movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008); *See also Fusco v. City of Rensselaer, N.Y.*, 2006 WL 752794, at *2 (N.D.N.Y. Mar. 22, 2006)("As one legal treatise has succinctly stated, summary judgment requires the parties to "put up or shut up")(*quoting* Fleming James, Jr. & Geoffrey C. Hazard, Jr., Civil Procedure 150 (2d ed.1977)).

"[G]iven the difficult problem posed by a suit for the use of deadly force, in which the witness most likely to contradict [the police officer's] story—the person shot dead—is unable to testify[,] .... the court may not simply accept what may be a self-serving account by the police officer. Rather, the court must also consider "circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably". *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003); see also *Maravilla v. United States*, 60 F.3d 1230, 1233–34 (7th Cir.1995) (where "the witness most likely to contradict the officers' testimony is dead," the court should "examine all the evidence to determine whether the officers' story is consistent with other known facts"); *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994).

Even procedurally, the Defendants' application is defective since it fails to comply with Local Rule 7.3 as to identifying specific undisputed facts. Rather, many paragraphs in the Statement contain reproduction of page(s) of deposition transcripts.[5] Additionally, many "facts" are self-contradictory in that the same "fact" is presented from the perspective of multiple witnesses with different recollections.

Leaving aside the procedural defects, the contradictory testimony about the events on the Bridge creates a question of fact about the reasonableness of the deadly force used by French. These questions of fact dispose of all of the Defendants' arguments for dismissal.

---

[5] See Defendants' Statement of Material Facts at ¶26, 28, 34, 35, 114, 118, 120, 187 and 198.

**POINT II**
**GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER FRENCH'S USE OF DEADLY FORCE WAS REASONABLE, PREVENTS SUMMARY JUDGMENT**

In moving for summary judgment, Defendants adopt the twin arguments that French's use of deadly force was objectively reasonable and/or protected under the doctrine of qualified immunity. Defendants present only one version of the facts – a carefully tailored version of the testimony given by French during his deposition. But, the Defendants misstate French's deposition testimony and the testimony of the non-party witnesses.

Because questions of fact exist as to whether probable cause existed that French faced significant injury or death from Edson's actions, a jury must decide if his use of deadly force was reasonable under the circumstances.

**A. Defendants Cannot Show that French's use of Deadly Force was Reasonable**

"[T]he Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir.2010). "The reasonableness of the use of force is evaluated under an objective inquiry that pays careful attention to the facts and circumstances of each particular case." *County of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1546, 198 L. Ed. 2d 52 (2017). Similarly, an "officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865 (1989).

When the force being used is deadly force, it "is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003). *See also Carvajal v.*

*Mihalek*, 453 F. App'x 69, 71 (2d Cir. 2011) ("Where, as here, officers use deadly force, their decision is objectively reasonable only if the officers have probable cause to believe from the facts then known to them that the suspect poses a significant threat of death or serious physical injury to the officer or others").

As the Supreme Court explained in *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694 (1985) "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."

In this case, the record is replete with questions of facts as to whether French had probable cause to believe he was in significant threat of death or serious physical injury.

1. **Defendants Failed to Eliminate Questions of Fact as to Whether French Needed to Shoot Edson Since the Non-Party Witnesses Present Conflicting Evidence that French was Pinned by Edson's car or that it was Moving when he Began Firing**

Although the Statement of Material Facts contains multiple versions of what occurred on the Bridge, Defendants' Brief argues that the use of deadly force was reasonable, as:

- French purportedly made an unsuccessful attempt to move out of the way when he exited his car, before becoming "trapped between the vehicles";
- French fired the first set of shots upon "the belief that he was going to be killed";
- French fired a second set of shots upon hearing the engine continue to rev and seeing that Edson was "unfazed by the first (sic) use two shots"

(Defendants' Brief at pp.7-8)

The problem for Defendants is that their arguments conflict with French's own testimony as well as the testimony of Gross, Millington and Montanino. Although Defendants cite R.187-188 in support of their argument that French tried to "move out of the way" before he "became immediately pinned", French's did not testify about an attempt to move out of the way.

Instead, French testified that when he opened his car door "I had not realized he had moved his car, because when I opened my door I'm hitting the front of his car and I'm thinking

that, you know, I didn't park too close; I don't know why I'm hitting his car. And at that point I go to get out of my car. I squeezed out." (R.184).

French's story about being "squeezed" does not help his claimed basis for summary judgment:

> Q. So what happened after you got out of the vehicle, after you were able to get out between the door?
> A. I was immediately stuck between his car and my car.
> Q. Did your entire body get out of your car?
> A. Yes.
> Q. What was causing you to become stuck; which part of the vehicle was making you stuck?
> A. His front bumper was pushed up against my lower left leg, pushing that against the side of my car.
> Q. Did you attempt to get back into your car at that point?
> A. I couldn't move. I was still trying to get off to the passenger side.

(R.187-188).

More important than the inconsistency between French's testimony and Defendants' Brief, his testimony is contradicted by the non-party witnesses. While French claimed the first set of shots were fired when he felt that he was trapped and "wishing that his leg was going to break". The second set of shots were fired because Edson was "unfazed" from the first round. Millington, Gross and Montanino testified that the shots were fired after or as Edson's car collided with French. This is a significant distinction from French's version that he began firing when he was trapped.

Specifically, Gross testified that all the shots were fired while Edson's vehicle was stopped after it backed into Montanino's car and before French was "pinned." Montanino testified that French had exited the vehicle and approached Edson's car when he saw Edson's vehicle move backwards. Significantly, Montanino was unsure of the sequence of the shots and French being pinned between the vehicles.

Given the inconsistencies in the witnesses' version of events, it is impossible to make a finding of reasonableness based on "undisputed facts." This is so as Defendants' theory about the reasonableness for shooting Edson hangs on a finding that French was pinned and feared for his safety when he fired. Each of the eyewitnesses testimony presents a scenario in which French potentially fired before his leg was "pinned" or Edson's car was moving towards him.

## 2. Defendants' Misapply the Law as to the Reasonableness of the Use of Deadly Force

In arguing that French's use of deadly force was objectively reasonable, Defendants rely heavily on the unreported decision in *Peguero v. City of New York*, 2015 WL 1208353 (S.D.N.Y. Mar. 17, 2015) and, to a lesser extent, on the Supreme Court decision in *Plumhoff v. Rickard*, 572 U.S. 765, 134 S. Ct. 2012 (2014). But the undisputed facts in *Peguero* and *Plumhoff* show that both cases are vastly distinguishable from this case.

In *Peguero* the trial court made findings of fact in which the officer was facing a far more dangerous situation than French as bystanders were in danger. In *Peguero* the officer:

> [H]ad a reasonable belief, based on a complaint made to the police, that Peguero and the passengers in the Cadillac had committed an armed robbery. Labate also had a reasonable belief, based on a radio transmission, that the Cadillac had rammed a police car when it attempted to stop him. When confronted by Labate and Schwarz at the corner of 188th Street and Amsterdam Avenue, the Cadillac accelerated forward, striking Castillo and pinning him and his motorcycle under the car. The Cadillac subsequently reversed and struck two cars containing civilian passengers. All of these passengers—Kaufman, Abad, and Alcantara— were injured. In sum, Labate had probable cause to believe that Peguero posed "a significant threat of death or serious physical injury" to those around him. Rasanen, 723 F.3d at 333. The interest in ending that threat justified both Labate's first and second shots at the Cadillac. It is beyond genuine dispute that Labate's use of deadly force was, therefore, objectively reasonable.

*Peguero v. City of New York*, 2015 WL 1208353 at *8 (internal citations omitted).

Unlike *Peguero*, French had no reason to believe that Edson was armed, nor was French aware of any criminal acts by Edson other than his refusal to be arrested for DWI and leading the police on a low speed chase at 3 A.M.

Perhaps most damning to French is his claim for the need to shoot Edson is unsupported, if not outright contradicted, by the testimony of every other witness to the events. None of the witnesses testimony supports French's testimony that he was "immediately trapped" and that "the pressure on his knee" together with the "fear that he would be dragged under the car" caused him to shoot Edson. These contradictions doom this application.

While the Defendants refer to Edson backing his car into Montanino's vehicle to flee the Bridge, this low speed collision is distinguishable from the multiple severe accidents in *Peguero* where the decedent fled through Manhattan, injuring a motorcyclist and passengers in other vehicles. And, as the timing of French's discharge of his gun is in dispute, Edson's car could have backed up after French shot him.

More importantly, the collision with Montanino's vehicle cannot support French's actions, as the record has no testimony that French was aware of a collision with Montanino's vehicle when he began shoot at Edson. French testified that he did not see Montanino's vehicle when he exited his car and "was not looking that way." (R.187). When French was asked how he learned that Montanino's vehicle had sustained damage as shown in French's report, French testified that he did not know where he got that information. (R.290-291). As the reasonableness of the use of force solely depends on the officer's knowledge at the time, French cannot rely on the collision with Montanino's car as a basis to shoot Edson. *See generally Jamison v. Metz*, 541 F. App'x 15, 19 (2d Cir. 2013)("Under the Fourth Amendment's objective test, we consider the objective reasonableness of an officer's conduct in employing deadly force. We focus on 'the

officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ [such] force'").

Unlike *Peguero*, this case presents credible evidence casting doubt on the reasonableness of French's actions. The evidence directly contradicts French's basis for shooting Edson-that French's leg was pinned by the car or was moving towards him.

Defendants' reliance on *Plumhoff* is similarly distinguishable As the Supreme Court noted that *Plumhoff* was a "grave public safety risk" based on his "outrageously reckless driving" at over 100 miles an hour, contact was made with the pursuing police officer vehicles and that the evidence conclusively showed that the Plaintiff was attempting to continue his flight. *Plumhoff v. Rickard*, 572 U.S. 765 at 776-777.

Unlike *Plumhoff*, every witness who testified in this case about the chase characterized it as low to moderate speed. Even if French was concerned that Edson was trying to continue to flee (despite no testimony that French held that belief) it would not have been objectively reasonable to use deadly force to prevent him from leaving the Bridge. And, Gross' testimony shows that Edson was not moving when the French began shooting at him.

The bottom line is that significant questions of fact exist on the fundamental basis for French shooting Edson- that he feared for his safety based on being pinned between the cars. French's story is riddled with holes wide enough to drive a truck through.

It cannot be overstated that French's version of the facts conflicts with the testimony of the other witnesses and that the genuine issues of fact mandate denial of summary judgment as to the reasonableness of his use of deadly force. *See generally Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003)("[I]n order to accept Breen's argument that, as a matter of law, his actions were objectively reasonable, one would have to accept, as a matter of fact,

that the Camaro was bearing down on him as he waved his hands, signaling Cooper to stop. Such facts are in dispute"); *Jones v. Howard*, 2018 WL 3432713, at *3 (N.D.N.Y. July 16, 2018) ("[T]he parties have very different versions of what happened when defendants acted to remove Jones from the police vehicle. This genuine dispute as to material facts—including whether defendants simply freed her feet or angrily yanked her around—preclude summary judgment as to her excessive force claim, which is all about reasonableness") and *Childs v. City of Chicago*, 2017 WL 1151049, at *9 (N.D. Ill. Mar. 28, 2017)("Because a reasonable jury considering the circumstances in their totality could credit the plaintiff's version of the facts and find that Mariano's use of deadly force was objectively unreasonable, summary judgment is inappropriate…").

Because the witnesses contradict French's claim that he feared for his safety because his leg was pinned by Edson's car, summary judgment is inappropriate. If a jury were to find against French on this issue, his force would not be objectively reasonable as French would not have been in fear of his physical safety and his shooting was for some other, unconstitutional reason.

When faced with a similar set of conflicting accounts as to the circumstances surrounding an officer's use of deadly force, Judge McAvoy denied summary judgment, explaining that:

> The Court finds that a question of fact exists as to whether Carey's use of force was objectively reasonable in light of all the circumstances. While the videos seem to support the affidavits the Defendants provide, Plaintiff disputes the veracity of those affidavits, and nothing in the videos provides a definitive answer as to when Carey shot Plaintiff, or what sort of threat that he faced at the time of the shooting. A jury is required to determine the circumstances of the shooting and whether the Carey's decision to shoot was objectively reasonable under the circumstances.

*Martin v. Cty. of Onondaga*, 2019 WL 1100157, at *5 (N.D.N.Y. Mar. 8, 2019)

Here, French's version of the events is largely contradicted about the crucial elements of the events on the bridge and as to what "sort of threat" French faced. A jury must determine the

circumstances of the shooting and whether French's decision to shoot was objectively reasonable under the circumstances.

## B. Defendants Cannot Show an Entitlement to Qualified Immunity

 "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808 (2009) (internal citations omitted). In its most recent decision on the issue, the Second Circuit instructed that "[s]ummary judgment on qualified immunity grounds is appropriate when a defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *Black v. Petitinato*, __ F.App'x__, 2019 WL 366704, at *1 (2d Cir. Jan. 30, 2019).

When evaluating an asserted qualified immunity defense, a court may begin by examining whether a reasonable law enforcement officer in the defendant's position would have believed his or her conduct would violate the asserted constitutional right. *Pearson*, 555 U.S. at 236. To determine whether a right is clearly established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011.)

A qualified immunity defense is not ripe for adjudication when material facts are in dispute. *See generally Kerman v. City of New York*, 261 F.3d 229, 240 (2d Cir. 2001) ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness"). *See also Aczel v. Labonia*, 92 F. App'x 17,

19–20 (2d Cir. 2004)("Although a jury ultimately could reject Aczel's account of what transpired in favor of the officers', "[w]here the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity").

In this matter, the Defendants have requested that the Court grant qualified immunity based on their selective reading of the record and tailoring of French's testimony. But the facts are far from clear. Based on the testimony of the other witnesses, French cannot show an entitlement to qualified immunity.

### 1. It was Clearly Established at the time of the Shooting that Edson had a Right Not to be Shot Unless French was in Physical Danger

In determining whether to apply the doctrine of qualified immunity, a trial court must first determine whether the right impinged by the government official was clearly established to the point that it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015). The Supreme Court has instructed that "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).

In this matter, Edson's right to be free from deadly force unless French feared for his safety was clearly established long before French shot him. *See O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003), in which the Second Court has made clear that "[i]t is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."

In framing the issue in their motion Defendants do not identify the constitutional right as they simply assert that "the dispositive question is this: did controlling precedent at the time clearly establish that an officer in Sergeant French's circumstance is constitutionally prohibited from using deadly force?" (Defendants Brief at p.15). Defendants then assert that Supreme Court precedent in *Brosseau v. Haugen*, 543 U.S. 194, 125 S. Ct. 596, (2004), *Plumhoff v. Rickard*, 572 U.S. 765, 134 S. Ct. 2012 (2014), *Mullenix v. Luna*, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015) and the Second Circuit decision in *Costello v. Town of Warwick*, 273 Fed Appx 118 (2d Cir. 2008) "favors the constitutionality of Sergeant French's actions."

In claiming *Plumoff, Mullenix* and *Costello* support a determination that right to be free from the use of deadly force was not clearly established, the Defendants appear to misunderstand the two step process to determined qualified immunity by conflating the determination if a right was clearly established with whether an officer's actions were objectively reasonable.

There can be no argument that the right to be free from deadly force unless an officer fears for their physical safety or that of the public was clearly established at the time that French shot Edson under *O'Bert*. As to the second prong of the qualified immunity analysis, factual disputes exist as to whether it was objectively reasonable for French to shoot Edson.

## 2. At the Very Least, Questions of Fact Exist as to Whether a Reasonable Officer Would Have Believed Shooting Edson was Unlawful

In support of their request for the Court to apply qualified immunity, the movants identify these facts which they claim are "undisputed" and which ostensibly show that a reasonable officer in French's position would not have believe that shooting Edson was unlawful:

At the moment Sergeant French determined to utilize his firearm, (1) Thevenin had been involved in a dangerous car chase through the streets of Troy, R. 180 - 183; (2) Sergeant French had ordered Thevenin to "stop" and Thevenin did not comply R. 186 - 187; (3) Thevenin's vehicle reversed into Captain Montanino's vehicle and impacted it, R. 437 - 439; (3) French became trapped between the

Thevenin vehicle and his patrol vehicle as the Thevenin vehicle continued to accelerate, R. 187-188; (5) French feared he would die if Thevenin were not stopped, R. 191; and (6) French was experiencing excruciating pain. R. 189. (Defendants' Brief at p.18).

Defendants' list of facts are far from "undisputed." While Defendants assert that there had been a "dangerous car chase" in which Edson did not accede to French's request to "stop," every witness who testified about the chase (including French himself) shared that the speed was low to average and had stopped at the time of the shooting. Similarly, the testimony that French was purportedly "trapped between the vehicles" and "fearing for his life as he heard the engine revving" is contradicted by Millington, Montanino & Gross' version of the events on the Bridge.

In *Godawa v Byrd*, 798 F.3d 457 (6th Cir. 2015), the Sixth Circuit reversed a grant of qualified immunity in a matter with striking similarity to this case. In *Godawa*, an officer elicited an admission from a motorist that he had lied about his drinking and the driver fled. *Id*. at 461. Similar to this case, there was conflicting evidence whether the car was moving towards the officer or the officer was moving towards the car, and the officer shot the driver after the office claimed to have been struck in the knee when the car was moving 5-10 miles per hour. *Id*. at 461-462. In reversing the grant of qualified immunity, the Sixth Circuit stated "viewing the facts in the light most favorable to Plaintiffs, Godawa never attempted to hit Defendant with his car and did not drive in a manner that endangered Defendant's life." *Id*. at 465. [6]

---

[6] Many other courts have deferred rulings on Rule 56 motions premised on qualified immunity when material facts are in dispute. *See Rogoz v. City of Hartford*, 796 F.3d 236, 240 (2d Cir. 2015)(reversing lower court's grant of qualified immunity when the district court made findings of credibility in resolving issues of fact in favor of officer). *See also Farrow v. City of Syracuse*, 2014 WL 1311903, at *7 (N.D.N.Y. Mar. 31, 2014)("[D]isputed issues of fact remain as to whether Wigton and Quonce reasonably believed that the amount of force they used was lawful").

In this case, substantial questions of fact exist as to whether French was presented with a scenario in which he faced significant threat to his physical well-being. No credible argument exists that the conflicting testimony of the witnesses as to whether French was pinned or Edson's car was coming towards him does not present a scenario in which French was not in fear for himself making summary judgment inappropriate.

Additionally, while the Defendants assert that the collision with Montanino's car was a factor justifying the use of force, their citation is solely to Montanino's testimony. (R.437-439). As noted, French never testified about having any awareness of the collision with Montanino's vehicle. He could not even remember who told him or what he was told later about it. In any case, it cannot be part of the Court's deliberation on qualified immunity as "[f]acts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007, 198 L. Ed. 2d 625 (2017).

And, this case is easily distinguishable from the decisions cited by Defendants in support of Qualified Immunity. In each of the cases relied upon by the Defendants, a known felon who had engaged in dangerous activity and who presented a grave danger to the public was involved in a dangerous car chase. That is simply not this case with French and Edson's encounter.

As discussed above, *Plumhoff* involved a motorist who had led the police on a 100+ mile per hour car chase and who had passed more than two dozen other vehicles, several of which were forced to alter course and whose "outrageously reckless driving posed a grave public safety risk." 572 U.S. at 776-777. Similarly, in *Mullenix*, the motorist who was already the subject of an arrest warrant led police on an 18 minute car chase at speeds between 85 and 110 miles per hour, while claiming to have a gun and threatening to shoot police if they did not abandon the chase. *Mullenix v. Luna*, 136 S. Ct. at 306. Much like *Plumhoff*, the officer in *Mullenix* testified that she

knew that the motorist had threatened to shoot police officers and that the motorist "was seconds away from encountering such an officer." *Id*. at 307.

Although *Costello* did not involve a 100 mph car chase, the officer's shooting was found to be justified because of a concern for the danger caused by the driver as it appeared to the officer that the driver "was then 'going to back the car up' again. At this moment, it was objectively reasonable for the officer to believe that at least one police officer was underneath Costello's car, that other officers may have been hurt, and that Costello would continue to use his car to inflict serious bodily harm on the other arresting officers." *Costello v. Town of Warwick*, 273 F. App'x 118 at 119 (2d Cir. 2008).

Similarly, in *Brosseau*, the Supreme Court dealt with a matter in which a motorist subject to a felony no-bail warrant and fled in a car after the officer had first broken the car window and struck the motorist with the barrel and butt of her gun. *Brosseau* 543 U.S. at 196. In explaining the reason for shooting the plaintiff the officer testified that "she was 'fearful for the other officers on foot who [she] believed were in the immediate area, [and] for the occupied vehicles in [Haugen's] path and for any other citizens who might be in the area." *Id*. at 197.

In *Cox v. Vill. of Pleasantville*, 271 F. Supp. 3d 591 (S.D.N.Y. 2017) a factually similar matter, an officer was accused of excessive force for firing at a vehicle which had been traveling no more than 17 miles per hour and slowing when the shots were fired. *Id*. at 615. Much like this case, the officer sought qualified immunity under *Mullenix* and *Plumhoff* and the Plaintiff raised issues of fact related to the officer's version of the events. In denying the motion for summary judgment Judge Karas observed:

> These cases, all of which involved high-speed chases in which civilians were put at risk by reckless driving, do not match at all the circumstances put forth by Plaintiff here, where the vehicle moved no faster than 17 mph, slowed down in an attempt to avoid colliding with Hess, and accelerated only after shots had already

been fired at the windshield. As set forth above, the constitutional prohibition on unprovoked use of deadly force—an issue far afield from the facts in White—is well settled, and no reasonable officer would conclude that Hess was constitutionally permitted to enter the roadway in front of a moving vehicle moving at 17 mph with no pedestrians in the road and begin firing almost immediately. If nothing else, the numerous factual disputes in this case warrant a denial of qualified immunity at this stage.

*Id*. at 645-616.

Unlike the extreme danger cases cited by the Defendants, Edson did not pose a grave danger to the public as he had been involved in a low speed car chase at 3 A.M. Additionally, unlike the officers in these cases, there is no testimony from French showing concern that Edson endangered bystanders or officers as French's sole rationale for shooting was his claim that he was pinned – a "fact" which Plaintiff sharply disputes. Instead, this is more in line with Second Circuit jurisprudence beginning with *O'Bert* in which the Second Circuit made clear that "[i]t is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *O'Bert*, 331 F.3d 29 at 36.

Moreover, French's entire argument in this case is not that he feared for public safety but for his ow, As been previously shown serious questions of fact exist as to whether French was in any danger when he shot Edson.

In light of the foregoing, summary judgment based upon Qualified Immunity is inappropriate.

## POINT III
## DEFENDANTS ARE NOT ENTITLED TO JUDGMENT
## ON THE STATE LAW CLAIMS

The final arguments in Defendants' brief are essentially bootstrapped to the assertions that French did not use excessive force in shooting Edson. The argument that the state law assault and battery claim is governed by the same standard as the Federal excessive force claim

(Defendants' Brief at pp.23-24) is correct. *See generally Crews v. Cty. of Nassau*, 996 F. Supp. 2d 186, 211 (E.D.N.Y. 2014)("Courts interpreting New York state law of assault and battery as it applies to police officers have stated that 'the essential elements of [§ 1983] excessive force and state law assault and battery claims are substantially identical"). But as the Defendants have not shown an entitlement to judgment on the Federal claims there is no reason to dispose of the state law claims. Similarly, the argument that wrongful death and conscious pain and suffering claims would be disposed of by judgment on the Federal claim is legally correct, but factually flawed, as the Defendants made no such showing. *See generally Negron v. City of New York*, 976 F. Supp. 2d 360, 373 (E.D.N.Y. 2013) ("Defendants argue that plaintiff's wrongful death claim should be dismissed if her assault and battery and negligence are dismissed. Because I hold that the claims for negligence and assault and battery should survive defendants' motion, plaintiff's wrongful death claim should as well"). Additionally, the record is replete with testimony that Edson was alive when he was pulled out of the car and left for dead in the roadway.

## POINT IV
## THE *MONELL* CLAIM SHOULD BE DISMISSED

Plaintiff concedes that she did not discover evidence of municipal policy *Monell v. Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018 (1978) and Plaintiff does not oppose dismissal of this claim.

## CONCLUSION

Because of the foregoing, Defendants' motion should be denied as to all claims other than the *Monell* claim.

Dated: Lake Success, New York
      April 2, 2019

                          Respectfully submitted,
                          HARFENIST KRAUT & PERLSTEIN, LLP
                          Attorneys for Plaintiff
                          3000 Marcus Avenue
                          Lake Success, New York 11042
                          (516) 355-9600
                      By:  *Steven J. Harfenist*
                            Steven J. Harfenist
                            Neil Torczyner

                          HACH & ROSE LLP
                          Attorneys for Plaintiff
                          185 Madison Avenue
                          New York, New York 10016
                          (212) 779-0057