ATTORNEYS' EYES ONLY

# City of Troy, NY
# Police Department



# Inspectional Services Bureau
# Case 16-04
# Death Investigation of
# Mr. Edson A. Thevenin

Prepared by: Captain Joseph L. Centanni

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

# Table of Contents

**Part I**

*Predication*..................................................................................*1-2*

*Evidence/Documentation Obtained*......................................*3-4*

*Investigation*............................................................................*5-20*

*Summary/Findings*.......................................................................*21*

*Allegations*..................................................................................*22*

*Findings Allegation #1*...........................................................*23-45*

*Findings Allegation #2*.................................................................*46*

*Findings Allegation #3*.................................................................*47*

*Findings Allegation #4*...........................................................*48-50*

*Findings Allegation #5*.................................................................*51*

**Part II**

*Analysis of the TPD Investigation in Contrast to the*

*OAG Report*...............................................................................*52-60*

**Part III**

*ISB Recommendations*............................................................*61-62*

***Appendix A***.............*Comprehensive Motor Vehicle Services & Consulting Report*

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

# PART I

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY



# TROY POLICE DEPARTMENT
## INSPECTIONAL SERVICES BUREAU
### INTRA-DEPARTMENTAL CORRESPONDENCE

**To:**     Chief Brian G. Owens

**From:**  Captain Joseph L. Centanni

**Date:**  September 26, 2018

**Re:**     Investigative Summary for ISB 16-04

## *Predication*

In January 2018, the Inspectional Services Bureau (ISB) recommenced an investigation into the circumstances surrounding the April 17, 2016 Officer Involved Shooting (OIS) death of Mr. Edson A. Thevenin by Sergeant Randall French.

(Note: The extended period of time between the OIS and the ISB investigation is due to a protracted legal dispute between Rensselaer County District Attorney (RCDA) Joel Abelove and the New York State Office of the Attorney General (OAG).

On April 22, 2016, Abelove presented this matter to a Rensselaer County Grand Jury which resulted in a *"No True Bill"* as it related to the actions of Sergeant French.

On April 29, 2016, New York State Governor Andrew Cuomo issued Executive Order 147.4 which authorized the OAG to seize control of this investigation from the Troy Police Department (TPD) and the RCDA.

On May 5, 2016, I was instructed by Chief John Tedesco (Ret.) and then City of Troy Corporation Counsel Kevin Glasheen, to suspend the ISB investigation based on a directive they (Chief Tedesco (Ret.) and Glasheen) received from the OAG.

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

In December 2017, the OAG indicted Abelove on several charges related to his handling of this matter.

On January 16, 2018, the OAG released their findings regarding the OIS, along with several criticisms as they relate to the TPD's handling of the investigation. (See Part II *Analysis of the TPD Investigation in Contrast to the OAG Report*).

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

### *Evidence/Documentation Obtained*

-3205 of Captain Matthew Montanino
-Deposition of Captain Matthew Montanino
-Captain Matthew Montanino Exposure Form
-Response to Resistance Report (RRR) of Captain Matthew Montanino
-Response to Resistance Report (RRR) of Police Officer David Dean
-Response to Resistance Report (RRR) of Police Officer Kristopher Daurio
-TPD 120 of Captain Brian Owens
-TPD 120 of Captain Matthew Montanino
-TPD 120 of Sergeant John McMahon (Ret.)
-TPD 120 of Sergeants White and Bornt
-TPD 120 of Sergeant Thomas Feeley
-TPD 120 of Police Officer Donald Marble
-TPD 120 of Police Officer Robert Gaudette
-TPD 120 of Police Officer Robert Smith
-TPD 120 of Police Officer Michael Gordon
-TPD 120 of Police Officer Kyle Wheeler
-TPD 120 of Police Officer Christopher Parker
-TPD 120 of Police Officer Christopher Pollay
-TPD 120 of Police Officer Aaron Collington
-TPD 120 of Police Officer Joseph Fazioli
-TPD 120 of Police Officer Colleen Goldston
-TPD 120 of Police Officer Martin Furciniti
-Two TPD 120s of Police Officer Brandon Galligan
-Two TPD 120s of Police Officer David Dean
-Two TPD 120s of Police Officer Kristopher Daurio
-Notes of Captain Christopher Kehn
-Notes of Sergeant White
-Notes of Sergeant Bornt (Ret.)
-April 17, 2016 First Platoon Duty Form
-April 17, 2016 Detective Bureau Callback Form
-April 17, 2016 Mobile Command Center (MCC) Callback Form
-April 17, 2016 Accident Investigation (AI) Callback Form
-Rensselaer County Communication Center (RCCC) Call Detail Sheet
-Deposition of Elena Furciniti
-Text exchange between Police Officer Martin Furciniti and Phillip Gross
-Consent to Search Form for Mr. Phillip Gross' cellular phone
-Video from Mr. Phillip Gross' cellular phone
-April 17, 2016 Troy Police Department (TPD) Deposition of Mr. Phillip Gross
-May 4, 2016 NYS Office of the Attorney General (OAG) Deposition of Mr. Phillip Gross
-May 3, 2016 NYS Office of the Attorney General (OAG) Deposition of Mr. Keith Millington

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

-May 4, 2016 NYS Office of the Attorney General (OAG) Deposition of Mr. Vincent
 Laware
-Video from Unity House at 2431 Sixth Ave.
-Video from McDonalds at 170 Hoosick St.
-Video from Bootlegger's Bar at 200 Broadway
-Comprehensive Motor Vehicle Services & Consulting (CMVSC) Report
-Accident Investigation (AI) Report
-FBI Report
-FBI Photos
-TPD Evidence Technician Reports
-TPD Evidence Technician Photos
-Video from TPD Evidence Technicians
-NYS Office of the Attorney General (OAG) Report
-NYS Executive Order 147
-Email exchange between the TPD ISB Captain and the Office of the Attorney General
 (OAG) attorney, Jennifer Sommers
-Radio transmissions (audio) from April 17, 2016
-Exam Before Trial (EBT) testimony of Sergeant Randall French
-BACS Log Sheet regarding Sergeant Randall French's Police Vehicle 30
-GPS Report of Sergeant Randall French's Police Vehicle 30
-Worker's Compensation Form of Sergeant Randall French
-Notice of Counsel Representation for Sergeant Randall French
-Receipts provided to Sergeant Randall French
-EJustice Report for Mr. Edson Thevenin
-Search Warrant for Mr. Edson Thevenin's vehicle
-X-Ray photos of Mr. Edson Thevenin
-Emergency Room Report for Mr. Edson Thevenin
-Mr. Edson Thevenin Autopsy Sign-in Sheet
-Mr. Edson Thevenin Autopsy Report
-Mr. Edson Thevenin Certificate of Death
-Criminal History of Mr. Edson Thevenin
-Lexis Nexus of Mr. James Thevenin
-People v. Petty, 7 N.Y. 3d 277
-Reference Article-*Perceptual and Memory Distortions During OIS*-Alexis Artwohl,
 Ph.D.
-Reference Article-*No Recall of Weapon Discharge*-Alexis Artwohl, Ph.D.
-Reference Article-*Police Responses to Officer Involved Shootings*-David Klinger, Ph.D.

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

## *Investigation*

**Witness Deposition #1 of Mr. Phillip Gross**

The ISB contacted Gross in an attempt to conduct an interview but Gross refused. As a result, the ISB utilized Gross' TPD and OAG written depositions for this report.

On April 17, 2016, Gross provided a deposition to Sergeant Raymond White which stated the following: On April 17, 2016, Gross was traveling eastbound on Alternate Route 7 when he stopped for the red light at Alternate Route 7 at Eighth Street.

Gross stated he observed cars "loop around" and go onto the highway. Gross stated he observed a police vehicle (Sergeant French's) stop with a black Honda (Thevenin's) behind it. He also observed another police vehicle (Captain Montanino's) behind the black Honda. Gross stated he heard an impact and initially thought the police vehicle was struck. Gross then observed a police officer (Sergeant French) standing outside the police vehicle, heard yelling and then gunshots.

Gross stated he began to audio/video record the incident from his cellular phone. Shortly after, Gross heard the police officer yelling, "My leg, my leg." Gross then exited his vehicle and ran over to help. Upon his arrival, he observed the police officer (Sergeant French) pinned between two vehicles. Gross observed several police officers attempting to free the pinned police officer and a black male (Thevenin) being removed from the Honda while a police officer (Captain Montanino) entered the driver seat of same. Gross believed the police officer who got into the driver seat of the Honda was trying to back the vehicle away from the pinned police officer. Gross stated he and the other unpinned police officers were able to move the car back, "inch by inch" until the pinned police officer was removed.

Gross stated he believed the pinned police officer's (Sergeant French) "boot" was stuck on a piece of metal and another police officer cut it in order to free the pinned police officer.

During Gross' April 17, 2016 TPD interview he advised Sergeant White that he (Gross) recorded a portion of the incident on his cellular phone. As a result, Sergeant White asked Gross if he would authorize the TPD to observe and copy the video. Gross agreed and signed a Consent to Search Form for his cellular phone video. A copy of the video was secured and placed into the Evidence Collection Unit.

ATTORNEYS' EYES ONLY

**Witness Deposition #2 of Mr. Phillip Gross**

On May 5, 2016, Gross provided a deposition to OAG Investigator Ronald Enfield which stated the following: While at the red light at Alternate Route 7 at Eighth Street he observed, "A white marked police car [Sergeant French's] chasing a dark colored car [Thevenin's]. Then a dark unmarked car [Captain Montanino's] was following the dark colored car does a U-turn." Gross stated Sergeant French pulled in front of Thevenin's car while Captain Montanino pulled behind it. Gross described Thevenin's car as backing up approximately three to five feet and striking Captain Montanino's vehicle. Gross stated he observed Sergeant French standing approximately four feet in front of Thevenin's vehicle near the rear driver door of his (Sergeant French's) patrol vehicle. Gross stated, "When the dark colored car [Thevenin's] backs up and hits the unmarked car [Captain Montaninio's] almost simultaneously I hear gunshots." Gross stated he thought Thevenin was shooting at the police officers. Gross stated, "When the shots stopped, that's when I saw the car [Thevenin's] roll into the police officer [Sergeant French]. The car [Thevenin's] rolled about three feet forward and pinned the police officer against his car."

Gross stated that at the conclusion of the gunshots, a police officer (Captain Montanino) removed Thevenin from his vehicle and Gross heard Sergeant French yelling for help. At that time, Gross exited his vehicle and assisted other officers in removing Sergeant French from the pinned position as described in his (Gross') April 17, 2016 deposition to Sergeant White.

Gross stated (in his May 5, 2016 OAG deposition) shortly after he provided the TPD the April 17, 2016 deposition, he knew "something was not accurate and I called Troy PD desk number and asked for Sergeant White." After Gross didn't receive a response from Sergeant White, Gross texted PO Furciniti (who Gross knew personally) and requested a copy of his (Gross') deposition to which PO Furciniti stated he would secure the following day. Also, PO Furciniti requested (from Gross) a copy of the video that Gross recorded and provided to the TPD. Gross stated he forwarded a copy of the video to PO Furciniti via personal cellular phone

Finally, Gross stated, "While giving this statement [to the TPD] I was under pressure from them. They made me feel uncomfortable and they sat right around me. I felt like I better say what they want to hear."

ATTORNEYS' EYES ONLY

**Interview of Mr. Keith Millington**

On February 1, 2018, the ISB conducted a recorded interview of Millington who stated the following: On April 17, 2016, he, along with his friend, Vincent Laware were at a party in Troy. Millington stated as a result of Laware's alcohol consumption he (Millington) drove them home via Laware's Jeep.

Millington stated while traveling to his home they stopped for a red light at the intersection of Hoosick Street at Eighth Street facing in an easterly direction. Millington stated after the light turned green he attempted to drive forward but stalled. Shortly after, a green car (Thevenin's) with no headlights on passed him on the left and was being followed by two police vehicles (Sergeant French & Captain Montanino). Millington stated the green car (Thevenin's) turned onto Alternate Route 7 and began to travel westbound when it struck the concrete barrier. Millington stated the two police vehicles that were following, "closed him in" seconds later. Millington stated a police officer (Sergeant French) got out of the marked police vehicle, drew his weapon and "told the guy to stop." Millington stated the green car (Thevenin's) then backed into the police vehicle (Captain Montanino's) and then began moving forward toward the area where Sergeant French was standing. Millington stated, "I believe as that vehicle [Thevenin's] was going forward that officer [Sergeant French] simultaneously fired his weapon." Millington described the sequence of firing as a "bunch of shots."

Millington viewed an ET Photograph (ISB Item 11) which depicts the area between the front of Thevenin's vehicle and the driver side area of Sergeant French's patrol vehicle but was unable to affirm with certainty where Sergeant French was standing at the time Thevenin's vehicle began moving forward toward Sergeant French. Millington stated moments later, he observed an unknown police officer remove Thevenin from his vehicle and attempt to move that vehicle (Thevenin's) backwards.

Millington stated Laware was "wasted" and thought his friend (Laware's) was in Thevenin's vehicle and may have been shot. Millington stated Laware was yelling that the police officer was in the wrong and that they "didn't have to shoot him." Millington stated several police officers arrived and one of them yelled for Millington and Laware to get out of the area (See Part I page 11 & Part II page 55 of this report for additional information regarding this topic).

Millington stated he read approximately 15 to 20 pages of the OAG Report.

(Note: Millington provided a similar fact pattern to the OAG during his May 3, 2016 deposition).

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

**Interview of Mr. Vincent Laware**

On February 22, 2018, the ISB conducted an interview of Vincent Laware who stated the following: On April 17, 2016, he, along with his friend Keith Millington were at a party in Troy and Laware became intoxicated (he described himself as "obliterated") to the point where he asked Millington to drive them home.

Laware stated during the drive home they (Laware & Millington) stopped for a red light at the intersection of Hoosick Street at Eighth Street facing in an easterly direction. Laware stated when the light turned green, Millington stalled. Laware stated he then observed a green car (Thevenin's) pass them and make a U-turn onto the Alternate Route 7 ramp and begin traveling westbound. Laware stated the next thing he recalls is hearing a crash and then looking in the direction of Thevenin's vehicle. Laware stated he saw a police officer (Sergeant French) standing in front of Thevenin's vehicle but he's not certain where and could only see the police officer from the neck up.  Laware stated he heard the engine revving on the green car (Thevenin's) and then approximately 10 to 15 seconds later he heard gunshots. Laware stated he doesn't recall what motion, if any, Thevenin's vehicle was moving when the gunshots began but does recall hearing the police officer yelling, "Stop."

Laware stated he didn't read any of the OAG Report.

Also, Laware declined to be audio recorded for his ISB interview.

(Note: Laware disputed several portions of his May 6, 2016 statement to the OAG).

Specifically:

1. "That's when I saw the two Troy Police cruisers pin him in."
2. "I then saw the green car pull forward and turn to the right to get away."
3. "A minute or so later some cop told us to 'Get the fuck out of here!', so we left."

Laware informed the ISB that he didn't observe numbers 1 & 2 and that Millington informed him that he (Millington) heard the police officer(s) make the statement described in number 3.

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

**Interview of Police Officer David Dean**

On February 6, 2018, the ISB conducted a recorded interview of PO Dean who stated the following: On April 17, 2016, he was dispatched to a disturbance investigation at 900 River St. While there, PO Dean heard a radio transmission from Sergeant French stating he (Sergeant French) would be initiating a motor vehicle stop. Shortly before completing at 900 River St., PO Dean heard a radio transmission from Sergeant French which indicated that he (Sergeant French) initiated a motor vehicle pursuit of an unknown vehicle. Shortly after, PO Dean became aware Sergeant French required assistance on Alternate Route 7 in the area of Eighth Street. As a result, PO Dean responded via the Jay Street ramp (the wrong way) onto Alternate Route 7 to Sergeant French's location.

Upon arrival he observed Sergeant French "pinned" between two vehicles. PO Dean initially stated he recalled Sergeant French's pinned position to be between his (Sergeant French's) "tire and back door" but then clarified his answer and said Sergeant French was moving around a lot which made it difficult for PO Dean to ascertain Sergeant French's exact location.

PO Dean then went to the driver side door of Thevenin's vehicle and observed Thevenin face down on the roadway next to his (Thevenin's) vehicle. PO Dean stated he observed Thevenin's "right hand reaching around the pants of Captain Montanino." As a result, PO Dean struck Thevenin once in the torso area with his (PO Dean's) baton resulting in Thevenin dropping his hand.

PO Dean stated several other officers were on scene at this time and he felt he should move Sergeant French's patrol vehicle in an attempt to free Sergeant French. As a result, PO Dean entered Sergeant French's patrol vehicle but was apprehensive to move it for fear that it may cause additional injury to Sergeant French. As a result, he, along with PO Marble pushed Thevenin's vehicle backwards, resulting in Sergeant French's removal from the immobilized position. PO Dean stated he gave PO Christopher Parker a knife to cut an unknown item because, "some part of Sergeant French was stuck to the car."

PO Dean stated he placed Sergeant French in the rear of his (PO Dean's) patrol vehicle and traveled to Albany Medical Center Hospital (AMCH). PO Dean stated during the travel to AMCH, Sergeant French stated, "I had to shoot the guy." PO Dean stated he was surprised by that comment because up to that point he was unaware anyone had been shot.

PO Dean stated at some point during the AMCH stay, Sergeant French provided a brief overview of the fact pattern. PO Dean stated in sum and substance, Sergeant French stated, "He had a traffic stop, the guy started to fight, I peppered sprayed him [Thevenin], fought his way back in the car, tried to get keys, drove away with him hanging out window, after car crashed…the car struck him."

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

**Interview of Police Officer Christopher Parker**

On February 8, 2018, the ISB conducted a recorded interview of PO Parker who provided a similar fact pattern as PO Dean with the following additional information: At the conclusion of the disturbance investigation at 900 River St., PO Parker heard "chaos" on the radio and immediately responded to Sergeant French's location. Upon arrival, he observed Sergeant French pinned between two vehicles while yelling, "Get the car off me." PO Parker stated he had "tunnel vision" and was focused on moving the vehicles in order to free Sergeant French from the immobilized position.

PO Parker stated he ran to the driver door of Thevenin's vehicle in an attempt to free Sergeant French by pushing the doorframe of Thevenin's vehicle but was unsuccessful. At some point during this time, PO Parker observed Captain Montanino enter Thevenin's vehicle and attempt to reverse it in order to free Sergeant French from the immobilized position but the engine was "revving" and Thevenin's vehicle wasn't reversing.

PO Parker stated he provided another police officer with a knife to cut Sergeant French's boot which was attached to one of the vehicles.

**Interview of Police Officer Donald Marble**

On February 6, 2018, the ISB conducted a recorded interview of PO Marble who provided a similar fact pattern as PO Dean and PO Parker, along with the following additional information: Upon his arrival to Sergeant French's location, he observed PO Parker and PO Dean assisting in removing Sergeant French from the immobilized position. PO Marble stated it appeared Sergeant French was, "between middle of hood and passenger area" of Thevenin's vehicle. PO Marble stated he assisted other officers in pushing the vehicles until Sergeant French was freed from the immobilized position.

**Interview of Police Officer Brandon Galligan**

On February 5, 2018, the ISB conducted a recorded interview of PO Galligan who provided a similar fact pattern as PO Dean, PO Parker and PO Marble with the following additional information: While assisting at the disturbance call investigation at 900 River St., PO Galligan heard a radio transmission from Sergeant French who stated, "He tried to run me over."

Upon his arrival to Sergeant French's location, he observed Sergeant French "pinned between two vehicles" and "screaming for help." PO Galligan observed PO Dean and PO Parker attempting to move the vehicles and believed that the positioning of Captain Montanino's patrol vehicle was precluding them from doing so. As a result, he (PO Galligan) moved Captain Montanino's vehicle backwards, approximately 10 to 15 feet. PO Galligan stated Captain Montanino directed him (PO Galligan) to handcuff Thevenin who was lying next to the driver door of his (Thevenin's) vehicle. PO Galligan was directed to follow Thevenin's ambulance to St. Mary's Hospital where he remained until relieved several hours later.

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

### Interview of Sergeant Thomas Feeley

On April 30, 2018, the ISB conducted a recorded interview of Sergeant Feeley (who was a police officer at the time of this incident) who stated the following: While assisting units at 900 River St., PO Feeley heard Sergeant French state in sum and substance that someone tried to run him (Sergeant French) over. As a result, PO Feeley traveled the wrong way up the Jay Street ramp and parked west of Sergeant French's police vehicle.

PO Feeley stated upon exiting his police vehicle he traveled east on foot between Sergeant French's vehicle and the concrete barrier where he observed Thevenin lying on the ground outside of his (Thevenin's) driver door. As a result, PO Feeley handcuffed Thevenin and initiated a weapons check. PO Feeley stated he checked Thevenin's pants pockets but was unable to check above the waist due to the amount of blood on Thevenin's clothing and PO Feeley's lack of protective equipment.

PO Feeley was then directed to a traffic control assignment at Sixth Avenue at Hoosick Street.

### Interview of Police Officer Kristopher Daurio

On February 8, 2018, the ISB conducted a recorded interview of PO Daurio who stated the following: While assisting units at 900 River St., PO Daurio heard Sergeant French request assistance. As a result, PO Daurio traveled to the area of Alternate Route 7 near Eighth Street.

Upon his arrival, PO Daurio observed Thevenin lying on the ground near the driver door of his vehicle being handcuffed by PO Galligan and PO Feeley.

PO Daurio stated he observed several people standing outside of a Jeep and an unknown sedan type vehicle in the area. PO Daurio described the scene as chaotic and still not secure. As a result, PO Daurio yelled, "Get the fuck out of here" which resulted in the people exiting the area (See Part II page 55 for additional information regarding this topic).

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

**Interviews of Captain Matthew Montanino**

On February 26, 2018, and May 28, 2018, the ISB conducted recorded interviews of Captain Montanino who stated the following: While assisting at a disturbance call at 900 River St., Captain Montanino heard Sergeant French state (via police radio) that someone tried to "run him over." As a result, Captain Montanino began to travel toward Sergeant French's location which was Sixth Avenue north of Jacob Street.

Captain Montanino stated while en route to Sergeant French, he (Captain Montanino) turned onto Hoosick Street from River Street and observed Sergeant French and Thevenin turn onto Hoosick Street from Sixth Avenue. Captain Montanino stated as the vehicles (Sergeant French's & Thevenin's) approached the area of Hoosick Street at Eighth Street he (Captain Montanino) was traveling behind Sergeant French who was traveling behind Thevenin. Captain Montanino stated that Thevenin made a U-turn onto Alternate Route 7 from Hoosick Street and began to travel in a westerly direction. Captain Montanino stated upon his (Captain Montanino's) completion of the U-turn onto Alternate Route 7, Thevenin had already struck the concrete barrier on the south side of the roadway. I asked Captain Montanino if he recalled the location of Sergeant French's vehicle at this time and he stated, "In the right lane...uh...almost up to the vehicle [Thevenin's] or alongside...I don't exactly recall." Captain Montanino stated, "And then Sergeant French's vehicle pulled around to the front side of Mr. Thevenin's vehicle and angled...uh...as to...uh...being on an angle to the south barrier as well." Captain Montanino stated he pulled behind Thevenin's vehicle while "leaving some distance" in order to afford Thevenin ample room to reverse and not strike Captain Montanino's police vehicle.

Captain Montanino stated he exited his police vehicle and approached Thevenin from the driver side and began to "Order him [Thevenin] out of the car." Specifically, "As Mr. Thevenin's vehicle was backing away from the barrier, I was up somewhere toward the back of Thevenin's vehicle...uh...when it was backing up at that point in time...uh...I was afraid that it was going to possibly strike me so I literally like jumped and turned... prior to me just jumping and turning is when I saw Sergeant French exit his vehicle and start to move to his...Sergeant French's left." Captain Montanino stated, "I turned to go for my vehicle and I...Sergeant French yelling, 'Stop,' 'Police'...and then at that point, I had turned away and that's when I heard gunfire." Captain Montanino stated he heard these gunshots after Thevenin struck his (Captain Montanino's) vehicle, hesitated slightly and then began to move forward. The ISB Captain asked Captain Montanino if he could describe the speed at which Thevenin's vehicle was moving forward he stated, "It just started going forward." Captain Montanino stated he heard "probably two" gunshots but wasn't certain. In an attempt to further clarify his (Captain Montanino's) position relative to his view of Sergeant French during this time, Captain Montanino stated, "As I was sideways to Thevenin's vehicle facing the driver side of his [Thevenin's] vehicle...and then I spun to my right...so I did not have a frontal view of what was in front of Mr. Thevenin's vehicle at that point in time. I saw Sergeant French exit the vehicle and start to move to his left so I saw him in front of the vehicle but I at that point in time didn't know if he continued or stopped because I turned...I saw him exiting his vehicle in front

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

of his [Sergeant French's] vehicle at that point in time I didn't know how far he [Sergeant French] had gotten because I spun away too and when I spun back to my vehicle I didn't have any view of Sergeant French."

Captain Montanino stated after hearing the gunshots, he (Captain Montanino) drew his weapon and moved toward Thevenin's driver door while yelling, "Stop" at Thevenin. In an attempt to clarify the specifics as it relates to when Captain Montanino drew his firearm in comparison to Sergeant French's testimony, Captain Montanino stated, "I did not place my weapon in my hand until that point when I heard gunshots." Captain Montanino stated simultaneous to his arrival at Thevenin's driver door, he heard a second volley of an unknown amount of gunshots. Captain Montanino stated he observed Sergeant French laying on Thevenin's hood "bent over" somewhere between the center of Thevenin's hood and the passenger side headlamp. Captain Montanino stated he was uncertain of the timeframe between the two volleys but it was noticeable.

Captain Montanino stated he was still uncertain as to who was firing but recalls feeling the "gun blast" and "energy," while "smelling powder" and being struck with small particles of glass.

Captain Montanino stated he observed Thevenin sitting in his (Thevenin's) vehicle with his (Thevenin's) head up but not responding to Captain Montanino's verbal commands. As a result, he (Captain Montanino) opened Thevenin's driver door, grabbed Thevenin by the shoulder area, pulled him (Thevenin) to the ground and placed his (Captain Montanino's) knee in Thevenin's back.

Captain Montanino stated he entered Thevenin's vehicle, observed the stick shift in Drive but the vehicle wasn't moving. As a result, Captain Montanino attempted to put Thevenin's vehicle in reverse but due to nervousness and not looking at the gearshift, he was unable to do so.

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

**Interview #1 of Sergeant Randall French**

On May 10, 2018, the ISB conducted a recorded interview of Sergeant French who stated the following: On April 17, 2016, while on patrol, Sergeant French heard the Rensselaer County Communications Center (RCCC) dispatch officers to 900 River St. for a reported disturbance.

Sergeant French stated that while en route to 900 River St., he observed Thevenin make a wide left turn northbound on Sixth Avenue from Fulton Street. Sergeant French stated he attempted to pass Thevenin but Thevenin swerved from the right lane to the left lane in the area of Sixth Avenue north of Federal Street. As a result, Sergeant French initiated a vehicle stop of Thevenin on Sixth Avenue between Jacob Street and Hoosick Street.

Sergeant French stated upon his approach to Thevenin's vehicle, he (Sergeant French) detected an odor of an alcoholic beverage emanating from Thevenin's vehicle. Sergeant French stated he requested Thevenin exit his (Thevenin's) vehicle for the purpose of conducting field sobriety tests which included: Horizontal Gaze Nystagmus (HGN), Walk and Turn and the One Leg Stand. Sergeant French stated Thevenin demonstrated several failing indicators for each test. Sergeant French stated he requested Thevenin partake in a pre-screening breath test but Thevenin refused. As a result of Sergeant French's investigation, Thevenin was informed he would be placed under arrest. Sergeant French stated Thevenin responded, "I can't be arrested, I'll lose my job." Sergeant French stated he directed Thevenin to place his (Thevenin's) hands behind his back for the purpose of handcuffing. Sergeant French stated Thevenin maintained his hands in a firm position preventing Sergeant French from securing Thevenin's wrists. Sergeant French stated at some point during his attempt to handcuff Thevenin, he stated, "Fuck this", pulled his hands away and began to walk back to his (Thevenin's) car. Sergeant French stated he attempted to prevent Thevenin from reentering his vehicle by exposing Thevenin to Oleoresin Capsicum (OC) which was ineffective. Sergeant French stated after Thevenin reentered his (Thevenin's) vehicle, he (Sergeant French) leaned into Thevenin's open vehicle door and attempted to remove Thevenin's key from the ignition but was unable to do so. Sergeant French stated at some point while Thevenin was in his vehicle, he (Sergeant French) exposed Thevenin to a second burst of OC but it was ineffective. Sergeant French stated Thevenin placed his vehicle in Drive and began to progress forward. Sergeant French stated when he realized he'd been unsuccessful in stopping Thevenin, he (Sergeant French) intentionally pushed himself away from Thevenin's vehicle causing Sergeant French to land on the roadway. Sergeant French stated he did this in order to prevent himself from being "dragged" by Thevenin.

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

Sergeant French stated he returned to his patrol vehicle and notified the RCCC that Thevenin fled northbound on Sixth Avenue. Sergeant French stated he began to pursue Thevenin and that Captain Montanino joined the pursuit shortly after. Specifically, Sergeant French stated Captain Montanino was traveling behind Sergeant French who was traveling behind Thevenin. Sergeant French stated Thevenin traveled north on Sixth Avenue to east on Hoosick Street and made a U-turn onto Alternate Route 7 where he (Thevenin) "Crashed on left side of roadway."

Sergeant French stated in an attempt to discontinue any further pursuit, he (Sergeant French) pulled in front of Thevenin's vehicle while Captain Montanino pulled behind Thevenin's vehicle. Sergeant French stated, "I thought we had him [Thevenin] boxed in." I asked Sergeant French if he received any specific training as it relates to the tactic of pulling in front of vehicles and he described Emergency Response Team (ERT) training relative to vehicle assaults but none specific to patrol functions.

Sergeant French stated upon pulling in front of Thevenin there was a moment where his attention was diverted away while he attempted retrieve a Maglite from his duty bag which was on the passenger seat of Sergeant French's vehicle. Sergeant French stated this momentary diversion prevented him from observing Thevenin's vehicle. Specifically; "I don't know what happened to his [Thevenin's] car at this point." Sergeant French stated simultaneous to attempting this Maglite retrieval, he (Sergeant French) was trying to open his driver door but it wouldn't. Sergeant French described this attempt to exit his (Sergeant French's) patrol vehicle as "a real struggle."

Sergeant French stated just prior to exiting his vehicle he observed, "Captain Montanino at the driver side window of Mr. Thevenin's car with gun pointed at him [Thevenin] yelling at him [Thevenin] and I don't know what he was yelling." Sergeant French stated his original thought was to approach the driver window of Thevenin's vehicle but due to Captain Montanino being at Thevenin's driver door, he (Sergeant French) decided to "cut in front of Thevenin's car so I could get to the passenger side, get in and try to get his [Thevenin's] keys...put the car in park."

On April 21, 2016, Sergeant French provided Sergeants White and Bornt (Ret.) with his (Sergeant French's) narrative related to this incident. During this interview, Sergeant French described being immobilized between his (Sergeant French's) patrol vehicle and Thevenin's vehicle "immediately" upon stepping out of his (Sergeant French's) vehicle. Sergeant French stated the following during his ISB interview as it relates to that portion of his description: "Open my door...can't get it all the way open...uh...I don't know why and I get out of the car and I felt like I was crushed in my left leg by his [Thevenin's] vehicle." Also, Sergeant French stated he stepped out "facing his [Thevenin's] car and that I was pinned straight on with my left leg. I don't know where my right leg was...um...the pain was increasing to the point where I thought it was going to break."

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

In an attempt to ascertain Sergeant French's specific location upon exiting his police vehicle, he was provided a sketch drawing (ISB Item 25) prepared as part of the Accident Investigation (AI). The sketch depicts Sergeant French's vehicle, along with Thevenin's vehicle as they were positioned at the conclusion of the incident. Initially, Sergeant French was uncertain of his location upon stepping from his vehicle but acknowledged (at the conclusion of viewing the vehicle positions in the sketch) that if he was standing next to his (Sergeant French's) driver door upon exiting, Thevenin's vehicle couldn't strike him. Sergeant French indicated his positioning upon being immobilized as between the center of Thevenin's hood and passenger headlamp.

Sergeant French stated upon being immobilized between the vehicles, Thevenin's engine was revving steadily. Sergeant French described the revving sound as, "Waaaaaa." Sergeant French stated Thevenin's vehicle wasn't moving. Specifically, he said, "It was stuck."

Sergeant French stated he attempted to remove himself from this immobilized position by pushing both hands against Thevenin's hood but was unable to free himself. I asked Sergeant French if he had his weapon drawn at this time and he stated, "No. I didn't think I needed it. I remember Captain Montanino had his pistol out and I was thinking why I don't know why…he has his [Captain Montanino's] gun out." The ISB Captain attempted to further clarify this pivotal issue as it related to Sergeant French's reasoning for not drawing his weapon up to this point. Sergeant French stated, "My mindset at that point was to prevent a pursuit from happening. I wanted to have my hands available in case I had to break a car window out or get a door open. I did not view that set of circumstances that was presented that night…I did not feel the need to draw my gun."

Sergeant French stated as a result of the circumstances described above (being immobilized), "I drew and I fired" an unknown amount of times into the windshield of Thevenin's vehicle. Sergeant French stated at the completion of firing into the windshield, he was still immobilized and Thevenin's vehicle engine was still revving. Sergeant French stated, "He [Thevenin] turned or the car moved" causing a "twist" in Sergeant French's left leg which caused him (Sergeant French) to turn to his left. Sergeant French stated as a result of his continued immobilization, he fired an unknown amount of additional rounds into the windshield of Thevenin's vehicle. Sergeant French stated he reassessed the situation and considered a magazine change but when he looked back toward Thevenin he (Thevenin) was removed from the vehicle. Sergeant French didn't recall the elapsed time between the two volleys.

Sergeant French stated several officers assisted in freeing him from the immobilized position and upon being freed, he was transported to AMCH by PO Dean.

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

Lastly, the ISB Captain presented Sergeant French with ISB Item 28 (photograph of Thevenin's windshield with bullet holes) and asked Sergeant French if it was possible he stepped from his police vehicle, drew his weapon, fired two shots into the driver area of Thevenin's windshield, then moved from his (Sergeant French's) right to left between the vehicles, became immobilized and fired the remaining six rounds into the passenger side of Thevenin's windshield from this immobilized position. Sergeant French stated, "I don't know. All I can tell you is what I recall." Also, Sergeant French stated, "I can't say...that is what I remember happening. I understand your question and I'm telling you I remember it one way. There's only one way I remember it and I don't...I'm not gonna deviate from that...I can't deviate from that...that is my memory."

**Interview #2 of Sergeant Randall French**

On June 6, 2018, the ISB conducted a recorded interview of Sergeant French in an attempt to further clarify the circumstances surrounding Thevenin's crash into the concrete barrier. Sergeant French stated the following as it related to that segment of events: The ISB Captain asked Sergeant French where he was relative to Thevenin when he (Thevenin) crashed into the concrete barrier. Sergeant French stated, "When he [Thevenin] made the U-turn I lost sight of him...uh...I was maybe four car lengths behind him [Thevenin] approximately based on the cars that were stopped. When I made the U-turn onto the bridge myself he had already crashed. I didn't actually see him collide with the side...I lost sight of him...the next time I saw him again he was crashed."

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

**Interview of Mr. Craig Fries**

Fries is the CEO and founder of Precision Simulations, Inc. (PSI) which is located in Grass Valley, CA.

Upon the OAG securing this matter from the TPD and RCDA, they (OAG) hired PSI to conduct an analysis of the OIS which was included in the OAG's report. Specifically, PSI developed a virtual recreation based on a laser scan of the incident location and the motor vehicles involved. This report (ISB) will cite specific portions when applicable.

On February 6, 2018, the ISB conducted a phone interview of Fries for the purpose of clarifying two issues in order to provide better context. The first issue was regarding the material Fries utilized to reach his conclusions. Specifically, was any of the information (criminal case file) provided to him not utilized in the completion of his report? Fries stated that his analysis was based on all documentation within the criminal case file, direct observation of the scene, motor vehicles involved and video/audio recordings. Additionally, he conducted several of his own testing (virtual recreation) and considered the totality of the circumstances in attaining his findings. The second issue was regarding the height of Sergeant French's muzzle at the time he commenced firing. Fries stated this data is difficult to determine due to the uncertainty of the round velocity, along with the type of windshield. As a result, Fries stated there is no absolute science of predicting the height of Sergeant French's weapon when firing as it relates to this incident.

**Interview of FBI Forensic Examiner Erich Smith**

Upon the OAG securing this matter from the TPD and RCDA, they (OAG) requested the FBI Firearms/Toolmark Unit evaluate the front windshield of Thevenin's vehicle for the purpose of establishing the hollows sequence in Thevenin's windshield.

On April 12, 2018, the ISB conducted a phone interview of Forensic Examiner Erich Smith for the purpose of clarifying one issue in order to provide better context. The issue was regarding the material Smith utilized to reach his conclusions. Specifically, was any of the information (criminal case file) provided to him not utilized in the completion of his report? Smith stated (unlike Fries) that Thevenin's windshield was the only item they (FBI) utilized to support their findings. Smith stated the FBI utilizes this method (single item review) in order to eliminate the potential of any contextual bias.

Also, the FBI report deviates from the PSI Report as it relates to the hollows sequence into the windshield of Thevenin's vehicle. Specifically, the FBI report indicates that the initial hollows into the windshield entered the passenger side of Thevenin's windshield and the latter rounds entered into the driver side of the windshield. In contrast, the PSI Report concludes the initial shots entered into the driver side of the windshield and the latter entered into the passenger side of the windshield.

18

ATTORNEYS' EYES ONLY

As a result, I asked Smith, what if anything, may cause inaccurate findings as it relates to the single item review? Smith indicated that several environmental factors could manipulate the findings. For example, what type of heat or cold has the windshield been exposed to? Second, Smith stated different types of trauma may cause deviations to the windshield which could cause inaccurate findings.

### Interview of Dr. Michael Sikirica, M.D.

On February 8, 2018 and June 12, 2018, the ISB conducted phone interviews of Dr. Sikirica who stated the following: Thevenin sustained seven (7) gunshot wounds as follows:

1. Left nose area
2. Graze wound along right upper shoulder
3. Right clavicular (collar)-*Mortal wound*
4. Left armpit area
5. Right upper arm
6. Right forearm
7. Left forearm

Dr. Sikirica stated he requires an entry wound, exit wound and accurate final rest position of a bullet to accurately determine the discharging position of a shooter. Dr. Sikirica stated he didn't possess those mandates for Thevenin's autopsy and therefore, is unable to render a scientific determination as to what discharging position by Sergeant French caused Thevenin's specific wounds.

Dr. Sikirica stated a drug analysis concluded the following: Thevenin had a Blood Alcohol Content (BAC) of 0.19.

### Interview of Dr. Philip Trompetter, Ph.D.

Dr. Trompetter is the President of the American Board of Police and Public Safety Psychology (ABPPSP). He has testified as an expert witness regarding multiple OIS. As part of my research and analysis for this investigation, I consulted with Dr. Trompetter specifically related to this matter, along with the research related to OIS. I will reference the information I received from Dr. Trompetter and the research throughout the remainder of this report.

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

**Interview of Mr. Brian Chase**

Chase is the chief investigator and senior instructor for Comprehensive Motor Vehicle Services & Consulting (CMVSC). Chase is the sole vehicle forensic expert for the United States Attorney's Office, along with the FBI Washington, D.C. Field Office. Chase has provided expert testimony is countless criminal and civil cases.

As part of the ISB investigation, Chase was hired to perform the Vehicle Autopsy and accident reconstruction. The CMVSC Report *(Appendix A)* will be referenced throughout the remainder of this report.

ATTORNEYS' EYES ONLY

## *Summary/Findings*

### CONSTITUTIONAL STANDARD REVIEW

The only constitutional provision at issue when law enforcement officers seize an individual by using deadly physical force is the first clause of the Fourth Amendment that provides:

*"The right of the people to be secure in their persons, houses, papers, and affects against unreasonable searches and seizures shall not be violated..."*

It is significant that the Fourth Amendment does not require a law enforcement officer to be right when conducting a seizure. Rather, the standard is one of objective reasonableness. In Graham v. Connor, 490 S.Ct. 386 (1989), the Supreme Court of the United States held that the determination of the reasonableness of an officer's decision to use force must be made from the perspective of an officer on the scene. The Court noted that *"officers are often forced to make split-second judgement-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation."* Furthermore, the Court concluded that the issue must be viewed *"from the perspective of a reasonable officer at the scene, rather than with 20/20 vision of hindsight..."*

The practical effect of the Supreme Court's decision in Graham v. Connor is that those sitting in judgement of an officer's use of force must view the relevant facts from the perspective of the law enforcement officer on the scene. Accordingly, the relevant facts are those facts, and only those facts, that were available to the officer at the time the decision to use force was made. After-acquired information cannot be used to determine the validity of an officer's actions. Moreover, because the perspective must be that of the law enforcement officer on the scene, it is extremely important to look at those relevant facts through the eyes of an officer trained to recognize and react to a threat.

ATTORNEYS' EYES ONLY

## *Allegations*

Allegations 1-5 will be detailed throughout the remainder of Part I of this report.

### Allegation #1

- Was the deadly physical force utilized against Thevenin upon Sergeant French's immediate exit from his (Sergeant French's) patrol vehicle justified under provisions of the New York State Penal Law, the United States Constitution and the Troy Police Department's General Orders?

### Allegation #2

- Was the deadly physical force against Thevenin upon Sergeant French becoming immobilized between the two vehicles justified under provisions of the New York State Penal Law, the United States Constitution and the Troy Police Department's General Orders?

### Allegation #3

- Was Sergeant French's initiated crash into Thevenin's vehicle justified under provisions of the New York State Penal Law, the United States Constitution and the Troy Police Department's General Orders?

### Allegation #4

- Did Sergeant French provide false testimony during his Inspectional Services Bureau (ISB) interviews?

### Allegation #5

- Was the physical force (baton strike) utilized by PO Dean against Thevenin justified under provisions of the New York State Penal Law, the United States Constitution and the Troy Police Department's General Orders?

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

Based on the ISB's review of the New York State Penal Law, the United States Constitution, the Troy Police Department's General Orders, witness depositions, video, audio, support documentation, physical evidence and the totality of the circumstances, the ISB has concluded the following:

**Allegation #1-Was the deadly physical force utilized against Thevenin upon Sergeant French's immediate exit from his (Sergeant French's) patrol vehicle justified under provisions of the New York State Penal Law, the United States Constitution and the Troy Police Department's General Orders?**

Information tending to support **Allegation #1**

Sergeant French is dogmatic that he fired all eight rounds while immobilized between the rear driver wheel area of his vehicle and the front passenger side bumper area of Thevenin's vehicle. Based on the empirical information as it relates to Sergeant French's shooting position, the hollow groupings in Thevenin's windshield and witness testimony, Sergeant French's version is inconceivable. For example, the two hollow entries in the driver side of Thevenin's windshield enter from a largely straight on direction which indicates that Sergeant French fired these two rounds while positioned at or near his driver door and not from the immobilized position Sergeant French described. Additionally, minimal movement to Sergeant French's left or right away from his driver door would render this same largely straight on trajectory implausible.

Additionally, the witnesses provided contrasting versions related to the motion of Thevenin's vehicle at the time Sergeant French commenced firing, along with Sergeant French's location. Millington stated Sergeant French had exited his police vehicle, drew his weapon and "told the guy [Thevenin] to stop" prior to Thevenin backing into Captain Montanino's vehicle. Additionally, Millington stated Sergeant French fired simultaneous to Thevenin moving forward at the conclusion of striking Captain Montanino's vehicle. Gross stated Sergeant French fired "almost simultaneous" to Thevenin striking Captain Montanino's vehicle. Gross also stated, "When the shots stopped, that's when I saw the car [Thevenin's] roll into the police officer [Sergeant French]. The car [Thevenin's] rolled about three feet forward and pinned the police officer against his car." Laware disqualified the statement he provided to the OAG and failed to provide the ISB with any information relative to the movement of Thevenin's vehicle prior, during, or at the conclusion of Sergeant French shooting. Lastly, Captain Montanino stated Sergeant French fired from at least two positions. For example, Captain Montanino stated he observed Sergeant French in front of Thevenin's vehicle as Thevenin began to reverse toward Captain Montanino's vehicle. Upon a slight hesitation at the conclusion of Thevenin striking Captain Montanino's vehicle, Thevenin proceeded forward at an unknown speed and Sergeant French fired an unknown amount of shots. Seconds later, Captain Montanino heard Sergeant French yell, "I'm pinned," then heard another unknown amount of shots and observed Sergeant French in the immobilized position between the vehicles.

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

Based on the above information, the ISB investigation determined Sergeant French did not shoot all eight projectiles from the immobilized position.

The CMVSC Report *(Appendix A)* provided precise data as it relates to the functionality of Thevenin's vehicle prior to impact, at the time of impact and the conclusion of impacting the concrete barrier.

Several portions of the CMVSC Report will be cited throughout the remainder of this report.

According the CMVSC Report, "The forensic vehicle autopsy of the 2000 Honda Civic EX operated by Edson Thevenin revealed absolutely no motor vehicle mechanical, electrical, or computer control deficiencies existing prior to, or at the time of impact with the concrete barrier of Alternate Route 7 (Collar City Bridge) which would have contributed to the cause of the vehicle dynamics or impact. This forensic investigation and analysis divulged evidence of a vehicle which was, prior to crash damage resulting from the violent impact with the concrete barrier, unequivocally capable of proper operation, steering, and stopping maneuvers."

The findings in the CMVSC Report as they relate to the functionality of Thevenin's vehicle at the conclusion of impact are, "The post impact acceleration analysis of the 2000 Honda Civic operated by Edson Thevenin revealed that the vehicle was capable of forward and rearward movement under engine power. However, due to the substantially increased rolling resistance friction resulting from the significant front tire toe out condition sustained during concrete barrier impact, greatly increased accelerator input for such operations was required. Additionally, the front tire toe-out condition resulted in notable reduced turning radii of the vehicle."

Also, the CMVSC conducted a *Vehicle Damage Matchup Analysis* which consists of a forensic matchup of the damage sustained to Sergeant French's vehicle, along with the damage to Thevenin's vehicle.

The following are the CMVSC Report findings as they relate to said matchup analysis:

1. Thevenin's vehicle sustained a right outside rearview mirror detachment which was matched to damage on the left rear door, exterior door handle area, left rear door upper forward area of Sergeant French's vehicle.

The CMVSC Report concluded the following regarding the damage matchup described in #1 above: "The forensic analysis of the damage present at the exterior door handle area of the left front door, and upper forward exterior door panel of the left rear door of the Troy Police Department 2013 Ford Taurus operated by Troy Police Sergeant Randall French; the forensic analysis of the damage present at the right outside mirror detached from the 2000 Honda Civic EX operated by Edson Thevenin; and the forensic damage matchup thereof revealed contact damage and forceful outside Honda mirror detachment consistent with impact by the left front outside door handle of the faster moving Ford Taurus."

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

(See description of the following images on page 26 of this report).





ATTORNEYS' EYES ONLY



According to the findings in the CMVSC Report, "These photographs [pages 25 & 26] depict the forensic matchup of the scuff/transfer marks of the 2013 Ford Taurus with the 2000 Honda Civic right outside rearview mirror prior to and during detachment. The Red Arrows denote areas of black transfer and scuffing present on the Ford Taurus. The above photograph represents the right outside rearview mirror during detachment due to impact by the left front exterior door handle of the 2013 Ford Taurus, being operated at a faster rate of speed. The mirror will become completely detached from the Honda Civic, and continue its trajectory to final rest in front of the left rear tire of the 2013 Ford Taurus at its stopped location."

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

2. Thevenin's vehicle sustained damage to the right rear door outside door handle which was matched to damage on the left rear quarter panel and upper dog leg area of Sergeant French's vehicle.

The CMVSC Report concluded the following regarding the damage matchup described in #2 above: "The forensic analysis of the damage present at the left rear quarter panel, upper dog leg area of the Troy Police Department 2013 Ford Taurus operated by Troy Police Sergeant Randall French; the forensic analysis of the damage present at the right rear exterior door handle of the 2000 Honda Civic EX operated by Edson Thevenin; and the forensic damage matchup thereof revealed contact damage consistent with a sideswipe event of the two motor vehicles; more specifically, that of the Ford Taurus left side/Honda Civic right side impact of the Ford Taurus operated at the faster rate of speed."



According to the findings in the CMVSC Report, "The above photograph depicts the forensic matchup of the scuff/transfer marks of the left rear forward quarter panel of the 2013 Ford Taurus with the right rear exterior door handle of the 2000 Honda Civic. The Orange Arrows denote the approximate contact areas."

27

ATTORNEYS' EYES ONLY

3. Thevenin's vehicle sustained damage to the right rear exterior side guard molding which was matched to left rear lower exterior door panel and dog leg area of Sergeant French's vehicle.

The CMVSC Report concluded the following regarding the damage matchup described in #3 above: "The forensic analysis of the damage present at the left rear exterior door panel and dog leg area of the Troy Police Department 2013 Ford Taurus operated by Troy Police Sergeant Randall French; the forensic analysis of the damage present at the right rear exterior side guard molding of the 2000 Honda Civic EX operated by Edson Thevenin; and the forensic damage matchup thereof revealed contact damage consistent with a sideswipe event of the two motor vehicles; more specifically, that of the Ford Taurus left side/Honda Civic side impact of the Ford Taurus operated at the faster rate of speed."



According to the findings in the CMVSC Report, "The above photograph depicts the forensic matchup of the scuff/transfer marks of the left rear exterior door panel of the 2013 Ford Taurus with the right rear exterior side guard molding of the 2000 Honda Civic. The Blue Arrows denote the approximate contact areas."

ATTORNEYS' EYES ONLY

4. Thevenin's vehicle sustained damage to the front bumper cover on the right side which was matched to the left front fender lower rear section of Sergeant French's vehicle.

The CMVSC Report concluded the following regarding the damage matchup described in #4 above: " The forensic analysis of the damage present at the left front lower rear fender panel of the Troy Police Department 2013 Ford Taurus operated by Troy Police Sergeant Randall French; the forensic analysis of the damage present at the right side of the front bumper cover of the 2000 Honda Civic EX operated by Edson Thevenin; and the forensic damage matchup thereof revealed damage consistent with a contact event of the two motor vehicles."



According to the findings in the CMVSC Report, "The above photograph depicts the forensic matchup scuff/transfer marks of the lower rear panel of the left front fender of the 2013 Ford Taurus with scuff/transfer marks of the right side front bumper cover of the 2000 Honda Civic. The Green Arrow denotes the approximate contact areas."

ATTORNEYS' EYES ONLY

5. Thevenin's vehicle sustained damage to the right front fender which was matched to the left front door outer panel section of Sergeant French's vehicle.

The CMVSC Report concluded the following regarding the damage matchup described in #5: "The forensic analysis of the damage present at the left outer front door panel of the Troy Police Department 2013 Ford Taurus operated by Troy Police Sergeant Randall French; the forensic analysis of the damage present at the right front outer fender location of the 2000 Honda Civic EX operated by Edson Thevenin; and the forensic damage matchup thereof revealed contact damage consistent with a sideswipe event of the two motor vehicles; more specifically, that of the Ford Taurus left side/Honda Civic right side impact of the Ford Taurus operated at the faster rate of speed."

(See images and description on pages 31 & 32 of this report).

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY



31
ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY



According to the findings in the CMVSC Report, the photos on pages 31 & 32 of this report depict, "damage present at the left front outer door panel of the 2013 Ford Taurus, and the right front outer fender panel of the 2000 Honda Civic. Note the matching scuffing/transfer, as well as the height of the deformation damage resulting from forceful sliding impact. The Red Arrows denote the direction of the damage, with obvious increasing intrusion."

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY





According to the findings in the CMVSC Report, "These photographs depict the forensic damage matchup of the 2013 Ford Taurus left front door and 2000 Honda Civic right front fender. The Blue Arrows denote the matched contact areas of the two motor vehicles. The directional damage is consistent with the white Ford Taurus [Sergeant French's] travelling at the faster rate of speed."

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

In addition to the *Vehicle Damage Matchup Analysis* section described above, the CMVSC analyzed several possible scenarios in the *Methodology/Analysis of Dynamic Vehicle Contact* section of their report.

Although the CMVSC Report concludes the fact pattern described in Scenario #4, all scenarios are described as follows:

Scenario #1

"The 2000 Honda Civic operated by Edson Thevenin violently impacts the concrete barrier of Alternate Route 7 (Collar City Bridge), with the impact force projecting the left frontal area of the vehicle in a westerly direction along the concrete barrier. The 2000 Honda Civic realizes a clockwise rotation, and ultimately arrives at a stopped location on the roadway. The 2013 Ford Taurus operated by Troy Police Sergeant Randall French then arrives at the location and in doing so contacts the 2000 Honda Civic in a sideswipe manner-left side of 2013 Ford Taurus to right side of 2000 Honda Civic-before stopping."

The CMVSC Report details the following facts for consideration as they relate to Scenario #1:

1. "The post concrete barrier impact location of the 2000 Honda Civic on Alternate Route 7 (Collar City Bridge) was established by a) Roadway physical evidence; b) Concrete barrier physical evidence; and c) Physical dimensions of 2000 Honda Civic, inclusive of wheelbase and track width."

2. "The location of the stopped Troy Police Department 2013 Ford Taurus operated by Troy Police Sergeant Randall French was established from a) Scene photographs; and b) Scene mapping conducted by Troy Police Department personnel."

3. "The angle of final rest relationship of the 2000 Honda Civic and the 2013 Ford Taurus at the scene on Alternate Route 7 (Collar City Bridge) following concrete barrier impact by the 2000 Honda Civic would not have allowed a full sideswipe contact of the dynamic 2013 Ford Taurus upon arrival."

4. "The trajectory of the right outside mirror of the 2000 Honda Civic, severed by the left exterior door handle of the faster moving 2013 Ford Taurus during sideswipe contact, would have been that of final rest of the mirror unit near the concrete barrier, and not within the westerly lane of travel."

5. "The operator of a motor vehicle most typically does not merely elect to suddenly steer to the left and violently impact a concrete barrier for no reason."

The CMVSC Report concluded the following as it relates to Scenario #1: "This described scenario is unsupported by physical evidence, vehicular trajectory, and science."

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

Scenario #2

"The 2000 Honda Civic operated by Edson Thevenin violently impacts the concrete barrier of Alternate Route 7 (Collar City Bridge), with the impact force projecting the left frontal area of the vehicle in a westerly direction along the concrete barrier. The 2013 Ford Taurus operated by Troy Police Sergeant Randall French then arrives at the location and stops. As the 2000 Honda accelerates rearward, the right front corner of the vehicle impacts the opened left front door of the Troy Police Department 2013 Ford Taurus, resulting in significant door damage."

The CMVSC Report details the following facts for consideration as they relate to Scenario #2:

1. "The above scenario has been offered by Craig Fries of Precision Simulations. According to the provided Curriculum Vitae, Mr. Fries is neither a Crash Reconstruction Expert; a Vehicle Crash Damage Analysis Expert; an Automotive Technology Expert; nor a Vehicle Dynamics Expert. Indeed, Mr. Fries is offered as a 3D Forensic Scan Expert."

2. "The referenced report of Mr. Fries does not reflect the clockwise rotation of the 2000 Honda Civic due to the violent impact with the concrete barrier, thus improperly representing the angle of the vehicle."

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY



According to the findings in the CMVSC Report, "This scene photograph depicts the scuff mark of the sideways sliding right front tire of the involved 2000 Honda Civic (Orange Arrow) resulting from forced westerly trajectory of the front of the vehicle along the concrete barrier due to the severity of the barrier impact. The Black Arrow designates the corresponding physical evidence of the left frontal area of the 2000 Honda Civic during impact trajectory in a westerly direction along the concrete barrier to ultimate stopped vehicle location."

"This physical evidence provided the basis for the locations of the two involved vehicles as set forth by this report."

3. "The actual angle of the two stopped vehicles following concrete barrier impact and resulting clockwise rotation of the 2000 Honda Civic, derived from physical evidence and forensic scene mapping, would not have allowed for the impact as provided by the stills of Exhibit O of the Fries report."

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

4. "The report of Mr. Fries provides opinion defying science to the effect that the substantial damage to the outer door panel of the 2013 Ford Taurus was the result of the rearward movement of the 2000 Honda Civic, with the right front of the Honda impacting the opened Ford door. Had this occurred, the opened Ford Taurus door would have merely been slammed shut with minimal damage. The least path of resistance is that of closing the door, as opposed to the amount of energy required to result in the extent of damage sustained by the door skin high strength steel. (It is that of Conservation of Energy Principles)."

5. "The report of Mr. Fries does not account for the severing of the right exterior mirror of the 2000 Honda Civic and resulting final rest location of the component, nor the physical evidence of damage at the left outer front door handle of the 2013 Ford Taurus."

6. "The report of Mr. Fries does not account for the physical evidence of scuffing/transfer at the left rear exterior front door area of the involved 2013 Ford Taurus."

7. "The report of Mr. Fries does not account for the physical evidence of scuffing/transfer at the left rear door exterior area of the involved 2013 Ford Taurus, nor the abrasion wear of the right side molding of the 2000 Honda Civic."

8. "The report of Mr. Fries does not account for the physical evidence of scuffing/transfer at the left rear upper dog leg area of the involved 2013 Ford Taurus."

9. "The report of Mr. Fries does not account for the physical evidence of scuffing at the left rear lower front fender area of the involved 2013 Ford Taurus, nor the scuffing/transfer at the right side front bumper cover of the 2000 Honda Civic."

10. "The report of Mr. Fries erroneously concludes that Sergeant French could not open the driver door of the Ford Taurus due to the Honda presence, supported by Ford Taurus door damage. As previously cited the positioning of the vehicles, based upon physical evidence, would not have allowed for such close contact. Indeed, the left front door of the Ford Taurus proved difficult to open due to the exterior door handle and rear door damage at latch."

The CMVSC Report concluded the following as it relates to Scenario #2: "This described scenario is unsupported and contradicts physical evidence, vehicular trajectory, and science."

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

Scenario #3

"The Troy Police Department 2013 Ford Taurus operated by Troy Police Sergeant Randall French overtakes the fleeing 2000 Honda Civic operated by Edson Thevenin, with Honda operator Thevenin then initiating aggressive actions to purposely impact the Troy Police Department vehicle."

The CMVSC Report details the following facts for consideration as they relate to Scenario #3:

1. "Digital microscopic analyses of the damage sustained to the right side of the 2000 Honda Civic and the left side of the 2013 Ford Taurus reveal that the damage was caused by the faster moving Ford Taurus. Usual and customary aggressive actions are not that of the operator of the slower moving vehicle in such situations."

2. "The final rest location of the severed right exterior mirror of the 2000 Honda Civic is that of the left, westerly lane of travel for Alternate Route 7 (Collar City Bridge). Had the 2000 Honda Civic operated by Edson Thevenin been the right swerve aggressor for the full sideswipe contact with the 2013 Ford Taurus, the trajectory of the detached mirror would result in final component rest location on the right side of the highway."

3. "Had the 2000 Honda Civic operated by Edson Thevenin been the right swerve aggressor for the full sideswipe contact with the 2013 Ford Taurus, there would be no reason for operator Thevenin to suddenly initiate a harsh left turn maneuver and violently impact the concrete barrier."

4. "Had the 2000 Honda Civic operated by Edson Thevenin been the right swerve aggressor for the full sideswipe contact with the 2013 Ford Taurus, the violent event would have indeed proven emotionally stunning for Troy Police Sergeant Randall French, operating the 2013 Ford Taurus. However, there was no contemporaneous radio transmission by Sergeant French to that effect; nor have there been any subsequent statements by Sergeant French to that effect."

The CMVSC Report concluded the following as it relates to Scenario #3: "This described scenario is unsupported by physical evidence, vehicular trajectory, and human statements."

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

Scenario #4

"The Troy Police Department 2013 Ford Taurus operated by Troy Police Sergeant Randall French overtakes the fleeing 2000 Honda Civic operated by Edson Thevenin, with Ford Taurus operator Sergeant French then initiating aggressive actions to purposely impact the 2000 Honda Civic operated by Edson Thevenin."

The CMVSC Report details the following facts for consideration as they relate to Scenario #4:

1. "The above scenario is forensically scientific and consistent with the *Vehicle Damage Analysis* and *Vehicle Damage Matchup* as provided by previous sections of this expert report."

2. "The kinetic energy of the 2013 Ford Taurus operated by Troy Police Sergeant Randall French significantly exceeded the kinetic energy of the 2000 Honda Civic operated by Edson Thevenin, with the weight of the Ford Taurus of 3850 lbs. (without operator) compared to the weight of the 2000 Honda Civic of 2441 lbs. (without operator)."



According to the findings in the CMVSC Report, "This photograph, representing the sideswipe impact of the two involved vehicles at the approximate moment of Ford Taurus left front door/Honda Civic right front fender contact damage matchup, depicts the comparison of the overall size of the 2013 Ford Taurus (left) and the 2000 Honda Civic (right). Digital scale weighing of the two vehicles revealed that the 2013 Ford Taurus weighed some 1409 lbs. more than the 2000 Honda Civic (without operators)."

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

3. "The proximity of the 2013 Ford Taurus and the 2000 Honda Civic at the concrete barrier location is consistent with Troy Police Sergeant French providing left turn steering input while operating the vehicle on the right side of the Honda Civic."

4. "The sudden and significant left turn input by 2000 Honda Civic operator Edson Thevenin, which resulted in violent concrete barrier impact with no evidence of braking, is consistent with operator actions responding to the forceful left movement of the vehicle due to contact by a larger vehicle."

5. "The final rest location of the right outside mirror of the 2000 Honda Civic, with physical evidence of forceful severing due to impact by the left front outside door handle of the faster moving 2013 Ford Taurus, is that of a trajectory consistent with the Honda Civic having been impacted in a full sideswipe maneuver as the Honda was operated in a westerly direction on Alternate Route 7 (Collar City Bridge)."

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY





According to the findings in the CMVSC Report, "These photographs taken at the scene of the event of April 17, 2016 on Alternate Route 7 (Collar City Bridge) in Troy, New York, depict the final rest location of the severed right exterior mirror of the involved 2000 Honda Civic operated by Edson Thevenin. There was no evidence that the mirror had been impacted by a vehicle tire; thus consistent with the trajectory from impact by the left exterior door handle of the 2013 Ford Taurus. The Red Arrow denotes the previously referenced Honda right front tire scuff mark."

The CMVSC Report concluded the following as it relates to Scenario #4: "This described scenario is consistent with, and supported by physical evidence, vehicular trajectory, and forensic science."

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY



According to the findings in the CMVSC Report, "This 3D Forensic Still Image, created by and through 1) Physical evidence; 2) Scene mapping data; 3) Vehicle turning radius data; 4) Vehicle dimensions, and 5) Forensic science, depicts a scientifically supported scenario with respect to the sideswipe collision of the 2013 Ford Taurus operated by Troy Police Sergeant Randall French and the 2000 Honda Civic operated by Edson Thevenin. The actual location of impact, vehicle turning radii, and u-turn locations cannot be succinctly established."

"Note: the trajectory of the right exterior mirror of the 2000 Honda from forceful separation of sideswipe contact to the known location of final rest."

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

Lastly, the CMVSC Report indicates the following in the *Conclusion/Opinion/Summary* section:

"The forensic vehicle autopsy procedures, vehicle damage forensic analyses, and related crash reconstruction analyses with respect to the events of April 17, 2016 at Alternate Route 7 (Collar City Bridge) in Troy, New York reveal the following conclusions."

1. "The forensic vehicle autopsy of the 2000 Honda Civic EX operated by Edson Thevenin revealed absolutely no motor vehicle mechanical, electrical, or computer control deficiencies existing prior to, or at the time of impact with the concrete barrier of Alternate Route 7 (Collar City Bridge) which would have contributed to the cause of the vehicle dynamics or impact. This forensic investigation and analysis divulged evidence of a vehicle which was, prior to crash damage resulting from the violent impact with the concrete barrier, unequivocally capable of proper operation steering, and stopping maneuvers."

2. "The post impact acceleration analysis of the 2000 Honda Civic operated by Edson Thevenin revealed that the vehicle was capable of forward and rearward movement under engine power. However, due to the substantially increased rolling resistance friction resulting from the significant front tire toe out condition sustained during concrete barrier impact, greatly increased accelerator input for such operation was required. Additionally, the front tire toe-out condition resulted in notably reduced turning radii of the vehicle."

3. "Forensic analysis of scene physical evidence as well as the physical evidence of the 2013 Ford Taurus and 2000 Honda Civic revealed compelling substantiation of full, forceful vehicular sideswipe impact -- consistent with the 2013 Ford Taurus operated by Troy Police Sergeant French overtaking and impacting the 2000 Honda Civic operated by Edson Thevenin."

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

Also, Sergeant French describes the moments just prior to the crash with Thevenin, along with the moments after discharging his (Sergeant French's) first two shots with great clarity and conviction but provides several mendacious statements (See **Allegation #4**) related to multiple critical factors surrounding the discharging of the first two shots. Sergeant French's false statements cause disquiet because they're all interconnected as they relate to his (Sergeant French's) justification surrounding the first two shots which occur prior to him (Sergeant French) becoming immobilized between the vehicles.

Research has indicated that a portion of officers involved in OIS may have varying degrees of perceptual or memory distortion. These distortions may result in an officer believing he/she was standing in a location they weren't or inaccuracies as they relate to the number of rounds that were discharged. The research assists in understanding the causes for such distortions.

Moreover, research has indicated, when an officer is placed in a life-threatening situation, it creates a vivid recollection of the threat which offers a more intense recall of that segment, not less. Based on the ISB investigation, Sergeant French's responses are contradictory to such research.

Although Thevenin's actions should bear a certain level of culpability in this matter, Sergeant French engaged in several reckless acts which placed him (Sergeant French) and Thevenin in a precarious position which greatly contributed to the outcome in this matter. For example:

- Sergeant French initiated an unauthorized crash (as described in the CMVSC Report) and forced Thevenin's vehicle to strike the concrete barrier. This act by Sergeant French was an unjustifiable act of deadly physical force according to Article 35 of the NYS Penal Law. Specifically, "physical force which, under the circumstances in which it is used is readily capable of causing death or other serious physical injury." Furthermore, "When justification is in issue, the trier of fact must first determine whether the defendant was the initial aggressor. If the answer to this question is yes, the justification is generally not available to the defendant" See People v. Petty, 7 N.Y. 3d 277 (2006).

- At the conclusion of the initiated unauthorized crash, Sergeant French angled his vehicle in a position that virtually eliminated any chance for him (Sergeant French) or Thevenin to safely egress.

- Upon exiting his (Sergeant French's) vehicle, Sergeant French intentionally placed himself in the direct path of Thevenin's vehicle.

These reckless actions by Sergeant French dramatically increased the likelihood of a violent confrontation with Thevenin and are diametrically opposite the training provided to TPD members. In summary, Sergeant French is principally responsible for this outcome.

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

These actions, along with Sergeant French's empirically untruthful statements (See **Allegation #4**) are of noteworthy significance as they relate to Sergeant French's justification, or lack thereof.

Information tending to refute **Allegation #1**

Testimony of Sergeant French

Findings for **Allegation #1**

I respectfully submit **Allegation #1** be deemed **SUSTAINED.**

ATTORNEYS' EYES ONLY

**Allegation #2-Was the deadly physical force against Thevenin upon Sergeant French becoming immobilized between the two vehicles justified under provisions of the New York State Penal Law, the United States Constitution and the Troy Police Department's General Orders?**

Information tending to support **Allegation #2**

As described in **Allegation #1**, Sergeant French engaged in several reckless acts which dramatically increased the likelihood of a violent confrontation with Thevenin upon Sergeant French's exit from his police vehicle. As a result of Sergeant French's lack of justification under those circumstances, Sergeant French is equally responsible for the circumstances which led to the discharges that occurred while he (Sergeant French) was immobilized between the vehicles.

Information tending to refute **Allegation #2**

Testimony of Sergeant French

Findings for **Allegation #2**

I respectfully request **Allegation #2** be deemed **SUSTAINED.**

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

**Allegation #3-Was Sergeant French's initiated crash into Thevenin's vehicle justified under provisions of the New York State Penal Law, the United States Constitution and the Troy Police Department's General Orders?**

Information tending to support **Allegation #3**

According to the CMVSC Report, Sergeant French initiated an unauthorized crash into Thevenin's vehicle which was the crucial cause of Thevenin striking the concrete barrier.

Information tending to refute **Allegation #3**

Testimony of Sergeant French.

Findings for **Allegation #3**

I respectfully request **Allegation #3** be deemed **SUSTAINED.**

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

**Allegation #4-Did Sergeant French provide false testimony during his Inspectional Services Bureau (ISB) interviews?**

Information tending to support **Allegation #4**

For purposes of brevity, I submit the following:

1. During Sergeant French's May 10, 2018 ISB interview, Sergeant French failed to inform the ISB that he (Sergeant French) initiated a crash into Thevenin's vehicle which was the crucial cause of Thevenin striking the concrete barrier.

   Furthermore, during Sergeant French's June 6, 2018 ISB interview he stated the following as it relates to his (Sergeant French's) location relative to Thevenin when he (Thevenin) crashed into the concrete barrier; "When he [Thevenin] made the U-turn I lost sight of him…uh…I was maybe four car lengths behind him [Thevenin] approximately based on the cars that were stopped. When I made the U-turn onto the bridge myself he had already crashed. I didn't actually see him collide with the side…I lost sight of him…the next time I saw him again he was crashed."

   Lastly, in addition to the findings in the CMVSC Report, Sergeant French's testimony is refuted by Captain Montanino as it relates to this portion of events. Specifically, Captain Montanino stated upon his (Captain Montanino's) completing the U-turn onto Alternate Route 7, Thevenin had already struck the concrete barrier on the south side of the roadway. The ISB asked Captain Montanino if he recalled the location of Sergeant French's vehicle at this time and he stated, "In the right lane… uh…almost up to the vehicle or alongside…I don't exactly recall." Captain Montanino stated, "And then Sergeant French's vehicle pulled around to the front side of Mr. Thevenin's vehicle and angled…uh…as to uh…being on an angle to the south barrier as well."

2. Sergeant French stated just prior to exiting his police vehicle, he observed, "Captain Montanino at the driver's window of Mr. Thevenin's car with gun pointed at him [Thevenin] yelling at him [Thevenin] and I don't know what he [Captain Montanino] was yelling." Sergeant French's description as it relates to this segment of events is contradicted by the testimony of Captain Montanino. Specifically, Captain Montanino stated, "I did not place my weapon in my hand until that point when I heard gunshots." In other words, Captain Montanino didn't remove his weapon from his holster until the conclusion of Sergeant French discharging the first two shots.

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

3.  Sergeant French stated upon exiting his police vehicle to confront
    Thevenin, he didn't feel the circumstances warranted the drawing of his
    firearm. Specifically, "No. I didn't think I needed it. I remember Captain
    Montanino had his pistol out and I was thinking why…I don't know why
    he has his [Captain Montanino's] gun out." Sergeant French also stated,
    "My mindset at that point was to prevent a pursuit from happening. I
    wanted to have my hands available in case I had to break a car window out
    or get a door open. I did not view that set of circumstances that was
    presented that night…I did not feel the need to draw my gun." Lastly,
    Sergeant French stated he intended to, "Cut in front of Thevenin's car so I
    could get to the passenger side, get in and try to get his [Thevenin's]
    keys…put the car in park."

    This response is confounding for several reasons: Sergeant French stated
    Thevenin demonstrated several indicators of intoxication during the motor
    vehicle stop, resisted arrest, didn't respond to either of two OC
    exposures, drove forward while Sergeant French was leaning inside of
    Thevenin's vehicle and proceeded to flee from Sergeant French. This set
    of circumstances is replete with concern as it relates to an officer's
    personal safety, the safety of other officers and the community as a whole.
    In fact, an officer would be justly scrutinized for not removing his/her
    firearm from the holster under these circumstances.

    Furthermore, Sergeant French stated he wanted to maintain both hands
    available in case he had to "break a car window out," "get a door open," or
    "get to the passenger side, get in and try to get his [Thevenin's]
    keys…..put the car in park." All of these choices are extremely dangerous
    and are divergent to the training TPD officers receive in these types of
    situations. Also, Sergeant French is a 10-year member of the department's
    Emergency Response Team (ERT) and a firearm's instructor. As such, he
    (Sergeant French) has received extensive specialized training as it relates
    to countless tactical situations. It is inconceivable that Sergeant French
    would consider attempting to engage in any of these described actions
    based on his training, along with his (Sergeant French's) described
    interactions with Thevenin.

    Lastly, this narrative is refuted by witness testimony. Specifically,
    Captain Montanino, Millington and Gross stated that Sergeant French
    discharged an unknown amount of rounds prior to becoming immobilized.
    This information, along with the physical evidence plainly indicate
    Sergeant French drew and shot his weapon prior to becoming immobilized
    between the two vehicles.

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

4.  Sergeant French stated after becoming immobilized between the two vehicles but prior to shooting into the windshield he (Sergeant French) attempted to remove himself by pushing with both hands against Thevenin's hood (with weapon holstered) but was unsuccessful. Sergeant French stated as a result of his inability to free himself, he drew his firearm and shot into the windshield of Thevenin's vehicle.

This narrative is contradicted for the same reasons described in #3 above.

(Note: I attempted to obtain the April 22, 2016 Sergeant French Grand Jury testimony but was informed by Corporation Counsel James Caruso that United States Magistrate Judge Daniel J. Stewart, who is presiding over the civil matter, has only authorized counsel for the City, FitzGerald Morris Baker Firth, P.C. and Thevenin's attorney, Hach & Rose L.L.P. to review same).

Information tending to refute **Allegation #4**

Testimony of Sergeant French

Findings for **Allegation #4**

I respectfully request **Allegation #4** be deemed **SUSTAINED.**

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

**Allegation #5-Was the physical force utilized by PO Dean against Thevenin justified under provisions of the New York State Penal Law, the United States Constitution, and the Troy Police Department's General Orders?**

Information tending to support **Allegation #5**

Upon PO Dean's arrival to Alternate Route 7 west of Eighth Street he observed Sergeant French immobilized between two vehicles. As a result, PO Dean ran to Thevenin's driver door and while doing so, he observed Thevenin lying on the ground with his (Thevenin's) "right hand reaching around the pants of Captain Montanino." PO Dean was uncertain of the circumstances surrounding this situation or Thevenin's threat level at that time. As a result, PO Dean struck Thevenin once in the torso area with his (PO Dean's) baton resulting in Thevenin dropping his hand.

Information tending to refute **Allegation #5:**

None

Findings for **Allegation #5**

I respectfully submit **Allegation #5** be deemed **EXONERATED.**

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

# PART II

ATTORNEYS' EYES ONLY

## *Analysis of the TPD Investigation in Contrast to the OAG Report*

The OAG Report criticized several aspects of the TPD investigation and recommended changes related to the manner in which the TPD executes OIS investigations. This section will provide context and background to clarify and/or dispute specific items in the OAG Report.

### *ISSUE #1*

**The OAG Report alleges the TPD prejudged the outcome of the OIS investigation prior to gathering significant evidence.**

The ISB investigation reviewed the actions of the TPD and the OAG as it relates to this issue. The ISB findings are as follows:

### *TPD Personnel*

- Countless critical portions of information should have been established prior to Chief Tedesco's (Ret.) April 18, 2016 public comments related to the fact pattern surrounding the death of Thevenin and/or actions of Sergeant French. In fact, the ISB Captain recommended Chief Tedesco (Ret.) refrain from any such comments prior to said press conference.

- On April 23, 2018, the ISB conducted a recorded interview of Captain White (who was a co-lead investigator and sergeant in April 2016. As such, he will be referenced as Sergeant White throughout the remainder of this report.) who stated the following as it relates to prejudging the investigation: Sergeant White defended his April 21, 2016 follow-up narrative report which justified the actions of Sergeant French based on the April 17, 2016 deposition of Captain Montanino, the April 17, 2016 deposition of Gross, the cellular phone video provided by Gross, the April 21, 2016 interview of Sergeant French and the "layout of vehicles." Sergeant White stated, "Those are the factors I felt were leaning toward the justification of Sergeant French's actions."

  To the contrary, Captain Montanino's April 17, 2016 deposition indicates that Sergeant French fired from a single unknown position, Gross' April 17, 2016 deposition provides no insight as it relates to Sergeant French's justification, Gross' cellular phone video begins at the conclusion of the shooting and Sergeant French's April 21, 2016 narrative directly contradicts the bullet hollows in Thevenin's windshield.

ATTORNEYS' EYES ONLY

Furthermore, during the summer of 2016, Sergeant White, Sergeant Bornt (Ret.) and the ISB Captain were in the police garage discussing this matter while viewing the windshield of Thevenin's vehicle. Sergeant Bornt (Ret.) was steadfast that Sergeant French fired from one position (immobilized) and Sergeant White noted it was plausible that Sergeant French may have discharged all bullets from an immobilized position due to the uncertain angle of Thevenin's windshield during the time Sergeant French was firing.

- During conversations between the ISB Captain and Chief Tedesco (Ret.), AC George VanBramer (Ret.), Captain Richard Sprague (Ret.), Sergeant White and Sergeant Bornt (Ret.) during 2016 and 2017, they affirmed Sergeant French's description as it relates to his (Sergeant French's) location upon discharging his weapon (immobilized position).

- On April 17, 2016, Sergeant Bornt (Ret.) completed a Search Warrant Affidavit requesting authorization to search Thevenin's vehicle based on an assault against Sergeant French. As stated above, there were countless critical unknowns at this time in the investigation, along with the inability to charge Thevenin with any offense due to his (Thevenin's) death. At that time, the foundation of the affidavit should have been based on obtaining information as it related to a death investigation not an assault against Sergeant French. Additionally, on April 23, 2018, the ISB conducted a recorded interview of Sergeant White where he stated he wasn't certain a search warrant could be acquired based on the actions of a deceased person.

## *OAG Personnel*

The OAG didn't interview any members of the TPD during the compiling of information as it related to their report which contributed to several inaccuracies regarding the conduct of many TPD members.

## *ISB Conclusions for ISSUE #1*

The ISB investigation determined several TPD command officers, specific TPD detectives and specific OAG personnel engaged in prejudiced activities which impaired both investigations.

ATTORNEYS' EYES ONLY

*ISSUE #2*

**The OAG Report alleges the TPD grossly mishandled three civilian witnesses.**

The ISB investigation reviewed the actions of the TPD and the OAG as it relates to the handling of witnesses Phillip Gross, Keith Millington and Vincent Laware. The ISB findings are as follows:

*TPD Personnel*

WITNESS PHILIP GROSS

- The April 17, 2016 deposition of Gross (taken by Sergeants White & Bornt) was void of critical information as it related to the actions of Sergeant French and Thevenin. For example: What was the positioning of Sergeant French in relation to Thevenin's vehicle at the time of the shooting? What motion, if any, was Thevenin's vehicle moving at the time of the shooting? Was Sergeant French immobilized when he initiated the firing of his weapon? None of this indispensable information was asked or documented.

  On April 23, 2018, the ISB conducted a recorded interview of Sergeant White who stated the following as it relates to the April 17, 2016 Gross deposition: Sergeant White stated Gross was "vague" when responding to his (Sergeant White's) questions but Sergeant White didn't recall the specific questions he asked Gross. In contrast, Sergeant White stated Gross wasn't evasive and willingly spoke about any topic Sergeant White raised. Furthermore, Sergeant White stated that Gross wanted to speak to the TPD regarding this matter because, "It was the right thing to do." Finally, when asked if he would modify anything if given another opportunity to interview Gross, Sergeant White stated, "I don't think so."

  On April 24, 2018, the ISB conducted a recorded interview of Captain Sprague (Ret.) who stated the following as it relates to the April 17, 2016 Gross deposition: Captain Sprague (Ret.) stated that in general a deposition consists of asking open-ended questions while not providing the witness with any information as it relates to police evidence and allowing the witness to answer. Captain Sprague (Ret.) stated he didn't recall reviewing the Gross deposition on April 17, 2016 but "probably did." Lastly, Captain Sprague stated, "He found nothing wrong with the [Gross] statement."

  Although the practice of asking witnesses open-ended questions is generally accurate, it's central to understand that when a witness is cooperative (as Sergeant White described Gross) the questions should become more narrow in scope in an attempt to clarify any broad statements which are made. Sergeants White and Bornt (Ret.) failed to utilize this practice during their April 17, 2016 Gross interview.

ATTORNEYS' EYES ONLY

### WITNESSES KEITH MILLINGTON & VINCENT LAWARE

- The OAG Report alleged that upon arrival to the OIS scene, a TPD officer stated, "Get the fuck out of here" to Millington and Laware which resulted in the TPD's inability to properly evaluate them contemporaneous to the event. The ISB investigation determined that PO Daurio did make the statement to Millington and Laware but it was during his (PO Daurio's) immediate arrival to the scene which PO Daurio noted as unsecure and chaotic. PO Daurio stated one of his primary responsibilities was to ensure the scene was secure and wasn't certain what, if anything, Millington and Laware observed regarding the OIS. Although PO Daurio's actions weren't ideal, his justification is plausible.

- Millington left a message on the detective bureau voicemail on approximately May 2, 2016 stating he wished to speak to a detective regarding the OIS. (Note: Until this date, the TPD were unaware that Millington and Laware witnessed the OIS based on the information described in the above bullet point). Upon contact by Sergeant Bornt (Ret.), Millington's attorney stated the OAG was scheduled to interview Millington on May 3, 2016. By this time, the OAG had seized control of the investigation and they precluded the TPD from speaking to Millington.

#### *OAG Personnel*

- During Laware's ISB interview, he indicated that several critical statements that were documented in his May 3, 2016 OAG deposition were wrongly attributed to him. (See ISB narrative of Laware in Part I page 8)

#### *ISB Conclusions for ISSUE #2*

The ISB investigation determined specific TPD detectives were inadequate in their handling of witness Gross and the Detective Bureau Captain provided inadequate oversight as it relates to same. The ISB investigation determined no member of the TPD was inadequate in their handling of Millington or Laware.

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

*ISSUE #3*

**The OAG alleged the TPD didn't properly evaluate/analyze evidence.**

The ISB investigation reviewed the actions of the TPD and the OAG as it relates to the evaluating/analyzing of evidence related to this matter. The ISB findings are as follows:

*TPD Personnel*

- Even without Sergeant French's narrative, the windshield of Thevenin's vehicle should have raised questions regarding the shooting position(s) of Sergeant French. Specifically, even to an untrained eye, the bullet hollows indicate the two projectiles which entered the driver side portion of Thevenin's windshield were discharged from a different angle than the remaining six rounds which entered through the passenger side area of the windshield.

  On April 23, 2018, the ISB conducted a recorded interview of Sergeant White who stated the following as it relates to his evaluation of Thevenin's windshield: Sergeant White stated he didn't consider that Sergeant French may have shot from two positions even though Thevenin's windshield clearly indicated otherwise (as described above) because of Captain Montanino's April 17, 2016 deposition, Gross' April 17, 2016 deposition and the cellular phone video provided by Gross. It wasn't until he (Sergeant White) interviewed Sergeant French on April 21, 2016 that Sergeant White considered the possibility that Sergeant French may have discharged his (Sergeant French's) weapon from two different positions. This reasoning is confounding for the following reasons: Captain Montanino's April 17, 2016 deposition indicated Sergeant French shot from one shooting position, Gross' April 17, 2016 deposition gave no indication of Sergeant French's shooting position and Gross' cellular phone video begins after the shooting concludes. Sergeant French's narrative wasn't essential for considering the likelihood of two shooting positions, a visual evaluation of the windshield would have sufficed.

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

On April 24, 2018, the ISB conducted a recorded interview of Captain Sprague (Ret.) who stated the following as it relates to his evaluation of Thevenin's windshield: Captain Sprague (Ret.) stated he considered that Sergeant French fired from two different positions from the "onset" of the investigation. Captain Sprague stated it appeared the first two shots were fired from straight on while the remaining shots were fired from a position more indicative of Sergeant French lying on the hood of Thevenin's vehicle (immobilized). When asked if he shared his views with Sergeants White and Bornt (Ret.), Captain Sprague stated he didn't remember but he was certain they (Sergeants White and Bornt) "noted it." Furthermore, when the ISB Captain informed Captain Sprague that Sergeant White and Sergeant Bornt (Ret.) arrived at a different conclusion than he did as it related to Sergeant French's shooting position(s), Captain Sprague stated in sum and substance that Sergeants White and Bornt (Ret.) have the right to interpret the information differently.

To the contrary, during several conversations the ISB Captain had with Captain Sprague (Ret.), he affirmed Sergeant French's account as it relates to firing all rounds from an immobilized position. The first time the ISB Captain recalls Captain Sprague (Ret.) describing that Sergeant French fired from two shooting positions was approximately January 2018.

- Additionally, neither Sergeant White nor Sergeant Bornt (Ret.) conducted a final walkthrough of the incident location (Alternate Route 7 west of Eighth Street). Sergeant White stated he was informed that Sergeant Adam Mason (ET Coordinator) was in charge of the evidence technicians and therefore, Sergeant White "deferred" to Sergeant Mason's expertise. Sergeant White's reasoning is disconcerting because the final walkthrough is of paramount importance as it relates to detectives obtaining a macro view of the investigation, along with ensuring any evidence the detectives deem critical has been collected.

(Note: On January 16, 2018, AC George VanBramer (Ret.), AC Brian Owens, Captain Daniel Dewolf, Mayor Patrick Madden, Deputy Mayor Monica Kurzejeski, City of Troy Corporation Counsel James Caruso and the ISB Captain met with OAG Chief Investigator Dominick Zarrella, Assistant Chief Investigator John Sullivan and Executive Deputy Attorney General Margaret Garnett, for purposes of discussing the OAG Report. At one point during the meeting, Zarrella stated in sum and substance, the OAG's "First Draft" of the final report was more adverse as it related to alleged inappropriate conduct of certain unnamed TPD members. As a result of this information, on January 24, 2018, the ISB Captain emailed Executive Deputy District Attorney Jennifer Sommers and requested a copy of any OAG Report(s) which may contain information omitted from the final report as they relate to the conduct of TPD members so the ISB could evaluate, what action, if any, is required from an administrative standpoint. Sommers failed to respond to the ISB request).

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

- The OAG condemned the TPD for failing to properly analyze the firearms of Sergeant French and Captain Montanino. Specifically, the TPD failed to confirm Sergeant French was the only police officer who discharged his weapon. To the contrary, the ISB determined the TPD arranged for the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) to conduct such testing prior to the OAG seizing the investigation from the TPD.

- The OAG Report criticized the TPD for failing to conduct a functionality evaluation of Thevenin's vehicle. Specifically, Thevenin's vehicle sustained extensive damage as a result of striking the concrete barrier which should have necessitated specific testing as it related to the vehicle's ability to turn left, right, reverse, accelerate, brake, etc. PO M. Magnetto informed the ISB that upon her assignment of the AI, she planned to complete a functionality test of Thevenin's vehicle but was directed by the OAG to avoid any testing that would require the physical handling of Thevenin's vehicle.

### *OAG Personnel*

Although the OAG criticized the TPD for failing to conduct a functionality evaluation of Thevenin's vehicle as described in the above bullet point, the OAG also failed to conduct such testing during their investigation.

### *ISB Conclusions for ISSUE #3*

Specific TPD detectives and the OAG failed to conduct the required functionality testing of Thevenin's vehicle as described in the above bullet points. Also, the Detective Bureau Captain failed to provide adequate oversight of same.

Moreover, specific TPD detectives and the OAG grossly mishandled the evaluation of the damage sustained to both Sergeant French's vehicle and Thevenin's vehicle. Specifically, the damage sustained to Sergeant French's driver door and the damage sustained to Thevenin's passenger side front fender are indicative of a crash occurring prior to Thevenin striking the concrete barrier. This damage necessitated further inquiry but the TPD and OAG failed to do so during their investigations.

Due to this critical oversight, the ISB directed the completion of the vehicle functionality evaluation and accident reconstruction.

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

*ISSUE #4*

**The OAG Report recommends the TPD alter its policy (General Order 06.02.05 Deadly Physical Force) as it relates to police officers shooting at motor vehicles.**

The ISB findings are as follows:

TPD General Order 06.02.05 (Deadly Physical Force) reads as follows: "Discharging a firearm at a moving vehicle is prohibited unless the officer reasonably believes that the occupant(s) of the vehicle is using or about to use deadly physical force against the officer or another person, and other available options have been exhausted. Officers should note that a motor vehicle presents a formidable shield against most firearms and if the officer disables the operator the vehicle can be expected to continue uncontrolled creating a hazard to officers and the public."

The OAG Report recommends the TPD consider altering General Order 06.02.05 (Deadly Physical Force) to authorize officers to shoot at motor vehicles if, and only if, officers are presented with deadly physical force, other than the moving vehicle.

*ISB Conclusions for ISSUE #4*

In the opinion of the ISB Captain, this recommendation is replete with deficiencies and should not be considered. First, this change would drastically reduce an officer's ability to protect himself/herself and members of the community by dramatically reducing an invaluable force option, under certain, otherwise, justified circumstances. Second, the added dangers to the community which could occur if the dangerous operator of a vehicle wasn't immediately addressed could be catastrophic.

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

*ISSUE #5*

**The OAG recommends the use of body-worn cameras for police officers.**

The ISB findings are as follows:

In approximately 2014, the City of Troy administration and TPD command agreed to purchase dashboard cameras and microphones for TPD officer use but the matter was tabled due to budgetary restrictions. Since then, not only do the budgetary restrictions remain, but also, a collective bargaining element between the Police Benevolent Association, Inc. (PBA) and the City requires resolution prior to implementation of this item.

*ISB Conclusions for ISSUE #5*

Body-worn cameras (or dash cameras in Captain Montanino's or Sergeant French's vehicle) would have assisted in providing further clarity as it relates to some of the circumstances surrounding this incident (See also Part III *ISB Recommendations* page 62).

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

# PART III

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

## *ISB Recommendations*

Based on my review of the TPD OIS investigation, the ISB recommends the following:

1. Provide detective bureau members specific training as it relates to OIS investigations.

   - OIS investigations create a variety of complexities which are unique to most other matters. Specifically, palpable pressure inherent from the community and government officials to quickly provide answers. In addition, there are vast complexities related to OIS investigations such as due process rights of police officers when they are the subject of a criminal investigation, the due process rights of witness police officers and the unique differences between the criminal and administrative investigations. These factors, along with several additional essentials, require specialized training which will greatly assist detectives in similar future matters.

   - In the opinion of the ISB Captain, this investigation was prejudged (as described previously) by several members of both the TPD detective bureau and command staff. These prejudices, along with the vast intricacies related to the involvement of the RCDA's Office created significant disorder which resulted in embarrassment, confusion and added consternation to both the Thevenin and French families.

2. Discontinue the practice of placing docile pressure to release crime scenes prior to the completion of evidence collection/evaluation.

   - This provision isn't specific to OIS but is applicable to all matters which require the complicated responsibility of evidence collection and crime scene preservation. Several of the members the ISB interviewed desribed a sense of pressure to reopen Hoosick Street. Specifically, Captain Sprague (Ret.), Sergeant Mason, PO Marble, and PO Fitch stated that AC VanBramer (Ret.) asked them several times when the scene would be reopened. Captain Sprague (Ret.) and Sergeant Mason stated they felt no discomfort in advising AC VanBramer (Ret.) of the status. PO Marble and PO Fitch stated that AC VanBramer's (Ret.) requests were cumbersome and resulted in pressure to reopen Hoosick Street prior to feeling absolute confidence to do so. These matters are of the utmost sensitivity and the evidence collection process must be handled with great care, perseverance and patience.

61

ATTORNEYS' EYES ONLY

ATTORNEYS' EYES ONLY

3. Provide training as it relates to police officer positioning near motor vehicles.

- Since April 2016, TPD officers have been involved in two situations which resulted in them shooting at the operator of motor vehicles.

  The broader issue should surround an unrelenting quest in creating a police culture of training that consistently reinforces the dangers regarding officer positioning as it relates to vehicles and the perils that can derive therefrom.

4. Install dashboard cameras in TPD vehicles.

- As noted in Part II *Analysis of the TPD Investigation in Contrast to the OAG Report*, body-worn cameras and microphones can't be introduced until collectively bargained but dashboard cameras with microphones don't require the same stipulation. Although not ideal, dashboard cameras would provide at least some level of video and audio as it relates to the interactions between police officers and community members.

In conclusion, a vortex of exceptionally unique circumstances engulfed this matter from its inception. Some of these circumstances were unavoidable but, based on the empirical information obtained during the ISB investigation, many could, and should have been prevented. The vast majority of the deficiencies described in this report were committed by TPD command officers, specific TPD detectives and the OAG. The preponderance of the TPD rank and file assigned to this investigation comported themselves in an objective, professional manner.

The recommendations submitted in Part III will facilitate the TPD in future similar matters which will result in a more positive outcome for the TPD, the City of Troy and the community.

Respectfully submitted,


Captain Joseph L. Centanni
Inspectional Services Bureau

ATTORNEYS' EYES ONLY