**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CINTHIA THEVENIN,

                        Plaintiff,

    - v -                                        Civ. No. 1:16-CV-1115
                                                           (DJS)

CITY OF TROY, *et al.*,

                        Defendants.

**APPEARANCES:**                                    **OF COUNSEL:**

HACH & ROSE, LLP                       MICHAEL A. ROSE, ESQ.
Attorneys for Plaintiff
185 Madison Avenue, 14th Floor
New York, NY 10016

HARFENIST KRAUT &                 STEVEN J. HARFENIST, ESQ.
PERLSTEIN LLP                          NEIL S. TORCZYNER, ESQ.
Attorneys for Plaintiff
3000 Marcus Avenue, Suite 2E1
Lake Success, NY 11042

FITZGERALD MORRIS BAKER        JOHN D. ASPLAND, ESQ.
FIRTH, P.C.                                MICHAEL A. BRANDI, ESQ.
Attorneys for Defendants
16 Pearl Street
P.O. Box 2017
Glens Falls, NY 12801

**DANIEL J. STEWART**
**United States Magistrate Judge**

## MEMORANDUM-DECISION & ORDER

### I. FACTUAL STATEMENT

In the early morning hours of April 17, 2016, Randall French and Edson Thevenin were driving their respective vehicles in the City of Troy. Dkt. No. 101-2, Defendants' Statement of Material Facts ("Defs.' SMF") at ¶¶ 4-9; Dkt. No. 105, Plaintiff's Statement of Material Facts ("Pl.'s

SMF") at ¶¶ 4-9. At that time Defendant French was a Sergeant with the Troy Police Department and Mr. Thevenin was employed by Enterprise Rent-a-Car as an auto technician. *Id.*; Dkt. No. 104-1, Cinthia Thevenin Deposition ("C. Thevenin Dep.") at pp. 13 & 21.[1] At approximately 3:10 a.m., after observing Mr. Thevenin's Honda failing to stay in his lane, Sergeant French pulled Mr. Thevenin over. Defs.' SMF at ¶¶ 14-18; Pl.'s SMF at ¶¶ 14-18. When Sgt. French approached Mr. Thevenin, who was in the driver's seat, he indicated he could smell a strong odor of alcohol. Defs.' SMF at ¶ 21; Pl.'s SMF at ¶ 21. Sgt. French ran the license provided to him, with no issue, and then performed field sobriety tests on Mr. Thevenin. Defs.' SMF at ¶¶ 23 & 26-33; Pl.'s SMF at ¶¶ 23 & 26-33. Again, according to Sgt. French, Mr. Thevenin was cooperative with the testing, but failed the horizontal gaze nystagmus, the walk and turn, and French cut short the one leg stand test on the belief that Mr. Thevenin was going to fall over. *Id.* When asked by Sgt. French, Mr. Thevenin refused to perform an Alco Sensor test, and was then advised that he was under arrest for DWI. Defs.' SMF at ¶ 34.

After the intention to arrest was communicated to Mr. Thevenin, he insisted that he could not be arrested, resisted attempts by the Sergeant to apply handcuffs, escaped to his vehicle where he was pepper sprayed by Sgt. French without effect, and then drove the car away with Sgt. French still halfway in the window. Defs.' SMF at ¶¶ 34-35; Pl.'s SMF at ¶¶ 34-35. After he fell out, Sgt. French went to his own vehicle to begin to pursue Mr. Thevenin through the streets of Troy. Defs.' SMF at ¶¶ 36-39. Sgt. French called in the incident on his police radio.[2] Defs.' SMF at ¶¶ 36-37;

---

[1] Reference is made to the pagination in the transcript of the deposition.

[2] It is unclear whether all the facts that he relayed in this radio call were accurate. Although Sgt. French related on the call that Mr. Thevenin attempted to "run him over," he acknowledged in his Deposition that this was not the case and he is unsure why he said that. Defs.' SMF at ¶¶ 36-37.

Pl.'s SMF at ¶¶ 36-37. Another police officer, Captain Montanino, also participated in the pursuit. Defs.' SMF at ¶ 42; Pl.'s SMF at ¶ 42. Mr. Thevenin ultimately ended up on the Collar City Bridge in Troy, where his vehicle crashed into a concrete barrier. Defs.' SMF at ¶ 44; Pl.'s SMF at ¶ 44.

At this critical point there are four witnesses who individually recount different versions of what happened next:

### A. Defendant Sgt. French

According to Sgt. French, he pulled his vehicle in front of the Thevenin vehicle on the Collar City Bridge, to make sure that it could not drive away. Dkt. No. 101-4, Randall French Deposition ("French Dep.") at p. 154. He thought that his car was positioned a few feet away from the front of the Thevenin vehicle, but when he opened his door, it hit the front of Thevenin's car leading French to believe Plaintiff had moved his car; he had to squeeze out of his vehicle. *Id.* at p. 155. Sgt. French then yelled at Mr. Thevenin to "Stop." *Id*. at p. 158. At the same time he became stuck between the Thevenin vehicle and his patrol car. *Id*. He heard the engine in the Thevenin vehicle "rev," and Sgt. French felt intense pain from the pinning of his leg. *Id*. at pp. 159-160 & 171. He continued to yell at Mr. Thevenin to "Stop" but the Honda continued to accelerate. *Id.* At that point in time, believing that he "was going to die," he shot at the "center mass" of Edson Thevenin. *Id*. at pp. 161-162. Sgt. French then twisted and his body ended up on the hood of the Honda, where he fired again at Mr. Thevenin. *Id*. at pp. 163-164 & 169. Sgt. French indicated that he stopped firing his pistol when the engine of the Thevenin vehicle stopped revving. *Id*. at pp. 169-70. Eight shots were fired, and five struck Mr. Thevenin, causing his death. *Id.* at pp. 180-81; Dkt. No. 101-4, French Dep. Vol. II at p. 242. Sgt. French was then pulled from between the two vehicles with the assistance of Officer Dean, and he was provided medical attention for an injury to his leg. *Id*. at pp.

172-173 & 205; Dkt. No. 101-5, Deposition of David Dean at p. 55.

## B. Capt. Matthew Montanino

Capt. Montanino received Sgt. French's call for assistance in the early morning hours of April 17, 2016 and drove towards French's location to assist with the Thevenin incident and to "call out the pursuit." Dkt. No. 101-5, Deposition of Matthew Montanino ("Montanino Dep.") at pp. 93-97. He saw Mr. Thevenin going eastbound on the westbound lane of Hoosick Street and then turn onto the Collar City Bridge. *Id.* at pp. 99-101. Mr. Thevenin then crashed into the concrete barrier on the bridge and came to a stop. *Id.* at pp. 101-102. Capt. Montanino witnessed Sgt. French pull in front of Mr. Thevenin's vehicle, at an angle, within five feet of that vehicle. *Id.* at pp. 103 & 106-107. Capt. Montanino pulled his vehicle behind Thevenin's Honda, leaving a few feet of distance. *Id.* at p. 107. He then got out of his patrol car and began to approach the Honda. *Id.* at p. 108. He left his weapon holstered. *Id.* He heard Sgt. French yelling "Stop." *Id.* at p. 110. Capt. Montanino recalls the Thevenin engine revving, the tires spinning in reverse, and the vehicle coming backward, ultimately striking his vehicle, causing damage. *Id.* at pp. 111-113. Capt. Montanino had to jump out of the way. *Id.* at p. 113. The Thevenin vehicle then started moving forward at an angle, and Capt. Montanino yelled "Stop, stop." *Id.* at pp. 114 & 118. Sgt. French was at the front passenger side of the Honda. *Id*. at p. 115. At that point in time Montanino heard gunshots. *Id.* at pp. 125-126. Capt. Montanino approached the Honda, which had stopped, at which point time he heard a few more gunshots and saw Sgt. French pinned between the Thevenin vehicle and his parked patrol car, with his upper body on the hood. *Id.* at pp. 121 & 125-129. Capt. Montanino then pulled Mr. Thevenin from his vehicle, onto the roadway. *Id.* at p. 135. According to Capt. Montanino, when he did this the Thevenin vehicle's transmission was in "drive." *Id.* at p. 139.

### C. Keith Millington

Keith Millington testified at his deposition that the vehicle he was driving was stalled on the side of the road, and at that point he was passed by the Thevenin vehicle (a Honda with its lights off) and two marked police cars. Dkt. No. 101-5, Deposition of Keith Millington ("Millington Dep.") at p. 18. The Thevenin vehicle then made a quick U-turn onto the Collar City Bridge. *Id.* The Thevenin vehicle proceeded to hit a concrete wall, and was then blocked in by the two police vehicles. *Id.* at pp. 18, 20, & 21. The officers then got out of their cruisers. *Id.* at p. 24. Mr. Millington heard one or both of the police officers instructing the driver of the Honda to "Stop," but that driver then backed into the police vehicle behind him, and then went forward as if to drive through or around the police vehicle in front of him. *Id.* at pp. 26-30. At that point in time the shooting occurred, and simultaneous with the shooting was the point when the Thevenin vehicle hit Sgt. French. *Id.* at pp. 31-32.

### D. Phillip Gross

Mr. Gross was deposed, and also provided statements to various investigating authorities. Mr. Gross is a private citizen and the owner of Phil's Automotive. Dkt No. 101-6, Deposition of Phillip Gross ("Gross Dep."), at p. 10. He had received a tow call from the State Police that morning and was driving on Route 7 in Troy when he saw police lights and sirens. *Id.* at pp. 11-14 & 17-19. He witnessed a Honda automobile driving approximately twenty miles per hour and turning on to the Collar City Bridge. *Id.* at pp. 18-20. A police vehicle was close behind. *Id.* at p. 19. The police vehicle then "blocked him off" which caused the Honda to be involved in a "light" collision with the barrier, and it was then blocked in by police cars. *Id.* at pp. 20-21. From Mr. Gross's position, fifty feet away from the incident, he observed a police officer get out of his car and then, without

saying anything, fire eight to twelve shots all at once. *Id.* at pp. 21-22 & 37. He testified that at the time of the shooting, the Honda and the police vehicle were approximately four feet apart. *Id.* at p. 24. The Honda was not moving. *Id.* Elsewhere in his deposition, however, Mr. Gross recounted a prior statement that there was also an unmarked police car present, and that the Thevenin vehicle backed up towards that police car, and it was at this time that he heard shots being fired. *Id.* at pp. 57-58. After the shooting, according to Mr. Gross, the vehicle rolled forward, trapping the police officer. *Id.* at pp. 25-26. Mr. Gross then assisted in getting the car off of Sgt. French. *Id.* at p. 28.

## II. PROCEDURAL HISTORY

The parties have engaged in extensive pretrial discovery. Presently before the Court is Defendants' Motion for Summary Judgment. Dkt. No. 101. In making this Motion Defendants present several arguments for the Court's review. First, Defendants argue that the use of force by Defendant Sgt. French was objectively reasonable under the facts of the case, and therefore no constitutional violation is established as a matter of law. Dkt. No. 101-3, Defendants' Memorandum of Law ("Defs.' Mem. of Law") at pp. 9-12. Alternatively, they contend that even if the Court were to conclude that under a certain version of facts the force used was not objectively reasonable, or that material questions regarding the reasonableness of the force used persist, Sgt. French is nevertheless entitled to qualified immunity because he could have reasonably but mistakenly believed that the shooting of Mr. Thevenin was constitutionally permitted. *Id.* at pp. 13-18. Third, Defendants argue that the state law claims for assault and battery and wrongful death are governed by the same standard as the federal claims, and thus suffer from the same defects. *Id.* at pp. 23-25. Finally, Defendants argue that there is no basis for a *Monell* liability claim against the City of Troy. *Id.* at pp. 18-23.

Plaintiff's counsel, for their part, argue that substantial material issues of disputed fact exist regarding the use of force by Defendant French, as well as on the separate and distinct issue of qualified immunity. Dkt. No. 106, Plaintiff's Memorandum of Law ("Pl's Mem. of Law") at pp. 11-20. Therefore, the granting of the Motion in the face of this disputed factual landscape would be inappropriate. *Id*. Plaintiff's counsel agree that the state law claims are generally governed by the federal standard but, for the reasons just stated, assert that such claims should proceed to trial. *Id.* at pp. 24-25; *see also* Dkt. No. 129. As a final matter, however, Plaintiff's counsel agree that there is insufficient evidence of a *Monell* claim against the City of Troy, and therefore do not oppose the dismissal of that particular claim. *Id.* at p. 25.

### III. DISCUSSION

#### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings,*

*Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

This summary judgment standard should be applied with great care in situations where one of the participants to the event has been killed and is therefore unable to provide his or her version of the evidence. As stated by the Second Circuit:

> [G]iven the difficult problem posed by a suit for the use of deadly force, in which "the witness most likely to contradict [the police officer's] story - the person shot dead - is unable to testify[,] . . . the court may not simply accept what may be a self-serving account by the police officer." *Scott v. Henrich*, 39 F.3d at 915. Rather, the court must also consider "circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id.*; *see, e.g., Maravilla v. United States*, 60 F.3d 1230, 1233-34 (7th Cir. 1995) (where "the witness most likely to contradict the officers' testimony is dead," the court should "examine all the evidence to determine whether the officers' story is consistent with other known facts"); *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir.) ("in deadly force cases[,] . . . where the officer defendant is the only witness left alive to testify[,] . . . a court must undertake a fairly critical assessment of," *inter alia*, "the officer's original reports or statements . . . to decide whether the officer's testimony could reasonably be rejected at a trial"), *cert. denied*, 513 U.S. 820, 115 S.Ct. 81, 130 L.Ed.2d 34 (1994).

*O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003).[3]

### B. The Fourth Amendment Reasonableness Standard and Qualified Immunity

With regard to a police officer's use of force, that conduct is governed by the Fourth Amendment to the United States Constitution, with its attendant objective reasonableness standard. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). As a rule, courts do not employ 20/20 hindsight in this analysis, but rather consider the facts presented to the officer immediately prior to and at the time the decision to use force is made. *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996).

The separate and independent doctrine of qualified immunity inserts a second level of reasonableness review when judging a police officer's use of force. To determine whether an official is entitled to qualified immunity, courts first look to whether the plaintiff's allegations, if true, establish a constitutional violation. *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982). Once a constitutional violation is found, or assumed,[4] courts must then decide whether it was "objectively reasonable" for the officer to believe that his or her actions were lawful "in light of the legal rules that were clearly established at the time [action] was taken." *Anderson v. Creighton*, 483 U.S. 635,

---

[3] As to the state law claims, under the *Noseworthy* doctrine a plaintiff in a wrongful death action is not held to as high a degree of proof as a plaintiff in a personal injury action and is entitled to benefit from every favorable inference which can reasonably be drawn from the evidence in determining whether a *prima facie* case has been made out. *Noseworthy v. New York*, 298 N.Y. 76 (1948). "The *Noseworthy* rule does not shift the burden of proof on control, negligence, and causation", instead it "simply describes a method of, or approach to, weighing evidence." N.Y. Pattern Jury Instr., Civil 1:61 (citations omitted).

[4] Following the Supreme Court decision in *Pearson v. Callahan*, 555 U.S. 223, 242 (2009), courts are no longer required to make a "threshold inquiry" as to the violation of a constitutional right in a qualified immunity context, but are free to do so.

638-39 (1987). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

A police officer's use of a weapon, as in this case, is governed by these same legal standards, even where it results in the death of the suspect. In general terms, an officer may use deadly force if he or she "has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985); *see also Graham v. Connor*, 490 U.S. at 396 (to determine whether force used to effect a particular seizure is reasonable, a court must examine "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."). Conversely, "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Tennessee v. Garner*, 471 U.S. at 11. The *Garner* case involved the police shooting of a 15-year-old burglary suspect as he was climbing a fence and attempting to elude the police. *Id.* The Supreme Court concluded that a blanket rule approving of the use of deadly physical force to prevent the escape of *all* felony suspects is constitutionally unreasonable. *Id.* "It is not better that all felony suspects die than that they escape." *Id.* However, where the suspect poses a threat of serious physical harm, and, where feasible, some warning has been given, deadly force may be used in conformity with the Fourth Amendment. *Id.* Further, and as noted above, even in circumstances where the court concludes that there was, or could have been, a Fourth Amendment violation, qualified immunity would apply to a police officer who reasonably but mistakenly believed that the use of deadly physical force was appropriate.

Since *Garner*, the Supreme Court has spoken on several occasions regarding police officers' use of deadly physical force on suspects who are operating a motor vehicle, employing both the Fourth Amendment and the qualified immunity tests. First, in *Brosseau v. Haugen*, the Supreme Court ruled that a police officer did not violate clearly settled Fourth Amendment law when she fired at a fleeing vehicle in order to prevent harm to officers she believed were nearby and to protect other citizens. 543 U.S. 194, 200-201 (2004). In granting summary judgment on the grounds of qualified immunity, the Court concluded that the officer's acts fell in the "hazy border between excessive and acceptable force." *Id.* at 201.

In *Scott v. Harris,* the Court considered whether "a law enforcement official can, consistent with the Fourth Amendment, attempt to stop a fleeing motorist from continuing his public-endangering flight by ramming the motorist's car from behind" even though the officer's actions "place [the] fleeing motorist at risk of serious injury or death." 550 U.S. 372, 374 (2007). In that case, the police chase at issue was videotaped and therefore the case presented no factual dispute at the summary judgment stage. *Id.* at 378. After reviewing the video, the Court readily concluded that, despite the tragic outcome whereby the driver was rendered a quadriplegic, the officer was justified as a matter of law in taking the actions that he did. *Id.* at 386.

Next, in *Plumhoff v. Rickard*, the Supreme Court ruled that the police officers did not violate the Fourth Amendment by using deadly force to terminate a high-speed chase posing a grave public safety risk. 572 U.S. 765, 776-777 (2014). There, the chase had lasted over five minutes with speeds exceeding one hundred miles per hour, the driver's conduct put many others in nearby vehicles at risk, and even though the driver had come to a temporary halt, that did not end the chase because he continued pushing down on the accelerator in an attempt to escape. *Id.* The police were

therefore justified in firing fifteen shots into the vehicle killing the driver. *Id.* at 777. In making this decision, the Court noted that the officers did not need to stop shooting until it was clear to them that the threat to public safety had ended. *Id.*

Finally, in *Mullenix v. Luna*, the police were confronted with a reportedly intoxicated individual engaged in a high-speed flight from the police, who had twice threatened to shoot police officers. 136 S. Ct. 305, 309 (2015). In light of these facts, and the fact that the driver was racing towards a police officer, the Supreme Court concluded that the use of deadly force by the police officer was at least entitled to qualified immunity. *Id.*

### C. Application of These Standards to the Present Case

In the present case Defendant French is correct that, if his version of events is accepted, his use of deadly physical force was constitutionally permissible as a matter of law, or alternatively, that a reasonable police officer could have believed that discharging his weapon in those circumstances was appropriate. Sgt. French maintains that when he made the decision to shoot, he was pinned between two vehicles, in fear for his life, with the Thevenin vehicle pressing forward upon him. It would be hard to imagine a more compelling justification for the use of deadly physical force. The fact that Sgt. French fired multiple rounds at Mr. Thevenin's center mass does not change the analysis, as police officers are justified in continuing to shoot until the danger is abated. *Plumhoff v. Rickard*, 572 U.S. at 777. The fact that Capt. Montanino did not have his weapon out at the time of the incident, while relevant, is also not necessarily determinative, as the critical issue is only the reasonableness of the use of force based upon the facts that were known or reasonably believed by Sgt. French. Capt. Montanino may have been in a different position or perceived different facts. *See Soto v. City of New York*, 283 F. Supp. 3d 135, 142 n. 5 (S.D.N.Y. 2017) ("The fact that the

other officers on the stairway did not fire their weapons does not compel a different conclusion" regarding the reasonableness of the use of force). Moreover, for qualified immunity purposes the question is whether a reasonable police officer could have believed that defendant's action to be lawful, not whether *all* police officers would have drawn the same conclusion. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) ("the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.").

The difficulty with the argument of Defendant French on this Motion, however, is that it assumes the correctness of his factual account. Defs.' Mem. of Law at pp. 1 & 13 ("Sgt. Randall French, in a moment of existential terror, found himself pinned between his squad car and the still accelerating vehicle of Edson Thevenin" and "Based on *these* facts, no reasonable jury could conclude that French's actions constituted excessive force . . .") (emphasis added). At least two witnesses, however, dispute critical facts asserted by the Defendant. While Defendant French testified at his deposition to becoming "immediately stuck between [Thevenin's] car and my car," French Dep. at p. 158, Captain Montanino testified to French moving around the vehicles, Montanino Dep. at p. 115, and Phillip Gross testified that when he initially saw French he was not in contact with Thevenin's vehicle. Gross Dep. at p. 22. Sgt. French becoming immediately pinned by the Thevenin vehicle would also appear to be contrary to Captain Montanino's testimony that the vehicle first proceeded backwards striking his own vehicle[5] *before* moving forward and before he heard gunshots. Montanino Dep. at pp. 112-15, 118, & 125; *see also* Millington Dep. at p. 28 (discussing Thevenin vehicle backing up toward Montanino vehicle). It is similarly contrary to

---

[5] This account that the Thevenin vehicle backed into Montanino's patrol car appears to be corroborated by the damage to the police vehicle. *See* Montanino Dep. at p. 113.

Montanino's testimony which places Sgt. French to the front passenger side of the Thevenin vehicle immediately prior to the shooting, not pinned in front. *Id.* at p. 115.

The clearest dispute of fact is presented by witness Phillip Gross' testimony that he observed Sgt. French get out of his vehicle and, without saying anything and without being pinned, immediately start firing into the Thevenin vehicle. Gross Dep. at pp. 21-22 & 24. Gross alternatively placed the Thevenin vehicle backing away from French when the shots were fired. *Id.* at pp. 57-58. Both versions are distinctly different from the testimony of French, Montanino, and Keith Millington. French Dep. at pp. 161-62 (initial shots fired while pinned by Thevenin vehicle); Montanino Dep. at pp. 125-26 (initial shots fired as car moved forward away from his vehicle); Millington Dep. at p. 31 (shots fired as car moved toward French). Assuming the facts most favorable to Plaintiff places Thevenin's vehicle either stationary or moving away from Sgt. French at the time he discharged his weapon, which would be in stark contradiction to the facts which Sgt. French has supplied as justification for the use of deadly force. While defense counsel notes many inconsistencies in the Gross testimony, that simply presents a credibility question which is not for this Court to resolve on a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."); *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d at 40; *see also Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015) ("summary judgment is proper only when, if all permissible inferences and credibility questions are resolved in favor of the party against whom judgment is sought, there can be but one reasonable conclusion as to the verdict") (internal quotations omitted).

It is clearly settled law that a police officer who, based upon the facts known to him, believes

that a suspect poses a threat of serious physical harm to himself or others is justified in using lethal force. *Tennessee v. Garner*, 471 U.S. at 11. It follows that if a police officer does not have probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others, deadly force is not justified. *Id.*; *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d at 36. Assuming that Sgt. French exited his vehicle and immediately fired into the Honda, which at that time was either stationary, or was slowly moving away from him and therefore did not pose a risk to him, these facts create a question both as to whether the use of force was constitutionally permissible, and secondarily, whether the conduct was protected by qualified immunity. *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d at 39-40.

In this regard this case is factually similar to the Second Circuit decision in *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756 (2d Cir. 2003). In *Cowan*, a police officer had pulled over a vehicle and searched the driver, discovering narcotics. *Id.* at 758. The driver ran off into the woods, and the officer briefly pursued him on foot before returning back to the road where his cruiser was located. *Id.* At this point in time a passenger in the stopped vehicle had moved over to the driver side and started driving the vehicle down the road. *Id.* The officer maintained that he waved at the vehicle to stop, but it did not do so. *Id.* With the car bearing down upon him, and fearing for his safety, he shot twice at the vehicle, killing the driver with the second shot. *Id.* The driver's estate then filed a civil rights complaint. The defendants moved for summary judgment arguing that the use of force by the officer was justified or, alternatively, that the officer was entitled to qualified immunity. *Id.* at 759.

In reviewing the appeal of the District Court's denial of summary judgment, the Second Circuit noted that while the officer "purports to rely only on the undisputed evidence in

demonstrating that there was no constitutional violation . . . , 'his brief on appeal is replete with his own versions of the events.'" *Id.* at 762 (quoting *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d at 38). The appropriate inquiry, however, was to consider the motion upon the facts asserted by the plaintiff as well as all permissible inferences. *Id.* at 763. The plaintiff maintained that the officer was not in danger when he fired the fatal shots, that he may have been as far as eleven feet away from the vehicle at the time of the shooting, that the vehicle may have been moving slowly, and that the vehicle was not "bearing down" on the officer. *Id.* at 759-762.

Accepting the most favorable version of facts, the Second Circuit concluded that the officer was not entitled to judgment as a matter of law on the issue of whether a constitutional violation occurred because that issue "turns on which of two conflicting stories best captures what happened on the street." *Id.* at 763 (quoting *Saucier v. Katz*, 533 U.S. at 216); *accord Marrero v. City of Hartford*, 2017 WL 5484669, at *3 (D. Conn. Nov. 15, 2017), *appeal dismissed sub nom. Marrero for Estate of Morales v. Cote*, 756 Fed. Appx. 79 (2d Cir. 2019) ("Plaintiff's evidence suggests that Cote was not in danger of death or even physical harm when he continued to fire into the rear side of the Honda as it passed him."). Further, the Second Circuit concluded that these same questions of fact existed on the issue of qualified immunity. As a result, the Court determined the qualified immunity issue would need to be resolved after trial, and after a jury answered certain special interrogatories, such as whether the decedent drove her car towards the officer and whether the officer was in the zone of danger or could have safely gotten out of the way. *Id.* at 764.

The case law relied upon by Defendants does not lead to an opposite conclusion. The Second Circuit case of *Costello v. Town of Warwick*, for example, involved a suspect in a vehicle that was stopped by the police and was attempting to get away despite being boxed in and surrounded by

numerous officers, hitting one of the police cars. 273 Fed. Appx. 118, 119 (2d Cir. 2008). The driver was shot and killed. *Id.* In holding that the force used was objectively reasonable, the Court noted that the officer involved had reason to believe that at least one of the his fellow officers was trapped underneath the decedent's car, and that others may have been hurt, and that the decedent would continue to use his car to inflict serious bodily harm on the other arresting officers. *Id.* In the present case, there is a fundamental factual dispute regarding the situation that Sgt. French found himself in when he decided to fire his weapon. Defendant maintains he was trapped between two vehicles and about to die, and there is at least some evidence in the record which disputes the claim. That type of factual dispute was not present in the *Costello* case.

This case is made more complicated by the fact that, in addition to the facts perceived by Sgt. French, a separate set of facts has been testified to by others, particularly by Capt. Montanino. An argument could be made that if the Court were to discard Defendant's testimony and accept the other witnesses' versions of facts, that Sgt. French's use of deadly physical force would still have been justified. Under this theory, Sgt. French could have believed that Mr. Thevenin posed a risk to Montanino by backing his vehicle into that officer's vehicle, while Montanino was in close proximity. However, as noted above "[t]he reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." *Salim v. Proulx*, 93 F.3d at 92. In this case Sgt. French testified at his deposition that he was unaware of the position of the other police car, and he did not perceive that Decedent's vehicle was moving in that direction. Sgt. French testified at his deposition:

> Q. At the time you exited the vehicle was Captain Montanino's already there?
> A. I know he was right behind me in his car, so, yeah, he was there.
> Q. Okay. Did you see Captain Montanino's vehicle when you exited your vehicle?

>    A. I was not looking that way. I was just concentrating on the car, so, no.

French Dep. at p. 158.

>    Q. At any point after you pulled your vehicle in front of Mr. Thevenin's vehicle did you see Mr. Thevenin's vehicle backup?
>    A. No.
>    Q. Did you at the point where you were firing your weapon, did you see whether Captain Montanino's vehicle was in contact with any part of Mr. Thevenin's vehicle?
>    A. I wasn't looking at Captain Montanino's vehicle.
>    Q. I understand that. I just want to know whether you saw it.
>    A. No.

*Id.* at pp. 162-163.

The Court cannot insert facts not known to Defendant in order to justify Defendant's use of force. Rather, the determination whether a reasonable person in the officer's position would have known that his conduct would violate the right at issue must be made on the basis of information actually possessed by the officer at the critical time. *Anderson v. Creighton*, 483 U.S. at 641; *Hunter v. Bryant*, 502 U.S. at 227. As noted above, material questions of fact exist regarding Sgt. French's version of events immediately prior to the shooting, and those facts must be resolved by a jury.

## IV. CONCLUSION

Based upon the foregoing the Court concludes that questions of fact exist which prevent it from granting Defendants' Motion for Summary Judgment on the Fourth Amendment claim, the claim for qualified immunity, and the state law claims.[6] As to the issue of qualified immunity, when the matter proceeds to trial the Court will submit special interrogatories to the jury to be answered by them to assist the Court in deciding qualified immunity, if necessary, once a verdict has been

---

[6] Counsel have submitted additional letter briefs regarding qualified immunity as it relates to the state law claims. Dkt. Nos. 129 & 131. Because questions of fact exist as to the state law claims, summary judgment is inappropriate. *Hansen v. Warren Cty.*, 2019 WL 652235, at *11 (N.D.N.Y. Feb. 15, 2019).

rendered.  With regard to the 42 U.S.C. § 1983 *Monell* claim against the City of Troy, however, that claim is dismissed on consent.

**ACCORDINGLY**, it is hereby

**ORDERED**, that the Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**, and the *Monell* claim against the City of Troy is hereby **DISMISSED**, and all remaining claims shall proceed to trial.

**SO ORDERED**.

Date: September 6, 2019
      Albany, New York

_____
Daniel J. Stewart
U.S. Magistrate Judge